UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | CIVIL ACTION NO. 1:04-CV-10657-DPW |
| Plaintiff, | ) ) ) |  |
| v. | ) ) |  |
| THE BLACK & DECKER CORPORATION, BLACK & DECKER, INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART INDUSTRIES, INC., | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

BLACK & DECKER'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL
CONCERNING THE FORMER WASTE DISPOSAL AREA
AND THE BUILDING 41 AREA AT THE BOSTIK MIDDLETON SITE

INTRODUCTION

Three questions were presented to the jury in the trial concerning the Bostik-Middleton and Whitman sites. This motion concerns the third question (Question B.2), which raised the issue of whether coverage of costs for remediation of Area 5 at Bostik, consisting of the Former Waste Disposal Area ("FWDA") and part of the area upon which Building 41 was constructed, was barred by the owned property exclusion.[1] The jury concluded that Liberty

---

[1] The Verdict containing the jury's answers to the questions is attached as Exhibit A. Excerpts from trial exhibits are attached as Exhibit B. Excerpts from the trial transcript are attached as Exhibit C. References to transcript pages are by day (Roman numeral) and page (Arabic numeral). Excerpts from Black & Decker's Memorandum in Opposition to Motion for Partial Summary Judgment Relating to the Beverly Site, filed on October 6, 2003, are attached as Exhibit D.

Mutual had established that such costs "were not incurred to remedy or prevent migration of contaminants off the Bostik site" (Tr. XV:10 and the Verdict).

As is shown below, the undisputed evidence before the jury mandated the conclusion that the remediation addressed, at least in part, actual and threatened off-site migration of contaminants. While protection of construction workers was a reason for the remediation in Area 5, the undisputed evidence shows that prevention of off-site migration of volatile organic compounds ("VOCs") and polychlorinated biphenyls ("PCBs") was also an important reason. VOCs were in the soil in high concentrations at Area 5 and had reached the groundwater. The undisputed evidence mandated the conclusion that the contaminants would continue to migrate from the soil to the groundwater at Area 5, and, once in the groundwater, would continue to migrate off-site into the Ipswich River. There also was a threat that, as in the past, PCBs in the soil in Area 5 would be carried off-site due to erosion, surface water flow, and, possibly, groundwater flow. The remediation method selected for Area 5 was excavation and removal of contaminated soils. While this method was driven by the high PCB contamination, excavation and removal also remediated the VOCs. Had there been no PCB contamination, VOC remediation would have been required as it was elsewhere on the site.

Since Question B.2 pertained to the owned property exclusion, Liberty Mutual had the burden of proof. (Verdict and Tr. XV:10). See also <u>Hakim</u> v. <u>Massachusetts Insurers' Insolvency Fund</u>, 424 Mass. 275, 283, n. 13, 675 N.E.2d 1161, 1166, n. 13 (1997). It failed to present even a "scintilla" of evidence to show that the sole purpose of the Area 5 remediation was to address on-site contamination which had neither contaminated, nor threatened, third party property. The undisputed evidence pointed in the other direction. Accordingly, Black & Decker renews its motion for judgment as a matter of law concerning the remediation costs incurred in

connection with the FWDA and the land upon which a portion of Building 41 was built. In the alternative, the Court should grant a new trial regarding the applicability of the owned property exclusion to those remediation costs.

As is also discussed, it is indisputable that the groundwater at the FWDA and the Building 41 area was itself contaminated. Black & Decker has previously shown that groundwater is not owned property in Massachusetts. The undisputed contamination of property not owned by Black & Decker entitles Black & Decker to judgment as a matter of law. In the alternative, Black & Decker respectfully requests that the question of public ownership of the groundwater beneath the privately owned surface be certified to the Supreme Judicial Court.

## STATEMENT OF FACTS

### A. Contamination Of FWDA Ground And Surface Water

Undisputed expert testimony and overwhelming analytical data, as set forth in the Phase I through Phase IV reports of GEI Consultants, Inc ("GEI"), describe contamination of ground and surface waters at the FWDA (Exs. BD 98, 101, 104, 122, 129 and 130). The 1988 Phase I Report described the presence of VOCs in FWDA surface and groundwater (Ex. BD 98 at i-ii, 25-26). Groundwater samples from monitoring well MW102 indicated the presence of VOCs (id.). Surface water samples (SW1) adjacent to the FWDA in the Upper Pond indicated the presence of VOCs (id., at 26), consistent with migration of contaminants from the soil and groundwater into the surface waters of the Upper Pond. Additional testing reported in the 1990 Phase II Report confirmed the presence of VOCs in FWDA groundwater and soil (Ex. BD 101 at iv). The source of the contamination was the historic waste disposal and burning (id.).

The Phase II Addendum (Ex. BD 104) described the FWDA as having "extensive PCB, TPH and VOC contamination in soil and ground water" (see, id., at 46, § 6.5 (emphasis

added)). Section 5.5.3 of that report sets forth the results of the groundwater sampling from monitoring wells and test pits (id. at 37). It confirmed that contaminant limits for VOCs and PCBs were exceeded in groundwater in and near the FWDA (id. at 36-37).

Benzene, toluene, trichloroethylene (TCE), xylene and TPH all were found in groundwater (id., at 37). VOCs, including TCE, toluene and benzene, had concentrations in excess of applicable groundwater standards (id., data for MW202, MW405S, MW406S and MW409). James Ash, the current GEI Licensed Site Professional ("LSP") at the site, testified that there were "high concentrations" of "VOCs, such as toluene," in groundwater at the FWDA (Tr. XI:12). These contaminants continued to be present until remediation (BD Ex 129 at 17 (Phase III Report); BD Ex 130 at 7-8 (Phase IV Report)).

As for PCB contamination at the FWDA, concentrations of Aroclor $1248^2$ in FWDA groundwater exceeded permitted groundwater limits (see, Ex. BD 104 at 37, data for MW405 and MW406). PCB contamination in groundwater continued to be present in subsequent years (see Ex. BD 130 at 8).

It is undisputed that PCBs from the FWDA entered the Upper Pond and discharged to the Ipswich River. PCBs migrate primarily through surface water runoff from the land (Tr. X:38), but can also migrate through groundwater in high porosity soils (Tr. X:124). PCBs were directly exposed before the FWDA was reconfigured by the mid-1960s (see Tr. IX:93-94). Exposed PCBs were carried with runoff down the slopes and into the Upper and Lower Ponds, and then to the Ipswich River (Tr. X:38). By 1964, the FWDA was reconfigured and covered with soil and grass (Tr. IX:93-94). After that there was less surface water runoff carrying PCBs into the Upper Pond. However, precipitation percolated through the

---

[2]    Arocolor 124 is the trade name for an oil containing PCBs.

soil, and, where the water encountered PCBs, it carried them on to the Upper Pond (Tr. X:124-25). During the Phase III Site Investigation, such erosion and waste materials were observed on the Upper Pond banks (Ex. BD 129 at 16).

The Phase III Report (Ex. BD 129) evaluated remediation methods. Because PCBs as well as VOCs were present, a different remediation method was chosen (removal of contaminated soils and replacement of those soils with clean fill) than would have been selected if the only contamination had been from VOCs (id., at 56; Tr. XI:12, 115-16). However, Mr. Ash testified that one purpose of the remediation at the FWDA was to prevent future migration of both PCBs and VOCs from the soil in the FWDA into the Upper Pond and Lower Pond, and eventually into the off-site Ipswich River and to prevent, particularly with respect to VOCs, migration from the soil into the groundwater (Tr. XI:10-13, 113-16). Mr. Ash was not contradicted.

The target cleanup level was "selected based on environmental criteria (potential leaching to groundwater)" (Ex. BD 129 at 28). Mr. Ash explained that the FWDA soil contained high VOC and PCB concentrations that threatened groundwater and required remediation (Tr. XI: 115). He termed the "high concentration" of VOCs "an important reason for that remediation [the excavation]" (Tr. XI:12). The VOCs had the potential to migrate in groundwater; VOCs "dissolve readily into groundwater" and in water percolating through contaminated soils (id., at 114). Removal of soils with high PCB concentrations also removed soils with high VOC concentrations (id.). Here, the VOC levels in the soil were sufficiently high that GEI projected that the excavated soil could not be accepted "at a special waste landfill" (Ex. BD 129 at 35). GEI repeatedly stated that it expected the excavation to improve groundwater quality (Ex. BD 129 at 40-44; Tr. XI:46).

### B. Surface Water And Groundwater Migrated From The FWDA To The Ipswich River.

It is undisputed that the contaminants in the groundwater and surface water at the FWDA made their way into the Upper and Lower Ponds leading to the Ipswich River or across the site through underground flow discharging to the Ipswich River.

There was no question concerning the flow of surface water. Liberty Mutual presented no contrary evidence concerning FWDA surface water flow; its expert, Paul Roux, testified that surface water from the nearby Pilot Plant flowed into the Upper Pond and from there to the Ipswich River (Tr. XII:131-32). Margret Hanley, Mr. Ash's predecessor and the original LSP for the Bostik Site, testified that FWDA surface water drained into the Upper Pond, which in turn drained into the Ipswich River (Tr. X:44). Mr. Mansourian testified that surface waters flowed from the Upper Pond into the Lower Pond, down the unnamed stream and into the Ipswich River (Tr. IX:66).

Groundwater near the FWDA migrates off site to the Ipswich River. GEI provided detailed information about groundwater flow in its reports:

> Groundwater flow direction at the Site is predominantly to the north/northeast toward the Ipswich River. Based on historic groundwater and surface water elevation data, the Ipswich River is a point of general groundwater discharge in the vicinity of the Site. Based on data collected during the Phase II CSA, the hydraulic gradient across the Site ranges from approximately 0.014 at Area 5 [the FWDA] to approximately 0.036 at Area 2. Assuming a porosity of 0.25, the groundwater velocity in Area 5 [the FWDA] ranged from approximately 1.2 ft/year to 5.8 ft/year….

(Ex. BD 129 at 6, § 2.2.3; also see Ex. BD 130 at 5, § 2.2.2). GEI used groundwater elevation data from the monitoring wells and recovery wells, collected as part of the site investigations, to develop a groundwater contour map (Ex. BD 101 at 12). That map shows that groundwater flows across the site in a generally north/northeast direction to the Ipswich River (id., Ground

Water Contour Diagram). There was some bending of groundwater direction around the Upper and Lower Ponds (Tr. XI:88); this indicated that there were localized discharges (id., at 12). Groundwater not discharged to the ponds would continue across the site until discharging into the Ipswich River (Ex. BD 129 at 6).

Ms. Hanley confirmed that groundwater generally flows across the site toward the Ipswich River (Tr. X:23-24). She testified that the contaminants from the FWDA migrated off-site; solvent and PCB contamination reached or threatened to reach the Ipswich River (Tr. X:43-44, 52). Near the ponds, groundwater may flow directly into the ponds; again, however, groundwater in the FWDA that discharges to the Upper Pond drains directly to the Ipswich River (id., at 52). The VOCs in groundwater were carried with the groundwater and/or migrated with pond surface water, discharging directly to the Ipswich River (id., at 37-38, 52).

Upper Pond surface water samples adjacent to the FWDA (SW1) indicated the presence of VOCs consistent with migration from the soil and groundwater into the Upper Pond (Ex. BD 98 at 26). Again, it is undisputed that VOCs dissolve readily in water (Tr. XI:115) and that the VOCs in the Upper Pond would follow the drainage route and ultimately discharge off site into the Ipswich River (Tr. X:25).

Waste adjacent to the Upper Pond that contained PCBs was exposed or could be exposed through erosion (id., at 38). Ms. Hanley described sampling data that showed PCB contamination in both the Upper Pond and the Lower Pond (id., at 44). She also testified that the PCBs from the FWDA found their way into the Upper Pond, then into the Lower Pond, then into the cove and, ultimately, into the Ipswich River (id., at 44). The FWDA was a suspected source of PCB contamination already in river sediments (Ex. BD 122 at 10).

Mr. Ash testified that the bulk of the PCB contamination detected in the Ipswich River came from the FWDA because the concentrations and extent of PCB contamination in the FWDA were far greater than that in the soil at other locations (Tr. XI:94). By comparing the quantities, extent and proximity to the water bodies, Mr. Ash concluded that the FWDA contributed a high volume of PCBs to the Upper Pond and Ipswich River (id.).

### C. Mr. Roux' Testimony Did Not Support The Verdict

Liberty Mutual presented no contrary evidence. Its only witness who even referred to the FWDA was Mr. Roux, one of its experts.

Mr. Roux' testimony, based upon his prior deposition, reflects the undisputed fact record:

> Q. Line 17. Did you say, "Yes, I'm sorry, there was contaminated groundwater in Area 5"?
>
> A. Yes.
>
> * * *
>
> Q. Were you asked, "And did the contaminated groundwater in Area 5 flow into the Ipswich River"? Were you asked that question?
>
> A. Yes.
>
> Q. And is this your answer: "I don't know exactly where it went. It would either go into the upper and lower ponds or into the Ipswich River"? Do you remember giving that answer?
>
> A. Yes.
>
> * * *
>
> Q. Could you turn to Page 59. Without belaboring it, did you on Page 59 and 60 say that groundwater flowed into the Ipswich River?
>
> A. Yes.
>
> * * *
>
> Q. Can I ask you to turn to Page 79. Were you asked the question, "What are the contaminants you understood came from direct discharges," at Line 5? Do you see that?

-8-

> A. Yes.
>
> Q. And you said, "Potentially the PCB contamination."
>
> A. Yes.
>
> Q. And if you go over to -- or go back to Page 77. Do you see, Page 17, you were asked, "Surface water was contaminated as a result of the contamination of the groundwater; is that correct?" And you answered, "At least to some extent, yes." Did you say that?
>
> A. Yes.
>
> * * *
>
> Q. And isn't it so that contaminated soil above groundwater will cause contamination to flow into the groundwater?
>
> A. It can, yes.

(Tr. XIII:25-28).

On redirect, Mr. Roux, asserted that the contaminated groundwater at the FWDA did not migrate away from the area (Tr. XIII:31-33). He claimed he based his opinion on the GEI reports, but did not point to any specific sections of those reports (id.). The GEI reports, quoted above, showed that there was groundwater flow across the entire Bostik site, including the FWDA, to the off-site Ipswich River (Ex. BD 129 at 6, § 2.2.3; Ex. BD 130 at 5, § 2.2.2). To the extent that the groundwater from the FWDA did not flow directly into the river, it was diverted into the Upper and Lower Ponds, which discharged into the river (Tr. X:25; Tr. XI:88). It is undisputed that there was contamination in the groundwater at the FWDA (see, e.g., Ex. BD 104 at 36-37, 46). As the documents upon which Mr. Roux relied do not show an absence of actual or threatened contamination from the FWDA, no reasonable jury could find that Liberty Mutual discharged its burden to prove that the remedial costs associated with the FWDA and Building 41 "were not incurred to remedy or prevent migration of contaminants off the Bostik Site."

If Mr. Roux' testimony were read as being simply a denial of "significant" actual or threatened off-site contamination (see Tr. XIII:32-33), that testimony still does not support the jury's verdict. Question B.2 did not ask the jury to weigh the degree of actual or threatened contamination against any standard and Liberty Mutual did not request such a question (Tr. XV:10; see also Tr. XIII of afternoon conference, 3:45 p.m. to 4:24 p.m., at 13-16). Similarly, the jury was not asked to determine whether the actual or threatened off-site contamination exceeded state guidelines. Further, if Liberty Mutual is arguing that the off-site contamination was "insignificant" or below guidelines, it presented no expert testimony or other evidence to show that, if there had been no remediation in Area 5, the off-site contamination from VOCs, PCBs, or both would have <u>remained</u> "insignificant" or below the guidelines set by the state. On the other hand, as shown above, the record was replete with evidence that the badly contaminated soil would have remained a source of continued groundwater and surface water contamination if there had been no excavation or other remediation in Area 5.[3] As noted above, Mr. Roux conceded that such groundwater and surface water from the Bostik site flowed off-site into the Ipswich River.

Mr. Roux also asserted that there was no remediation of groundwater at the FWDA (Tr. XIII:7). Mr. Roux based his opinions upon a review, <u>inter alia</u>, of the GEI reports. Those reports did not support his testimony. GEI's reports expressly required groundwater remediation as part of the overall work at the FWDA. According to the plan for FWDA remediation set forth in the Phase IV Report: "Dewatering effluent will be treated to remove PCBs prior to discharging water to the on-site treatment system, if required. … Water will then be pumped to the on-site treatment system, <u>which will remove VOCs prior to discharging to an on-site leachfield</u>" (Ex. BD 130 at 14, 16 (emphasis added); see also Ex. BD 129 at 34). Thus,

---

3  Also see note 4, <u>infra</u>.

Liberty Mutual cannot rely upon Mr. Roux' testimony regarding groundwater treatment to sustain its burden of showing the applicability of the owned property exclusion.

Finally, Mr. Roux conceded that, where soil was contaminated with solvents, removing the contaminated soil is one method of preventing solvents from reaching the groundwater (Tr. XIII:34). He also conceded that excavation was one of the alternatives available for removing solvents so that they could not migrate (Tr. XIII:34-35). In view of the undisputed evidence regarding the discharge path of groundwater at the site, Mr. Roux essentially conceded the nexus between the remediation and the threat of off-site contamination.

### D.    Building 41 Area Contaminated Or Threatened Contamination Off-Site

The work in the Building 41 area was described by Mr. Ash and the Phase III Report (Ex. BD 129). In the second half of 1997, before Building 41 was built, a portion of the area beneath it, that was part of the FWDA, was the subject of remediation actions (Ex. BD 129 at 15, § 3.5.1; Tr. XI:56). The area was described as one "where volatile organic compounds (VOCs) were detected in soil and buried debris and drums were present" (Ex. BD 129 at 15, § 3.5.1). The excavation removed forty-five decaying barrels and various materials. Id. Some forty tons of materials were removed. Id. These included drums containing contaminants and contaminated soils (Tr. XI:56). After these materials were removed, the remaining materials were sufficiently free of contaminants for reuse as backfill (Ex. BD 129 at 16).

The only evidence presented by Liberty Mutual was a brief restatement by Mr. Roux of information in the Phase III report (Tr. XIII:12-13), followed by a conclusory opinion (id., at 21-22). Mr. Roux did not address what would have occurred if the removed materials had remained in the ground. He provided no testimony concerning whether the materials that were removed included contaminants that were migrating into the groundwater and off-site.

ARGUMENT

A.    Standards For JMOL and New Trial

As stated in Alvarez-Fonesca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 24 (1st Cir. 1998), cert. denied, 526 U.S. 1123 (1999), in affirming the grant of JMOL after trial and a contrary jury verdict, "[a] non-moving party must submit more than a scintilla of evidence as to an issue on which it bears the burden of persuasion in order to resist or reverse the entry of judgment as a matter of law on that issue."  See also Coyante v. Puerto Rico Ports Authority, 105 F.3d 17, 21 (1st Cir. 1997) (cited in Alvarez-Fonesca).  "Thus, in order to support a jury finding on such an issue, the evidence presented must make the existence of the fact to be inferred more probable than its nonexistence."  Alvarez-Fonesca, 152 F.3d at 24.  Coyante, cited in Alvarez-Fonesca, similarly affirmed a grant of JMOL, there at the close of plaintiff's case.  As will be shown, Black & Decker also has met the test for a new trial.  "A verdict may be set aside and a new trial ordered 'when the verdict is against the clear weight of the evidence … or will result in a clear miscarriage of justice.'"  Puerto Rico Aqueduct & Sewer v. Constructora Lluch, Inc., 169 F.3d 68, 77 (lst Cir.), cert. denied, 528 U.S. 872 (1999).

Liberty Mutual bore the burden of proof on Special Question 2-B.  It had to show that the "owned property" exclusion applied.  Liberty Mutual has failed to meet its burden of proof.  The minimal evidence offered by Liberty Mutual did not even constitute a scintilla of evidence to support its claim, much less constitute sufficient evidence to sustain the jury verdict.

The bare assertion by Mr. Roux that contaminated groundwater did not migrate away from the FWDA was unsupported by the evidence.  As quoted above, GEI measured and reported the actual groundwater flow rates at the FWDA (Ex. BD 129 at 6, § 2.2.3; Ex. BD 130 at 5, § 2.2.2).  Mr. Roux relied upon those reports in forming his opinions.  He referred to no

other data used by him in forming his opinions (Tr. XII:121-122). The evidence is undisputed that groundwater at the FWDA was contaminated and that groundwater at the FWDA did flow, like the rest of the groundwater, toward the Ipswich River.

> B.  Black & Decker Is Entitled To Recover For Remediation Of Contamination In The FWDA And Building 41 Areas
>
> 1.  There Was Actual Or Threatened Off-Site Contamination

The issue presented by Special Question B.2 is whether the owned property exclusion applies to the work undertaken to remediate the contamination of the FWDA and the area under Building 41. Black & Decker respectfully submits that the answer by the jury was unsupported by the evidence. Liberty Mutual failed to meet its burden of proof that the owned property exclusion applied.

In its December 5, 2003 Memorandum and Order Regarding Summary Judgment ("December Order"), this Court addressed the questions of coverage where groundwater is contaminated. As this Court stated, it is settled law that if contaminated groundwater actually contaminates adjacent property, the owned property exclusion does not apply to remediation costs, including expenses for on-site remedial activities, if the remediation addresses, in part, present or future off-site contamination. See, December Order at 82. This rule also applies if there is a threat of off-site migration. Id. As this Court has held, Black & Decker is entitled to recover remediation expenses in full even where remediation of the covered contamination also removes other contamination not within the scope of coverage. If actual, or threatened, off-site contamination is one of the drivers behind the costs, then the costs are covered. Liberty Mutual would have been entitled to prevail only if the "costs [were] incurred for the sole purpose of remediating" on-site contamination posing no threat to off-site property. Hakim v.

Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 282, 675 N.E.2d 1161, 1166 (1997); see also Tr. XIV: 14).

Here, it is undisputed that PCBs from the FWDA and Building 41 migrated into the Ipswich River. There was no dispute that erosion ("surface runoff") would carry soils into the ponds, then down the stream and into the Ipswich River. That soil was contaminated with PCBs. Contamination thus migrated off-site and there was a danger of further contamination migrating off-site.

In addition to the PCBs migrating off-site due to erosion, the VOCs in the soil at the FWDA and Building 41 were a source of surface water and groundwater contamination. As was undisputed, groundwater flowed across the Bostik property, toward the Ipswich River. The sole exception was that some surface water may have flowed into the Upper and Lower ponds, but that water then flowed down through the unnamed stream into the Ipswich River.

The "evidence" offered by Liberty Mutual was a bare opinion by Mr. Roux that was contrary to the very documents upon which he purported to rely. While denying, in conclusory fashion, that the contamination in Area 5 would migrate off-site, he never presented any type of scientific analysis regarding the environmental implications and, in particular, the effect on the Ipswich River, if the heavily contaminated soil in Area 5 had not been removed or remediated.[4] This does not even rise to a "scintilla" of evidence, much less suffice to meet Liberty Mutual's burden of proof.

---

4    As discussed above, Liberty Mutual cannot properly rely upon the levels of contamination. In Wasserman v. Commerce Insurance Co., 2002 WL 31187681 at *8 (Mass. Super. 2002), a case cited by Liberty Mutual when it submitted its offer of proof on February 11, 2004, the insurer argued that "levels of contamination in the groundwater samples do not exceed DEP standards." However, the court did not accept the argument that such standards must be exceeded. Rather, it rejected an argument based on the owned property exclusion even though "the tests have not detected a large quantity of fuel oil in the samples taken from Wasserman's Property." In Rubenstein v. Royal Insurance Company of America., 44 Mass. App. 842, 694 N.E.2d 381, 388-89 and n. 7 (1998), aff'd in part on other grounds, 429 Mass. 355, 708 N.E.2d 639 (1999), the jury question, like the one at bar, did not require a particular level of actual or threatened off-

2.    There Was Actual Or Threatened Groundwater Contamination

As has been shown, Liberty Mutual failed to sustain its burden of showing that the soil contamination in Area 5 did not cause, or threaten to cause, off-site contamination. However, Black & Decker is entitled to recover its remediation costs in Area 5 from Liberty Mutual even if there were no such actual or threatened damage. The evidence discussed, supra, shows, undeniably, that the groundwater at the Bostik site was contaminated, or threatened with contamination, from the VOCs and PCBs which were in the soil at the FWDA and in the area where Building 41 was constructed. Black & Decker showed in prior briefing, particularly in connection with the Beverly site,[5] that Massachusetts no longer adheres to the traditional rule of absolute ownership of groundwater by the overlying property owner. This Court discussed the issue in detail in its December Order at 83-87.

The Supreme Judicial Court has never squarely addressed the issue of whether groundwater is owned property for purposes of applying the owned property exclusion in a CGL policy. In Gamer v. Town of Milton, 346 Mass. 617, 620 (1964), the Court noted in dicta that a property owner owned the groundwater beneath his property. Gamer was concerned with the right of an owner of the surface to draw water. This Court relied upon the Gamer dicta in Allstate Ins. Co. v. Quinn Constr. Co., 713 F. Supp. 35, 40, n.7 (D. Mass. 1989), vacated as a result of settlement, 784 F. Supp. 927 (D. Mass. 1990), but ownership of groundwater was not outcome determinative in that case.

---

site contamination to establish that the owned property exclusion was not applicable. As noted above, Liberty Mutual did not seek a more specific jury question.

[5]    Black & Decker's Memorandum in Opposition to Motion for Partial Summary Judgment Relating to the Beverly Site was filed on October 6, 2003. Groundwater ownership was discussed at pages 50-53. Those pages are attached hereto as Exhibit D and are incorporated by reference into this Memorandum.

The dicta in Gamer pertaining to ownership of groundwater rested upon two nineteenth century cases according a landowner an absolute right to draw water beneath his property even if his usage reduced the availability of groundwater to his neighbors. Davis v. Spaulding, 157 Mass. 431 (1892), and its predecessor, Greenleaf v. Francis, 35 Mass. (18 Pick.) 117 (1836), both cited in Gamer. These cases, decided more than a century ago in a different era (where, according to the Davis Court, 157 Mass. at 437, groundwater flow was governed by "obscure natural causes"), addressed the subject of property rights solely in the context of a right appurtenant to surface ownership to draw groundwater from beneath the surface - not in the context of absolute title in the groundwater itself. While Davis refers to ownership of groundwater, this right to draw water (a property interest less than ownership of the fee) does not transform this right appurtenant to the surface to absolute ownership of the groundwater itself any more than the right to draw water from a river or stream equals absolute ownership of the river or stream.

The common law rule of an absolute right of groundwater ownership, whereby a landowner was permitted to flood his neighbor's basement with groundwater, was abrogated prospectively by the Supreme Judicial Court, in favor of a "reasonable use" standard, in Tucker v. Badoian, 376 Mass. 907, 917, 384 N.E.2d 1195, 1201 (1978) (abandoning "common enemy" rule and noting that the prior rule "exhibited from the beginning a deplorable rigidity")(concurring opinion of Kaplan, J., joined by five other members of Court). Moreover, the Supreme Judicial Court has recognized that the rule of Davis, upon which the Gamer dicta is predicated, may be antiquated even where the question of groundwater usage is squarely presented. See Davis in Prince v. Stockdell, 397 Mass. 843 (1986).

Massachusetts cases decided subsequent to Quinn strongly suggest that Massachusetts groundwater would not be considered "owned property" in the environmental coverage context. These include Rubenstein v. Royal Ins. Co. of America, 44 Mass. App. Ct. 842, 853, n. 7 (1998), United Technologies Corp. v. Liberty Mut. Ins. Co., No. 877172, 1993 WL 818913, at *11 (Mass. Super. Ct. Aug. 3, 1993), Preferred Mut. Ins. Co. v. Gordon, No. 02-3147, 2003 WL 21077026, at *13 (Mass. Super. Ct. May 13, 2003), and Marks v. Lumbermens Mut. Cas. Co., No. 94-0917, 1995 WL 502231, at *4 (Mass. Super. Ct. Aug. 16, 1995). Marks pointed out that Gamer "did not relate to the issue of pollution containment" and "was decided over thirty years ago [now forty years ago], before many current understandings of environmental interdependence had surfaced." 1995 WL 502231, at *4, n.7. Davis and Greenleaf, of course, are much older than that. United Technologies concluded that Gamer should not be extended to the environmental coverage arena in view of the statutory declaration that "waters of the Commonwealth" include groundwater. 1995 WL 818913, at *11 (citing Mass. Gen. Laws ch. 21E, § 2 and Mass. Gen. Laws ch. 21G, § 2).

As the United Technologies court recognized, the continuing existence of the absolute ownership rule appears to be more apparent than real. That is because the common law rule has largely been made moot by subsequent statutes that redefine and regulate groundwater use. Referring to the Massachusetts Water Diversion Act, Mass. Gen. Laws, ch. 21G, one of the statutes cited in United Technologies, a commentator has said: "The most recent decisions in Massachusetts … are unclear on whether the courts still adhere to some version of the absolute dominion rule. … Massachusetts, however, went on to enact a regulated riparian statute applicable to groundwater. Mass. Gen. Laws ch. 21G, §§ 2, 7." 3 Beck, ed., Waters and Water Rights, § 20.07(b) at 20-72, n. 438 (2003 Volume)

Under <u>Rubenstein</u> and the Massachusetts environmental statutes, groundwater is not "owned property" in the environmental coverage context. The Massachusetts trial courts have been loath to apply the groundwater ownership rule to insurance coverage claims. While <u>Greenleaf</u> and <u>Davis</u>, in their day, were "in accord with the weight of authority," see <u>Davis</u>, 157 Mass. at 434, Massachusetts would now be going against the clear weight of authority were it to import the rule of <u>Greenleaf</u> and <u>Davis</u> into modern environmental coverage law. The Supreme Judicial Court has never done so. <u>Gamer</u>, <u>Greenleaf</u>, and <u>Davis</u> are all distinguishable. No decision of the Supreme Judicial Court requires this Court to hold that groundwater is "owned property" for purposes of the "owned property" exclusion in a CGL policy.

With CERCLA and its state counterparts on the books, a property owner's "absolute control" of groundwater, in the context of groundwater contamination, is a thing of the past. The issue of groundwater ownership in Massachusetts, in the context of an "owned property" exclusion in a CGL policy, would be outcome determinative if the Court were to determine that evidence supported the jury's conclusion that the Area 5 remediation costs "were not incurred to remedy or prevent migration of contaminants off the Bostik site." In that event, Black & Decker respectfully requests that the Court hold that groundwater is non-owned property in Massachusetts for purposes of a CGL policy and that, accordingly, Black & Decker is entitled to judgment on this issue as a matter of law. In the alternative, Black & Decker respectfully requests that the Court certify this question of groundwater ownership to the Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03. See December Order at 87.

## CONCLUSION

For the foregoing reasons, Black & Decker is entitled to judgment as a matter of law on the subject of Question B.2, the remediation of the Former Waste Disposal Area and the Building 41 area. Black & Decker is entitled to recover the costs of remediation of these portions of the Bostik site. In the alternative, Black & Decker is entitled to a new trial on this issue. In the event that groundwater contamination below a privately owned surface becomes outcome determinative, Black & Decker seeks certification to the Supreme Judicial Court

By their attorneys,

/s/ Jack R. Pirozzolo                    .
Jack R. Pirozzolo BBO# 400400
Richard L. Binder BBO# 043240
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470