EXHIBIT B

Reviewer Bell

Phase I - Environmental Site Assessment

Bostik Site

Boston Street

Middleton, Massachusetts


March 14, 1988



Submitted to

Emhart Corporation, Fastening Systems Group
Bostik Division
Boston Street
Middleton, Massachusetts  01949


by

GEI Consultants, Inc.
1021 Main Street
Winchester, Massachusetts  01890
(617) 721-4000


Project 87289


Michael J. Webster
Hydrogeologist

Joseph G. Engels, P.E.
Associate


LI-016

CONFIDENTIAL
INFORMATION
SB216-1294

EXHIBIT
BD 98

EXECUTIVE SUMMARY

This Phase I Environmental Site Assessment provides data for the evaluation of the Bostik site located on Boston Street in Middleton, Massachusetts, relative to Massachusetts General Law, Chapter 21E (MGL 21E). Information obtained during this assessment has been used to evaluate the site for the presence of hazardous material and/or oil and to determine if the observed site conditions represent a release or threat of a release of hazardous material to the environment, as defined by MGL 21E. This assessment included the development of a site history, a review of the environmental setting of the property, a review of information available from town and regulatory agencies concerning the site, site visits, and a field investigation program.

The Bostik site consists of about 25 acres of land located west of Boston Street in the southern portion of the town of Middleton. The property is owned by Emhart Corporation, Fastening Systems Group (Emhart), and is occupied by the Bostik Division of Emhart, a manufacturer of adhesives. The study site has been developed for industrial use since 1874, when a mill complex was constructed next to the Ipswich River at the northeast portion of the property. Manufacture of shoe finishing and adhesive products has been performed on the site since initial development. Land surrounding the site consists of residential property and undeveloped woodland.

The field investigation included the installation of ten ground water monitoring wells, ground water and surface water sampling, and a soil gas survey. Ground water samples collected from the ten monitoring wells installed by GEI Consultants, Inc. (GEI) and from eight wells already existing at the site were analyzed for Hazardous Substance List (HSL) volatile organic compounds (VOCs) and total oil/grease. Surface water collected from the Ipswich River and from surface water locations on the site during the initial sampling round were analyzed for the same parameters. Surface water samples collected from the Ipswich River during additional sampling rounds were analyzed for HSL VOCs.

Information obtained during this assessment indicates that VOCs are present in ground water at three locations on the site. The greatest concentrations were detected in ground water collected from large-diameter wells located at the northern portion of the site in the former tank farm area. Total VOC levels in these wells ranged from 68.3 to 270 parts per million (ppm). The compounds detected consisted predomi- nantly of aromatic solvents. VOCs were detected in ground

CONFIDENTIAL
INFORMATION
SB216-1295

LI-017

water collected near Upper Pond (MW102) and near Building 5 (MW110). Monitoring well MW102 is located in an area that had historically been used for waste disposal (primarily open pit burning), and MW110 is located in the vicinity of a demolished building. Total VOC concentrations in these wells ranged from 1.5 to 1.9 ppm.

Surface water samples collected from the Ipswich River contained elevated levels of toluene. Surface water samples collected from the river northeast of the former tank farm (SW7) contained toluene at levels ranging from 76 to 89,000 parts per billion (ppb). Weekly sampling of the river since mid-December, at a location just downstream (east) of the site, has indicated only very low concentrations of toluene ranging from not detectable to a maximum of 35 ppb.

Ground water at the site flows to the north/northeast toward the Ipswich River with a gradient of about 0.01 ft/ft. The Ipswich River flows to the east past the Bostik site. No public ground water supply wells are located in the immediate vicinity of the site. Surface water from the Ipswich River 1.5 miles downstream (east) of the site is used as a supplementary water resource for the Town of Peabody. In addition, residences located north of the Ipswich River on Pine Road and River Street use private ground water wells.

Based on data presented in this report, it is our opinion that hazardous material and/or oil are present in the environment at the Bostik site. The data do not suggest that the conditions on the site pose an imminent threat to public health. Additional investigation of the study site is required to further document and characterize the extent of the organic chemicals identified in ground water, surface water, and soil during this initial assessment. We recommend that a Phase II Investigation be undertaken so that the environmental risks associated with the site can be assessed and any required remedial measures can be formulated. The scope of work for a Phase II Investigation should be submitted to DEQE for their review and comment.

ii

CONFIDENTIAL
INFORMATION
SB216-1296

-25-

## 5.5  Ground Water Sampling

After the installation of monitoring wells and prior to any ground water sampling, each monitoring well was developed using a Teflon" bailer.

Ground water samples were obtained by GEI on November 12-13, 1987.  Samples were obtained from the ten GEI wells, the five GZA wells which had been installed in 1985, and the three recovery wells which were installed in 1986.  Ground water sampling methods are described in Appendix F.

Ground water samples were collected with a Teflon" bailer which was cleaned with distilled water and methanol between sampling locations to prevent cross-contamination.  Samples were dispensed into laboratory-prepared glassware and kept on ice prior to delivery to the laboratory for analysis.  Chain-of-custody records were maintained for all samples.

Laboratory chemical analyses were performed by Erco Laboratory of Cambridge, Massachusetts.  Samples were obtained from all wells and analyzed for the following parameters:

1.  HSL, VOCs by U.S. EPA Method 624.

2.  Total oil/grease.

Chemical results of ground water analyses for the November 1987 sampling round are summarized in Table 12 for those samples in which VOCs and oil and grease were detected. No VOCs or oil/grease were found in samples from MW104 through MW109 and GZA4.  Laboratory data sheets are presented in Appendix G.

VOCs were detected in samples from eight of the 18 monitoring wells located on the site.  High levels of VOCs were detected in recovery wells R1 and R2 during two sampling rounds (Table 13).  The second round of sampling was performed for R1 and R2 on December 22, 1987 to confirm previous results. About 1200 gallons of water was pumped from each well prior to obtaining the December samples.  The effluent water was drummed on site for eventual treatment.  Total VOC levels in these recovery wells ranged from 68,000 to 270,000 ppb.  The highest concentration detected was in a sample obtained from recovery well R2 on December 22, 1987.  This sample contained toluene at a level of 270,000 ppb.  Lower concentrations of VOCs were detected in samples obtained from wells MW102 and MW110.  The total VOC concentrations in these samples were 1470 ppb and 1895 ppb, respectively.  The VOCs detected at the

CONFIDENTIAL
INFORMATION
SB216-1324

-26-

highest concentration in these two wells were benzene (1700 ppb - MW110) and total xylenes (900 ppb - MW102). Low concentrations of VOCs were detected in water collected from wells GZA1, GZA2, GZA3, and R3. The total VOC concentrations in these samples ranged between 4 and 52 ppb.

Total oil/grease was detected in samples from nine of the 18 monitoring wells at the site (Table 12). Oil/ grease concentrations ranged between 1.2 and 33 parts per million (ppm).

To verify analytical results from the tests on ground water samples, GEI submitted one blind duplicate sample to the contract laboratory. Sample 87289-MW111-01 is a duplicate of sample 87289-MW102-01. The results of the duplicate analyses showed good reproducibility of data (Table 12). In addition, a trip blank accompanied the samples to the laboratory. No VOCs were detected in the trip blank.

5.6    Surface Water Sampling

5.6.1    Initial Sampling Round

Surface water samples were collected from five locations (SW1 through SW5) on November 12, 1987. Two samples were obtained from the Ipswich River (SW3, SW5), and samples were obtained from Upper Pond (SW1), the brook (SW2), and the canal (SW4). Figure 4 shows the location of the five sampling points.

As indicated in Appendix F, surface water samples were collected by submerging laboratory-prepared glassware directly into the water. Chain-of-custody records were maintained for all samples.

Results of the surface water analyses are summarized in Table 14. Laboratory data sheets are presented in Appendix G.

Low levels of VOCs were detected in surface water samples collected from Upper Pond (SW1), the canal (SW4), and from the Ipswich River downstream (east) of the Bostik site (SW5). Total VOC concentrations for the samples ranged from 2.4 to 15.2 ppb.

Total oil/grease was detected at a concentration of 1.2 ppm in the sample collected from the downstream portion of the Ipswich River (SW5). Oil and grease was not detected above the laboratory reporting limit of 1.0 ppm at the other four surface water sampling locations.

CONFIDENTIAL
INFORMATION
SB216-1325

# PHASE II - COMPREHENSIVE SITE ASSESSMENT

**Bostik Site**
**Middleton, Massachusetts**

**March 23, 1990**

Submitted to

**Bostik, Inc.**
**Boston Road**
**Middleton, Massachusetts**

Prepared By

**GEI Consultants, Inc.**
**1021 Main Street**
**Winchester, Massachusetts 01890**
**(617) 721-4000**

Project 88367

Ernest C. Ashley
Project Geologist

Joseph G. Engels, P.E.
Project Manager

CONFIDENTIAL
INFORMATION
SB216-1530

EXHIBIT
**BD 101**

LII-001

## Pilot Plant Area

Ground water downgradient of the Pilot Plant contains chlorinated VOCs. Monitoring well MW201 is the only overburden well at the Bostik Site in which chlorinated VOCs are the predominant contaminants. Chlorinated VOCs in much lower concentrations were detected in the bedrock water supply well, Bostik Well #1, located on the south side of Lower Pond.

PCB concentrations in soil around the Pilot Plant (Building 30) ranged from non-detected to 11,910 parts per million (ppm). The source of this PCB contamination is PCB-contaminated heater oil which was used in the Pilot Plant reactor vessels in the past. The extent of the PCB contamination outside of the Pilot Plant building is limited to the soils and asphalt in the immediate vicinity of the building. PCBs also are present on concrete surfaces inside portions of the Pilot Plant building. Only very low levels (less than 2 ppm) of PCBs were detected in sediments in Upper Pond.

## Former Waste Disposal Area

VOCs are present in ground water and soil in the former waste disposal area, located north of Upper Pond. The source of the VOC contamination in this area is apparently past waste disposal. Total VOCs in ground water ranged from 5,300 to 7,700 parts per billion (ppb). Ground water contamination from the former waste disposal area appears to have migrated downgradient (northward) in the shallow overburden aquifer between the waste disposal area and Building 35.

VOCs were detected by the laboratory in six of the ten test-pit soil samples submitted for analysis. The detected VOCs included acetone, chlorobenzene, ethylbenzene, benzene, toluene, and xylene. Total VOC concentrations ranged from non-detected to 10,100 ppm. PCBs were detected in five of the ten test-pit soil samples analyzed. The highest measured PCB concentration was 49 ppm. Solid adhesive waste also was observed in some of the test pits excavated in the former waste disposal area.

## Area North of Building 9

VOCs are present in ground water in an area north of Building 9 where a former building (Building 11) was located. Various non-chlorinated aromatic hydrocarbons were detected in ground water samples from wells in this area. Many of these compounds are typical of mineral spirits. Total VOC concentrations in ground water range up to 23,640 ppb. Underground solvent pipes from the old tank farm traversed the western side of this area en route to

iv

CONFIDENTIAL
INFORMATION
SB216-1535

-12-

28 feet in MW205D. The thick sand deposits in MW109 and MW205D may be the kame terrace deposits described in the USGS surficial geologic quadrangle map.

Glacial Till: Underlying the fill and sand in all borings drilled by GEI, except MW205D, is a layer of very dense glacial till. Based on drilling observations, examination of split-spoon soil samples and grain size analyses performed by GEI, the till consists of greenish-grey silty, widely graded sand and gravel with numerous cobbles and boulders and varying fines content (particle size less than No. 200 sieve) ranging between about 10% and 30%. Mechanical grain-size analyses were performed on five (5) samples of the glacial till and are presented in Appendix F. The thickness of the till, where encountered and fully penetrated, ranges from approximately 4.5 feet in MW212R to approximately 44 feet in MW104. The till was fully penetrated in three of the six borings in the old tank farm area and in seven of the twenty-five borings outside of the old tank farm area.

Bedrock: Bedrock was cored in ten of the twenty-six borings advanced by GEI as part of the Phase I and Phase II field investigations. Borings where bedrock was cored are MW101, MW104, MW107, MW109, MW110, MW203D, MW205D, MW210, MW211D, and MW212R. Five-foot sections of NX-size rock core were drilled in each of these borings to confirm the elevation of the bedrock surface. A total of 15 feet of rock was cored in MW212R to install a shallow bedrock monitoring well. Depths to bedrock at the tank farm boring locations where rock was cored range from 11 feet in MW212R to 18 feet in MW211D. Depths to bedrock outside of the old tank farm range from 19 feet in MW107 to 44 feet in MW104. Bedrock at the boring locations consists of pink and grey granodiorite. In general, the upper five feet of the bedrock surface does not appear to be highly fractured, and Rock Quality Designation (RQD) values for the rock cores ranged from 60% to 100%. However, bedrock in MW104, MW110, and MW203D was highly fractured and had RQD values of 25% or less. Some chlorite alteration also was observed in the fracture zones in the MW203D rock core. According to the United States Geological Survey (USGS), bedrock in the site vicinity consists of an undifferentiated orange-pink, medium- to coarse-grained biotite granite to granodiorite (11).

## 2.2.4 Site Hydrogeology

Ground water elevations were measured approximately monthly between January and June 1989 in all monitoring and recovery wells at the study site and are presented in Table 2. Ground water elevations measured on February 17, 1989 were used to develop a ground water contour diagram (Fig. 6).

CONFIDENTIAL
INFORMATION
SB216-1559

LII-030

-13-

Seasonal fluctuations of ground water elevation have varied from 0.4 foot in MW211D to 3.1 feet in GZA1 during the Phase II Investigation monitoring period. GZA1 is located near the sanitary wastewater sand filter beds and fluctuations in ground water elevations in this area may be partially influenced by varying discharges of water to the filter beds. The maximum fluctuation of ground water elevation at other locations on the site was measured in MW101 and MW105, each of which have fluctuated 2.7 feet during the measuring period.

Monitoring well couplets MW203S/MW203D, MW205S/MW205D, and MW211S/MW211D permit measurement of vertical gradients in ground water between shallow and deep overburden soils at the site. Monitoring well couplet MW212S/MW212R permits measurement of vertical gradients between overburden and bedrock within the old tank farm area of the site.

Small downward vertical gradients were detected in the overburden well couplets. The greatest hydraulic head difference in the three overburden well couplets (0.7 foot) was measured in MW203S/MW203D. This corresponds to a downward vertical gradient of approximately 0.05 at this location. The hydraulic head differences measured at couplets MW205S/MW205D and MW211S/MW211D averaged 0.2 foot and 0.06 foot, respectively. These correspond to downward vertical gradients of 0.02 and 0.007, respectively, at these locations. During two measurement rounds a slight upward gradient was observed at MW205S/MW205D with head differences of 0.02 to 0.24 foot measured in the couplet wells.

Only slight vertical gradients were measured between overburden and shallow bedrock at couplet MW212S/MW212R. These gradients varied from upward (0.001) to downward (0.006) during the monitoring period. The predominant vertical gradient was downward at this location.

The ground water flow direction at the study site is predominantly to the north/northeast toward the Ipswich River. Based on ground water and surface water elevation data, the Ipswich River is a point of ground water discharge in the vicinity of the site.

Permeability of the glacial till in the old tank farm area was measured during and after drilling operations using falling and rising head borehole permeability tests. Falling head permeability tests were performed in MW210 and MW211D. Permeability was measured after monitoring well installation in MW211D using rising head permeability tests. Descriptions of the permeability tests, test results, and methods used are presented in Appendix G. Mechanical grain size analyses were performed on five samples of the glacial till and are presented in Appendix F. The results of field permeability tests performed at the Bostik Site are summarized in Table G-1 in Appendix G.

CONFIDENTIAL
INFORMATION
SB216-1560

LII-031



PHASE II COMPREHENSIVE SITE ASSESSMENT
ADDENDUM REPORT
BOSTIK, INC.
MIDDLETON, MASSACHUSETTS
DEP RTN 3-1494
TIER IA PERMIT #83066

November 1995

Submitted to

Bostik, Inc.
Boston Street
Middleton, Massachusetts

By

GEI Consultants, Inc.
1021 Main Street
Winchester, Massachusetts 01890-1970
(617) 721-4000

Project 94086

Richard J. Cushing, LSP
LSP of Record

Norma W. Keane, LSP
Senior Project Manager

EXHIBIT
BD 104

-36-

**5.4    Area 4: Surface Water and Sediments**

### 5.4.1 Sediment Screening Results

Tables 12, 13 and 14 summarize VOC sediment screening data in the Upper and Lower Ponds, the stream, the Cove and the Ipswich River. VOC concentrations of 6 ppm were detected in three areas within Upper Pond. A maximum of 5 ppm and 2 ppm total VOCs were detected in sediments from Lower Pond and the stream, respectively.

### 5.4.2 Sediment Analytical Results

Tables 26 presents the sediment analytical results from the Upper and Lower Ponds, the stream, the Cove and the Ipswich River.

PCB concentrations ranging from 47 to 1,200 ppb were detected in the two samples in Upper Pond, six samples in Lower Pond and four samples collected in the stream. The samples from the cove contained 71 to 1,500 ppb PCBs. Twelve samples from the river contained 32 to 5,100 ppb PCBs. SED17 contained 280 ppm of TPH. CSED05 contained 89 ppm TPH. Five river samples contained 14 to 130 ppm of TPH. There are no regulatory standards for PCBs in sediments. Figure 22 is a representation of the results of PCB analyses of sediment samples from the Cove and the River. As shown, only one sediment sample location in the Cove contained PCB concentrations greater than 1 ppm.

### 5.4.3 Surface Water Screening Results

Surface water samples contained total VOC concentrations of 4.0 ppb, 3.7 ppb, and 3.9 ppb from samples obtained from Upper Pond, Lower Pond, and the stream, respectively. Table 6 contains a summary of surface water sample screening results.

### 5.4.4 Surface Water Analytical Results

Table 27 summarizes surface water analytical results. No PCBs or TPH compounds were identified above detection limits in any of the samples.

**5.5    Area 5: Former Waste Disposal Area**

### 5.5.1 Soil Screening Results

Tables 16 and 18 list the location, depth, field screening, and laboratory PCB and VOC screening results for the samples collected from the test borings and test pits, respectively. Soil samples with total VOC screening concentrations exceeding 10,000

-37-

ppm were collected from test borings B407, B408, and MW406D and test pits TP404, TP408, TP413, and TP417 (Figure 23 and 24). These borings and test pits are concentrated along the north bank of Upper Pond in an area where significant quantities of waste debris and adhesive material were found.

### 5.5.2 Soil Sample Analytical Results

Table 28 and Table 29 provide summaries of laboratory analytical results from test boring and test pit soil samples, respectively.

PCBs were identified in 12 test borings and 13 test pits within the FWDA at concentrations ranging from 0.019 to 320 ppm in the test pits and 0.027 to 290 ppm in the borings. Method 1 cleanup standards for S-2/GW-2 PCBs were exceeded in five borings and six test pits. Figure 23 presents the areas identified within the FWDA with PCB concentrations greater than the Method 1 S-2/GW-2 cleanup standard for PCBs of 2 ppm.

Polyaromatic hydrocarbons (PAHs) were identified in four test borings and five test pits within the FWDA. TPH concentrations were detected in 19 test borings and 24 test pits ranging from 3,500 ppm to 19,000 ppm and were identified as lubricating oil. Five test pits exceeded Method 1 S-2/GW-2 TPH standards and TP414 exceeded the UCL. Soil samples from boring B407 and test pits TP413, TP415, TP417, and TP419 contained PCB concentrations exceeding the UCL for PCBs in soils.

### 5.5.3 Ground Water Analytical Results

Table 30 summarizes the analytical results of the ground water from monitoring wells and test pits. VOCs including benzene, toluene, trichlorethene (TCE) and xylene were detected in monitoring wells. TPH concentrations in ground water within the FWDA ranged from 0.33 ppm to 11 ppm, with the maximum concentration identified in monitoring well MW406S. Benzene concentrations exceeding the UCL for ground water were identified in MW405S and MW202. Toluene concentrations exceeding the Method 1 GW-2 standards were detected in MW405S and MW406S. Trichloroethene was identified above the Method 1 GW-2 standard in MW409.

PCB (Aroclor 1248) concentrations detected in ground water within the FWDA ranged from 0.48 ppb to 21 ppb. PCB concentrations in MW405 and MW406 exceeded the MCP UCL for PCBs in ground water.

-46-

Screening results showed VOC contamination of sediments on the south shore of the River adjacent to the OTFA. GC/PID screening performed at GEI indicated a maximum total VOC concentration of 94 ppm for sediments in this area. Total VOC concentrations in the background sediment samples ranged from below detectable limits to approximately 21 ppm, and appeared to increase with depth below the sediment surface, suggesting historical releases of VOCs to the River from sources upstream of the Site. No VOC concentrations were identified above the detection limits in any other sediment samples.

No immediate hazard has been identified due to PCB or VOC contamination in the River. No surface water quality impact from the contaminated sediments was identified in surface water samples. Sediment deposition appears most prevalent along the south shore of the Ipswich River adjacent to the OTFA and slightly downstream by former Buildings 7 and 22. This observation is consistent with measured channel geometry, observed currents, measured velocities and observed presence of vegetation.

## 6.5    Area 5: Former Waste Disposal Area

The FWDA contains extensive PCB, TPH and VOC contamination in soil and ground water. Contamination is concentrated along the northern edge of Upper Pond and south of Building 35, as far east as TP406 and is bounded on the west by the eastern edge of Lower Pond.

As illustrated in Fig. 23, the highest PCB concentrations (greater than 100 ppm) in soils were detected along the north bank of Upper Pond where the greatest thickness of waste material was measured. Approximately equal amounts of waste debris and adhesive materials were observed in this area. PCB concentrations decreased with distance north of Upper Pond; however, PCB concentrations greater than 20 ppm were identified north of the paved access road. This concentration is an order of magnitude greater than the MCP Method 1 S-2/GW-2 soil cleanup standard of 2 ppm.

PCB contamination appears to be limited to the western portion of the FWDA. No evidence of PCB contamination was discovered in the soils east of Building 34 or within the Former Filter Bed Area located south of Building 37 (Fig. 23). Based on the Site history and the pattern of PCB contamination, it is likely that the source of PCBs in the FWDA is disposal of PCBs and PCB-containing material.

VOC soil contamination also appears to decrease with distance north of Upper Pond. Maximum total VOC concentrations from jar headspace screening were detected south of the paved access road (Fig. 24). However, VOC contamination does extend to the eastern edge of Building 37. TPH contamination in soils within the FWDA, appears to be limited to the soil and waste debris north of Upper Pond and west of Building 37.

No PCBs were detected in ground water samples from monitoring wells screened solely within the underlying till, which is expected based on the small vertical gradient, lower hydraulic conductivity of these soils, and the low transport potential of PCBs in water. However, PCBs

-47-

were detected in excess of MCP RCGW-2 limits in monitoring wells MW202, MW405S and MW406S which are screened in the fill and overburden soils.

## 6.6    Area 6: Building 9 Area

Contamination in Area 6 is largely concentrated along the former solvent pipe trench between Buildings 5 and 9. VOCs (primarily toluene) occur in both soil and ground water. Separate phase product has been detected in monitoring well MW609 along the pipe trench just north of Building 9. Soil samples from borings north of Building 9 (B635, B632, B702 and B703) contained significant concentrations of toluene. Soil and ground water samples collected north of Building 5 had much lower VOC concentrations, indicating a source closer to Building 9. TPH contamination is also present, but has not been conclusively identified, since gasoline, No. 6 fuel oil and lubricating oil have all been fingerprinted in this area. This may be a laboratory artifact due to the significant concentrations of benzene, toluene, ethylbenzene and xylene (commonly referred to collectively as BTEX) which are generally regarded as the "fingerprint" for gasoline. However, the site history verifies that each of these compounds was stored separately in USTs in the OTFA, and it is likely that their detection in soils and ground water represent historical releases of the individual contaminants.

The extent of soil and ground water contamination in Area 6 is defined by the change in concentrations to those found in Area 2 and in Area 7. To the west, the VOC contamination associated with the solvent pipe conduit and Building 9 operations merges with the contamination associated with the OTFA. To the east, VOC contamination associated with Area 6 appears in MW206, but does not appear in MW611, in Area 7. Recent sampling has identified significantly lower VOC concentrations in MW110 (southeast of Building 5) compared to MW206.

## 6.7    Area 7: Churn Pit Area

The Area 7 investigation was intended to identify potential VOC and TPH contamination associated with operations in the Churn Room Pit in Building 24. No VOC or TPH contamination above reportable concentrations (RCS-2, RCGW-2) was detected in soil or ground water samples collected from this area. Since no contamination was discovered above reportable concentrations, Area 7 should not be considered a separate Area in need of continued investigation.

## 6.8    Area 8: Building 1 Area

Because of the history of USTs south of Building 1 and west of Building 3, TPH is the contaminant of concern in Area 8. TPH with characteristics similar to lubricating oil, No. 2 fuel oil, and No. 6 fuel oil were identified in most soil and ground water samples, and separate phase product was observed in soil borings at depths varying from 10 to 15 feet below grade and in MW303 in August 1993.



# GEI Consultants, Inc.

April 27, 2000
Project 96125

1021 Main Street
Winchester, MA 01890-1970
781·721·4000
781·721·4073 Fax

Mr. Stephen J. Roberson
Department of Environmental Protection
Northeast Regional Office
205A Lowell Street
Wilmington, MA 01887

**RECEIVED**

APR 28 2000

**DEP
NORTHEAST REGIONAL OFFICE**

Dear Mr. Roberson:

Re:   Response to Comments - Phase II Report, Method 3 Human Health Risk
      Characterization, Ecological Risk Characterization
      Bostik, Inc.
      Middleton, Massachusetts
      DEP RTN 3-1494
      Tier 1 Permit No. 83066

GEI Consultants, Inc. (GEI), on behalf of Bostik, Inc. (Bostik), prepared this Phase II
Addendum Report No. 2 for the Bostik Site in Middleton, Massachusetts (the Site). This
report was prepared in response to DEP comments on GEI's November 1995, Phase II
Comprehensive Site Assessment (CSA) report and the Method 3 Human Health Risk
Characterization, and the March 6, 1997, Stage I Environmental Screening Report.

DEP comments and GEI responses on behalf of Bostik, have been provided in several different
documents and in meetings between the DEP, Bostik, and GEI representatives from 1995
through 1999. Therefore, this letter was prepared to provide a chronology of submittals and
responses, and to either respond directly to a DEP comment or to reference the document
where a response is provided. The following documents are provided with this letter:

Section 1       GEI's (and GEI's risk assessment subcontractor's) previous responses to DEP
                comments

Section 2       Limited Subsurface Investigation (LSI) Report

Section 3       Method 3 Human Health Risk Characterization Addendum Report

Section 4       Stage II Ecological Risk Assessment Report

CONFIDENTIAL INFORMATION
GEI SUPP 1 0379

Section 5       A copy of the Comprehensive Transmittal Form (BWSC-107). The original
                is attached to this report.

EXHIBIT
BD 122

Offices Nationwide

M:\PROJECT\1996\96125\Ph2-cpvltr.wpd\lek

MIDDLETON - Bostik, Inc.
Phase II Review
Page 10

Plant and Old Tank Farm Areas and was described in more detail above.

During aquatic observations and sampling in the Ipswich River in 1992, a disturbance of the sediments in the Cove area produced a sheen on the surface of the water. Subsequently, sediment samples were collected from the various surface water bodies and analyzed for VOCs, ABNs, PCBs, and TPH fingerprinting. PCBs were detected in sediment samples collected from the Upper and Lower Ponds (460 and 1,700 ug/kg, respectively), near NPDES Outfall 001 (3,800 ug/kg), the Cove (3,100 ug/kg), and the Ipswich River opposite the Old Tank Farm (3,930 ug/kg). The highest concentrations of total VOCs and ABNs were detected in the samples collected from the Ipswich River opposite the Old Tank Farm at 18,000 and 21,200 ug/kg, respectively. Concentrations of TPH from all sediment samples ranged from 84 to 3,000 mg/kg.

Sediment profiling and additional sediment sampling were performed as part of additional Phase II activities. Sediment samples were collected at various depth intervals to three feet. The samples were laboratory screened with a GC/PID and revealed VOC concentrations of up to 6.0 ppm in the samples collected from Upper Pond, 5.0 ppm in the samples collected from Lower Pond, 2.0 ppm in the samples collected from the Stream, 122 ppm from the samples collected in the Cove, and 94 ppm in the samples collected from the Ipswich River. Most of the sediment samples collected were laboratory analyzed for PCBs with a smaller number of selected samples analyzed for SVOCs and TPH. Concentrations of up to 510 ug/kg PCBs and 29 mg/kg TPH in the samples collected from the Upper Pond, 460 ug/kg PCBs and 110 mg/kg TPH in the samples collected from the Lower Pond, 1,200 ug/kg PCBs and 280 mg/kg TPH in the samples collected from the Stream, 1,500 ug/kg PCBs and 89 mg/kg TPH in the samples collected from the Cove, and 5,100 ug/kg PCBs and 130 mg/kg TPH in the samples collected from the Ipswich River. PCBs were not detected in the "background" sediment samples collected from the Ipswich River upstream of the Bostik property (RSED15-17); however, up to 130 ppm TPH and 21 ppm total VOCs (screened) were detected in these sediment samples. Surface water samples were collected from the surface water bodies approximately 24 hours following sediment sampling. Results from GC/PID screening of these water samples showed total VOC concentrations of 4.0 ppb, 3.7 ppb and 3.9 ppb from samples collected from Upper Pond, Lower Pond and the stream, respectively. No SVOCs, TPH or PCBs were detected in the surface water samples during laboratory analyses.

The extent of PCB-contaminated sediments in the Ipswich River appears to be limited to the reach of the River extending from the dam to approximately 420 feet upstream of the dam and including the Cove. The Pilot Plant, the Upper Pond, the Former Waste Disposal Area and Building 36 are the suspected sources of PCB contamination in the sediments of the Area 4 surface water bodies.

<u>Area 5: Former Waste Disposal Area</u>

A review of historical records and aerial photographs revealed that the central portion of the site had been used in the past for the disposal of waste materials by open-pit burning from the late 1940s until the mid-1960s. This area was located southwest of Building 15, adjacent to a wetland/water

CONFIDENTIAL INFORMATION
GEI SUPP 1 0399

# Phase III
# Remedial Action Plan
# Bostik, Inc.
# DEP RTN 3-1494
Middleton, MA



GEI Consultants, Inc.

GEOTECHNICAL

ENVIRONMENTAL

WATER RESOURCES

ENGINEERING

**EXHIBIT**
**BD 129**

CONFIDENTIAL INFORMATION
GEI SUPP 2 1045

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

### 2.2.2   Site Geology

The Site is underlain by glacial and post-glacial deposits.  The overburden consists of both stratified and unstratified till overlain by kame terrace deposits of sand and gravel.  Both types of till contain many cobbles and boulders, often lying close to the bedrock surface. Bedrock beneath the Site is primarily diorite and granodiorite and is present at depths ranging from 10 to 35 feet (ft) below ground surface (bgs).

Landscaping and filling activities have altered the topography and geology of the Site.  A formerly undefined wetland area and its corresponding swamp deposits that once occupied more than three acres of the southwest portion of the Site, was reconfigured in 1967 to form two surface water bodies, Upper Pond and Lower Pond.  Fill covers most of the Site north of Upper Pond extending up to and slightly past the fence line north of Buildings 35 and 36. The depth of fill varies from approximately 10 feet by Upper Pond, to five feet south of Building 35, to greater than 10 ft north of Building 36.  The fill is comprised mainly of fine sand and gravel.

### 2.2.3   Site Hydrogeology

Groundwater flow direction at the Site is predominantly to the north/northeast toward the Ipswich River.  Based on historic groundwater and surface water elevation data, the Ipswich River is a point of general groundwater discharge in the vicinity of the Site.  Based on data collected during the Phase II CSA, the hydraulic gradient across the Site ranges from approximately 0.014 at Area 5 to approximately 0.036 at Area 2.  Assuming a porosity of 0.25, the groundwater velocity in Area 5 ranged from approximately 1.2 ft/year to 5.8 ft/year, and from approximately 3.0 ft/year to 12 ft/year in Area 2.

## 2.3   Phase III Confirmatory Field Investigation

GEI performed additional field investigations at Bostik during September and October 2000 to confirm contaminant conditions at several areas of the Site prior to the evaluation of potential remedial alternatives.  The data collected during these investigations are presented in this report.

The field investigation included observing a geophysical survey, advancing three soil borings, installing four monitoring wells, and collecting soil and groundwater samples for chemical testing.  The locations of soil borings and monitoring wells are shown on Figure 2.

### 2.3.1   Geophysical Investigation

On September 24 and 25, 2000, GEI personnel observed Geophysics-GPR, Inc. of Newton, Massachusetts (GGI) conduct electromagnetic (EM) and ground-penetrating radar (GPR) surveys in portions of Areas 5 and 11.  Buried drums were encountered in several test pits in

GEI Consultants, Inc.                              6

CONFIDENTIAL INFORMATION
GEI SUPP 2 1060

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

## 3.5  Area 5:  Former Waste Disposal Area (FWDA)

From the late 1940s until the mid 1960s, a waste disposal area was located adjacent to what is now Upper Pond [GEI, 1990]. Disposal in this area consisted of open burning of various waste materials generated at the facility. During the Phase I Investigation, GEI observed partially buried refuse such as broken and melted glass, metals scraps, cans, and brick, at several locations along the northern bank of Upper Pond in the former waste disposal area. During the Phase II, GEI observed refuse consisting of metal strapping, drum lids, five-gallon cans, 55-gallon drums, and burned and unburned adhesive waste in test pits in the former waste disposal area.

The primary contaminants of concern (COCs) in soil and groundwater in Area 5 include PCBs, VOCs, and SVOCs. VOCs detected in soil in Area 5 include 2-butanone (MEK), 4-methyl-2-pentanone, toluene, and xylene. VOCs detected in groundwater from monitoring wells in Area 5 include benzene, toluene, xylene, trichloroethene (TCE), and vinyl chloride. The primary SVOCs detected in Area 5 include benzo(a)anthracene, chrysene, benzo(b) fluoranthene, benzo(a)pyrene, indeno(1,2,3-cd)pyrene, and bis(2-ethylhexyl)phthalate. PCBs detected in Area 5 primarily consist of Aroclor-1248. Total petroleum hydrocarbon (TPH) fingerprinting indicated the presence of lubrication oil and diesel oil in soil and groundwater in Area 5.

### 3.5.1  Response Actions Conducted To-Date

A RAM was conducted from August to October 1997 in the eastern portion of Area 5 prior to the construction of Building 41 and a new access road on the southern side of the building. Building 41 consists of an approximately 235-ft by 130-ft steel frame building with a concrete slab foundation that was constructed to house Bostik's web production process line. Based on GEI's November 1995 Phase II CSA Addendum Report, excavation for the slab foundation and the access road was planned in an area where volatile organic compounds (VOCs) were detected in soil and buried debris and drums were present. A RAM Plan was submitted to the DEP on August 8, 1997, and approval to perform the RAM was obtained from the DEP on August 15, 1997.

Forty-five 55-gallon drums, five 5-gallon drums, and one 10-gallon drum were excavated and transported off-site as hazardous waste. The drums were in varying stages of decay and contained rubber, latex, adhesive solids, organic gelatinous materials, soil, and water. Other debris was separated from the soil and included with the drums for offsite disposal. Approximately 40 tons of material were transported off-site for incineration. Approximately 850 cy of soil, drums, and debris was excavated from the drum removal area. An additional 1,050 cy of soil were excavated for the foundation footings for the new building. Limited dewatering was required for the excavation. The groundwater was pumped to a recharge pit located within the limits of the RAM area.

---

GEI Consultants, Inc.                                              15

CONFIDENTIAL INFORMATION
GEI SUPP 2 1069

The soil was stockpiled and sampled for VOCs and PCBs to evaluate whether it could be reused as backfill in the vicinity of the new building. VOC concentrations in the stockpiled soil were less than the Method 1 S2/S3-GW2/GW3 standards and PCB concentrations were less than 4 mg/kg. The soil was approved for reuse as backfill. VOC and PCB concentrations in sidewall and bottom samples collected from the limits of the drum excavation and the building foundation excavation were mostly below laboratory detection limits, and all concentrations were below Method 1 S1-GW2/GW3 standards. The limits of the excavations for the RAM are shown on Figure 7.

As a contingency, a vapor barrier was installed below the foundation of Building 41 to limit the potential for vapors attributed to subsurface contamination to migrate through the building foundation and accumulate in Building 41. The vapor barrier consists of one layer of 20 mil alloyed, high-density polyethylene membrane, specifically designed for vapor control and spill containment.

### 3.5.2   Extent of Contamination in Soil - Area 5

Contaminated soil is concentrated along the northern edge of Upper Pond south of Building 35, extends east to the limit of the Building 41 RAM, and is bounded on the west by the eastern edge of Lower Pond. Contaminated soil and debris east of test pit TP406 were removed in 1997 as part of the Building 41 RAM.

The highest PCB concentrations (>100 ppm) in soil were detected along the northern bank of Upper Pond at depths up to 6.5 ft and coincided with the presence of debris and manufacturing wastes in the soil. The UCL for PCBs in soil (100 ppm) was exceeded in four locations (B407, TP413, TP415, and TP417) between the Upper Pond and the paved access road. Approximately equal amounts of waste debris and adhesive materials were observed in this area. PCB concentrations decreased with distance from the Upper Pond.

PCB contamination is mostly limited to the western portion of the FWDA. No evidence of PCB contamination was discovered in the soil east of Building 34 during previous investigations and minor PCB concentrations were detected in several soil samples during the Building 41 RAM. Based on the Site history and the pattern of PCB contamination, it is likely that the source of PCBs in the FWDA was disposal of PCBs and PCB-containing material.

VOC contamination in soil also appears to decrease with distance north of Upper Pond and was highest in soil that contained debris and manufacturing wastes. The highest total VOC concentrations from jar headspace screening were detected in soil south of the paved access road. Elevated VOC concentrations were detected in soil in 8 locations (TP-407, TP-412, TP-417, TP-422, B407, B408, B409, B413) at depths up to 10 ft bgs.

---

CONFIDENTIAL INFORMATION
GEI SUPP 2 1070

TPH contamination in soil in Area 5 appears to be limited to the soil and waste debris in the western portion of Area 5, north of Upper Pond. Elevated total petroleum hydrocarbons concentrations were detected in 5 locations (TP414, TP415, TP416, TP417, TP423) at depths up to 6.5 ft below the ground surface.

### 3.5.3    Extent of Contamination in Groundwater - Area 5

PCBs were detected at concentrations greater than 0.3 parts per billion (ppb) in 1993 in four shallow monitoring wells (MW405S, MW406S, MW408, MW202) and four test pits (TP410, TP407, TP406, TP425) located north of and at the western end of Upper Pond. Concentrations of PCBs in MW405S and MW406S exceeded the UCL for PCBs in groundwater (5 ppb). PCBs were not detected in groundwater samples from monitoring wells screened within the underlying till. In 1993, benzene and trichloroethene were detected in groundwater samples from MW405S (north of Upper Pond) and MW409 (east of Lower Pond) at concentrations greater than GW3 standards. In August 2000, the chlorinated VOCs TCE, cis-1,2 DCE, and vinyl chloride were detected in monitoring well MW409 at concentrations generally consistent with previous results but were not detected in other monitoring wells in Area 5.

Monitoring wells MW405S, MW406S, MW408, MW202 were lost or destroyed during construction and regrading activities conducted in Area 5 since 1995. Therefore, GEI coordinated installation of three replacement wells: MW405R, MW406R and MW408R in October 2000 and sampled the wells using low flow techniques to evaluate current conditions. Details of the investigation are provided in Section 2.3. VOCs were detected in monitoring wells MW405R and MW406R at elevated concentrations and in MW408R at relatively minor concentrations. PCBs were detected in monitoring well MW406R at a concentration of 0.81 ug/l and were not detected above laboratory detection limits in the remaining wells. Groundwater samples from test pits and monitoring wells during the Phase II investigation were not collected using low-flow techniques. Based on these results, it is GEI's opinion that PCB concentrations that exceeded UCLs in groundwater from previous sampling rounds may have resulted from suspended solids in the samples and were not representative of dissolved-phase concentrations.

According to the Method 3 Human Health Risk Characterization Addendum Report [GEI, 2000], a condition of significant risk to human health for non-carcinogenic effects exists for potential future Site construction workers that may be exposed to PCB contaminated soil in Area 5. Therefore, additional response actions are warranted in Area 5 to achieve a condition of No Significant Risk. The remedial goals are summarized in more detail in Section 4.

## 3.6  Area 6:  Building 9 Area

The Building 9 Area is located on the northern portion of the Bostik property, south of and upgradient from the OTF Area (Fig. 2). The general layout of the Building 9 Area is shown

CONFIDENTIAL INFORMATION
GEI SUPP 2 1071

# 4. Identification of Remedial Action Alternatives

The MCP requires the identification and evaluation of RAAs that are reasonably likely to achieve a Permanent or Temporary Solution, considering the OHM present, media contaminated, and Site characteristics. The MCP requires that the recommended alternative will achieve a Permanent Solution unless a Permanent Solution is not feasible or a Temporary Solution is more cost-effective and timely.

In accordance with 310 CMR 40.0855, RAAs are assessed in two stages. The first stage is the identification of RAAs based solely on feasibility. The second stage is the evaluation of RAAs based on eight criteria presented in 310 CMR 40.0858. In accordance with 310 CMR 40.0857[2], the second stage of the evaluation is not required in those cases where an RAA identified during the initial screening:

a.  Is proven to be effective in remediating the types of OHMs present at the disposal site, based upon experience gained at other disposal sites with similar Site and contaminant conditions.

b.  Results in the reuse, recycling, destruction, detoxification, treatment, or any combination thereof of the OHM present at the disposal site.

c.  Can be implemented in a manner that will not pose a significant risk of harm to health, safety, public welfare, or the environment, as described in 310 CMR 40.0900.

d.  Is likely to result in the reduction and/or control of OHM at the disposal site to a degree and in a manner such that the requirements of a Class A Response Action Outcome as set forth in 310 CMR 40.10000 will be met.

## 4.1 Remedial Objectives

Consistent with the requirements of the MCP, the risks to human health and the environment under current and future Site use scenarios were evaluated as part of the Method 3 Human Health and Environmental Risk Characterization (Method 3 Risk Characterization) for the Site. It was assumed that future activities and uses of the Site would be limited by an Activity and Use Limitation with the following restrictions to limit potential access to soil:

- The Site will be used only for industrial/commercial purposes (i.e., children will not be routinely present on the Site).

GEI Consultants, Inc.    26    CONFIDENTIAL INFORMATION
GEI SUPP 2 1080

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

**Area 2:** Old Tank Farm Area - Reduce VOC concentrations in soil and groundwater to levels that will not pose unacceptable risks to potential ecological receptors in the Ipswich River. In previous RAM submittals to DEP for Area 2, a target cleanup goal of one half of the GW3 standard or the AWQC, whichever was lower, was established for groundwater in Area 2.

**Area 5:** Former Waste Disposal Area - Reduce PCB concentrations in soil to levels that will not pose unacceptable risks to potential future Site construction workers.

**Area 6:** Building 9 Area - Reduce VOC concentrations in soil and groundwater to levels that will not pose unacceptable risks to Site workers in adjacent buildings. Discharge of contaminants in groundwater from Area 6 to the Ipswich River is not likely due to the distance of this area from the River. However, similar to Area 2, a target cleanup goal of one half of the GW3 standard or the AWQC, whichever is lower, will be established for groundwater in Area 6. This cleanup goal will eliminate the need for long-term surface water monitoring of the Ipswich River and groundwater monitoring downgradient from Area 6 after the system is shut down.

**Area 7:** Churn Pit Area -- Area 7 was included within the area of influence of the remedial system in Area 6 and will have the same remedial goals.

**Area 8:** Building 1 Area - Remove residual NAPL from the area between the former UST excavations and the foundations of Buildings 1 and 3.

**Area 11:** Old Dump Site Area - Contaminant concentrations in soil and groundwater in Area 11 did not exceed levels that would pose unacceptable risks to potential receptors at the Site. However, geophysical surveys of the area indicated the potential presence of buried drums. Therefore, an objective of this RAP is to investigate the presence of buried drums using test pits, and remove drums that may serve as continuing sources of soil and groundwater contamination.

## 4.2 Development of Risk-Based Remedial Goals

A risk-based remedial goal was developed for PCBs in soil in Area 5 using the cumulative exposure scenarios that were developed for the Site-wide Method 3 Risk Characterization. The derivation of the remedial goal included an evaluation of human health criteria, environmental criteria, public welfare and safety criteria, and feasibility and practicability criteria. A target cleanup level of 26 mg/kg was selected based on environmental criteria (potential leaching to groundwater). A summary of the calculations used to establish the risk-based remedial goal for PCBs is provided in Appendix F. GEI used a target remedial goal of 20 mg/kg when estimating the extent of soil requiring remediation and for the remedial cost estimates presented in Section 5.0. The use of 20 mg/kg as a remedial goal for

---

GEI Consultants, Inc.                     28

CONFIDENTIAL INFORMATION
GEI SUPP 2 1082

term risks would be managed by requiring the construction Contractor to implement and maintain appropriate control measures.

The cap would require periodic maintenance to maintain its integrity. Warning tape or a physical barrier such as a geotextile may be installed beneath the cap to prevent inadvertent excavation. This warning/barrier would provide clear notice that excavation at the Site shall not be conducted without health and safety controls and soil management procedures as specified by the AUL.

### 5.1.3  Excavation of Buried Debris and Affected Soils

The removal of affected soils would be performed using standard excavation equipment. Buried debris may be encountered during excavation. Debris would be separated from soils and transferred directly into roll-offs for subsequent disposal. Soils would be stockpiled pending results of laboratory analysis. Soils meeting the established risk-based standard for the Site would be used as backfill; soils exceeding the established risk-based standard for the Site would be transferred to roll-offs for subsequent ex-situ treatment and/or disposal.

Dewatering may be required due to the shallow water table in the area (approximately 5 ft bgs in some areas). It was assumed that the dewatering effluent would require ex-situ treatment prior to discharge due to the presence of dissolved VOCs in groundwater at the Site. PCB contaminated water may require off-site disposal. Dewatering treatment requirements were assumed to consist of gravity separation with a fractionation tank, filtration of suspended solids, followed by treatment at the on-site treatment system.

### 5.1.4  Ex-Situ Treatment of Buried Debris and Affected Soil

Ex-situ treatment options that are applicable to Site contaminants (PCBs, TPH, SVOCs) and that passed the initial screening include:

- Off-site thermal desorption
- On-site thermal desorption

#### 5.1.4.1  Off-site Thermal Desorption

Thermal desorption is a physical separation process that is non destructive, i.e., it is not designed to destroy the organic contaminant. Wastes are heated to volatilize water and organic contaminants. A carrier gas or vacuum system transports the water and organics to a gas treatment system. Thermal desorption systems require treatment of the off-gas to remove particulates and contaminants. A thermal desorption facility that accepts soils with PCB concentrations less than 50 ppm is located in Loudon, New Hampshire. This facility has not received blanket approval under the new PCB regulations to receive remediation waste with

GEI Consultants, Inc.    34    CONFIDENTIAL INFORMATION
GEI SUPP 2 1088

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

PCB concentrations greater than 2 ppm, however, they may still accept PCB contaminated soils with concentrations greater than 2 ppm under certain conditions.

### 5.1.4.2    On-site Thermal Desorption

An on-site thermal desorption unit is a portable unit that may be constructed and operated on-site. The unit typically consists of a materials feed system, an indirectly heated desorber, a baghouse, a materials discharge system, a vapor treatment system, and a liquid treatment system. The unit uses indirect heat to separate contaminants from soil. The contaminants are condensed, collected, and filtered through a water treatment system into a small volume for off-site disposal. The system occupies a footprint of 70 ft by 80 ft and operates at a throughput of 15 to 20 tons per hour. The system has demonstrated removal efficiencies of 99.9999 percent for PCBs. Following treatment, the soils can be reused as backfill at the Site.

## 5.1.5    *Disposal of Affected Soils*

Due to the presence of PCBs in the soil, federal regulations (40 CFR 761.61) stipulate the soil disposal options available for the Site. Soil disposal options identified by federal regulations include:

- Municipal solid waste landfill
- Non-municipal solid waste landfill (Special waste landfill)
- RCRA hazardous waste landfill
- TSCA/RCRA hazardous landfill

### 5.1.5.1    Municipal Solid Waste Landfill

A municipal solid waste landfill can accept limited concentrations of contaminants. The following criteria must be met: PCB's concentrations must be less than 2 ppm, TPH less than 5,000 ppm, and total VOCs less than 10 ppm. None of the soil in Area 5 that require removal due to exceedances of risk-based standards meets these criteria. Therefore, reuse/disposal of soil from Area 5 at a municipal solid waste landfill is not a feasible alternative.

### 5.1.5.2    Non-Municipal Solid Waste Landfill (Special Waste Landfill)

A special waste landfill can accept soil with PCB concentrations less than 50 ppm, unlimited concentrations of TPH, and total VOCs less than 10 ppm. Much of the soil in Area 5 will likely have VOC concentrations in excess of 100 ppm and therefore will not be accepted at a special waste landfill.

---

CONFIDENTIAL INFORMATION
GEI SUPP 2 1089

could be implemented in approximately 9 weeks. Based on exposures calculated in the Method 3 Human Health Risk Characterization Addendum, a condition of NSR in Area 5 would be achieved for long-term human health by implementation of RAA 1.

### 5.3.1.6    Benefits

RAA 1 would reduce risk to the future Site construction worker by removing soil, which exceeds the risk-based standard. Groundwater quality may be improved by removal of soil with elevated PCB and VOC concentrations. Under this alternative, a cap would not be constructed, and no long-term maintenance or environmental monitoring would be required.

### 5.3.1.7    Timeliness

Implementation of RAA 1 would take approximately nine weeks. Upon completion, a level of No Significant Risk to human health in Area 5 would be achieved.

### 5.3.1.8    Effect on Non-Pecuniary Interests

The Site is industrial and paved in some areas. The area to be excavated is unpaved and consists of mostly bare soil and weeds. Implementation of RAA 1 includes backfilling with clean fill, grading, spreading topsoil, and seeding, which would result in the improved aesthetics of the area.

## 5.3.2    RAA 2:  Excavation, On-Site Ex-Situ Treatment, and On-Site Reuse of Soil Exceeding Risk-Based Standard

RAA 2 consists of excavation of all soils exceeding the risk-based standard, treatment by a portable on-site thermal desorption unit, and backfill with treated soils. Under this alternative, a cap is not required.

Under this alternative, the same volume of soil as identified under RAA 1 (approx. 3,400 cy) would be excavated from Area 5. As for RAA 1, it was assumed that the excavation would extend to 10 ft bgs since information from the Phase II investigation indicates that fill in the area extends to 10 ft bgs. Depth to groundwater in this area has been as shallow as 5 ft bgs, therefore, dewatering would be required during excavation. Sampling of excavation bottom and sidewalls would be required to confirm that soil remaining in-place does not exceed the risk-based standard. The excavated area would be backfilled with treated soil, graded, spread with top soil, and seeded.

The thermal desorption unit would occupy an area 70 ft by 80 ft. The unit can operate 12 or 24 hours per day with a throughput of 15 to 20 tons of soil per hour. A generator would be brought on Site to power the control room, and the desorption unit would be powered by

---

CONFIDENTIAL INFORMATION
GEI SUPP 2 1093

natural gas or propane. Residuals from the process include solids with a concentrated PCB content that would require off-site incineration.

### 5.3.2.1    Effectiveness

Under this alternative, all contaminated soil exceeding the risk-based standard would be removed from Area 5, treated by an on-site thermal desorption unit, and reused as backfill, resulting in a Permanent Solution. According to Maxmillian Technologies, the thermal desorption unit they own and operate has been shown to exceed 99.9999 percent contaminant removal efficiency. RAA 2 reduces the toxicity, mobility and volume of the contaminants at the Site. Therefore, this alternative, would be effective at limiting exposure of the Site construction workers to PCB contaminated soil. Groundwater quality would be expected to improve as a result of the removal and treatment of the most highly affected soil. This alternative would not reduce the level of OHM remaining at the Site to background conditions.

### 5.3.2.2    Short-Term and Long-Term Reliability

RAA 2 is expected to be reliable in the short and long-term. Removal and treatment of all soil exceeding the risk-based standard is an irreversible action. The AUL restrictions place on the Site will also survive indefinitely on the deed for the property and will be reliable over the long-term.

The portable thermal desorption unit owned and operated by Maxmillian Technologies has been successfully used at six sites to date. Dewatering during excavation would be required. Water may be treated at the on-site water treatment facility. Moisture content greater than 20 percent in soils may slow down the throughput of the system. Installation of several monitoring wells followed by several rounds of groundwater sampling will likely be recommended to confirm groundwater conditions at the conclusion of excavation activities. No long-term maintenance or monitoring would be required following implementation of this alternative.

### 5.3.2.3    Difficulty in Implementing

RAA 2 requires transportation of the unit to the Site, and set up. The unit requires a 70 ft by 80 ft space to operate. Rerouting of traffic and other limited interruptions to plant operations in the area would be required, but are feasible for the term of the project. Protection of the ponds, dewatering, and treatment of groundwater would be necessary. If the moisture content of the soil exceeds 20 percent, the throughput of the system would be adversely affected. Excavated soils would need to be staged prior to treatment, and treated soils would need to be staged pending results of chemical analysis.

CONFIDENTIAL INFORMATION
GEI SUPP 2 1094

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

No long-term maintenance or environmental monitoring would be required since risk-based standards would be met. This alternative, as with all of the other alternatives, would require notification to the EPA Regional Administrator, DEP, and local environmental agency, at least 30 days prior to initiation of cleanup activities. It is not expected that this alternative would be disapproved by the EPA, DEP, or local agency. This unit has been operated at several sites in Massachusetts and has been well received by regulators.

### 5.3.2.4   Costs

For this alternative, it is assumed that on Site time to complete the work is 18 weeks, based on the thermal desorption unit operating 12 hours per day, 5 days per week, at a throughput of 15 cy per hour. It was assumed that all soil treated by the unit will be reused as backfill, and that approximately 10 percent of the total volume removed will consist of debris. Therefore, approximately 340 cy of clean fill will be imported for backfill. The estimated comparative cost for this alternative is $1,799,000. Estimated costs for all options are summarized in Table 5. Details regarding the cost estimates for each alternative are presented in Appendix G.

### 5.3.2.5   Risks

Minimal short-term risks could be posed during implementation of RAA 2. Fugitive emissions to the air during excavation could pose increased short-term risks to construction workers and Site workers. Plans and specifications developed during the Phase IV would require implementation of dust control measures and personal protection equipment to mitigate these short-term risks. There is potential for accidental discharges of contaminated soil or groundwater to surface water bodies at the Site during the work. Controls would be required to minimize these risks. There would be more handling of soil at the Site under this alternative so the risk of accidental discharges is higher than for other alternatives.

Air emissions from the process are not expected to pose a risk because the system has been shown to meet emissions requirements during treatment of soils with PCB concentrations an order of magnitude higher than those observed at the Site. The state may, however, require emissions testing during the process.

It was assumed that RAA 2 could be completed in approximately 18 weeks, including equipment set-up and disassembly. Based on exposures calculated in the Method 3 Human Health Risk Characterization Addendum, a condition of NSR in Area 5 would be achieved for long-term human health by implementation of RAA 2.

### 5.3.2.6   Benefits

RAA 2 would reduce risk to the future Site construction worker by removing soil that exceeds the risk-based standard. Groundwater quality may be improved by removal of soil

GEI Consultants, Inc.                                        41

CONFIDENTIAL INFORMATION
GEI SUPP 2 1095

with elevated contaminant concentrations. Since all excavated soils would be treated on-site, the quantity of PCB-contaminated soils transported off-site would be greatly reduced or eliminated, resulting in reduced local truck traffic. No long-term maintenance or environmental monitoring would be required under this alternative.

### 5.3.2.7    Timeliness

It is assumed that the thermal desorption unit will operate at a throughput of 15 tons per hour, 12 hours per day, 5 days per week. Under this assumption, and barring any unforeseen circumstances, the on-site construction time would be approximately 18 weeks, including mobilization, demobilization, and time to install controls for the ponds. However, the system has the capability to operate 24 hours per day. In this case, the on-site construction time potentially could be reduced to 12 weeks, but would increase costs.

### 5.3.2.8    Effect on Non-Pecuniary Interests

The Site is industrial and paved in some areas. The area to be excavated is unpaved and consists of mostly bare soil and weeds. Implementation of RAA 2 includes backfilling with treated soil, grading, spreading topsoil, and seeding, which would result in the improved aesthetics of the area.

### 5.3.3    RAA 3:  Excavation, Ex-Situ Treatment and/or Off-Site Disposal of All Soil with Contaminant Concentrations Greater than Background, Backfill with Clean Fill

RAA 3 consists of excavation and removal of all soil from Area 5 that exceeds background contaminant concentrations; transport to an off-site facility for thermal treatment and/or disposal; and backfill with clean, imported fill. A cap would not be required under this alternative. Soil meeting specified acceptability criteria may be treated at an off-site thermal desorption facility. Soil not meeting these criteria would be disposed of at a permitted TSCA or RCRA landfill. We estimate that approximately 1,400 cy of soil would be disposed of at a TSCA landfill.

For RAA 3, approximately 16,800 cy of soil would be excavated from the Site. The excavation in Area 5 was assumed to extend to the bottom of the fill, an assumed depth of 10 ft based observations made during the Phase II investigation. Contamination may extend past the fill into native soils, requiring deeper excavation, however, this was not included in the cost or feasibility evaluation. The excavation in both areas would be continued horizontally until background conditions for VOCs, SVOCs, TPH, and PCBs were encountered. If contamination extends horizontally into the northern bank of the Upper Pond, measures such as draining the pond, or constructing sheet piling, would be required to control discharges to the pond during excavation.

CONFIDENTIAL INFORMATION
GEI SUPP 2 1096

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

Depth to groundwater in the area is approximately 5 ft bgs, therefore, dewatering would be required. It is assumed that dewatering effluent would be treated by the on-site water treatment system.

### 5.3.3.1    Effectiveness

All material in Area 5 with contaminant concentrations greater than background would be removed under RAA 3. Therefore, this alternative would be most effective at eliminating exposure to contaminants of all present and future potential human receptors in Area 5, and would achieve a Permanent Solution.

### 5.3.3.2    Short-Term and Long-Term Reliability

RAA 3 would be reliable in both the short and long-term. RAA 3 will generate approximately 25,200 tons of contaminated soil. Thermal desorption is a reliable treatment technology for soil with PCB concentrations less than 50 ppm. Soil with PCB concentrations less than 50 ppm that otherwise does not meet specified acceptance parameters, would be disposed of at an RCRA landfill. Soil with PCB concentrations greater than 50 ppm would be disposed of at a permitted TSCA landfill.

### 5.3.3.3    Difficulty in Implementing

RAA 3 could be implemented with significant difficulty. Demolition of approximately 14,800 square feet (sf) of pavement in Area 5 would be required. These areas would also require re-paving. Due to the potential for excavation of the northern bank of the Upper Pond and the eastern bank of the Lower Pond draining of the ponds and reconstruction of the banks would likely be required. RAA 3 would have a significant adverse affect on operations at the Site. A portion of the paved area is road that receives regular daily truck traffic and several buildings and loading docks would be inaccessible during the work. Due to the depth of excavation and shallow groundwater table, dewatering will be required. It is assumed that water can be treated at the on-site water treatment facility. Excavation and dewatering methods and equipment are readily available. Monitoring and control requirements for dewatering, dust, odors, and decontamination of trucks and equipment will be extensive, but have been applied at other similar sites and are readily available.

Maintenance and long-term monitoring would not be required at the Site since all contaminated material would be removed. This alternative, as with all of the other alternatives, would require notification to the EPA Regional Administrator, DEP, and local environmental agency, at least 30 days prior to initiation of cleanup activities. It is anticipated that this alternative would receive approval.

CONFIDENTIAL INFORMATION
GEI SUPP 2 1097

### 5.3.3.4    Costs

For this alternative, it was assumed that on-site time to complete the work is 28 weeks. The estimated comparative cost for this alternative depends on characterization of soils with PCB concentrations less than 50 ppm. If soil with PCB concentrations less than 50 ppm meet certain criteria, the soil may be treated at a thermal desorption facility in New Hampshire, resulting in a total estimated comparative cost of $4,567,000. If soil with PCB concentrations less than 50 ppm do not meet these criteria, and are considered hazardous, the soil must be disposed of at a RCRA landfill, resulting in a total estimated comparative cost of $10,289,000. Estimated costs for both options are summarized in Table 5. Details regarding the cost estimates for each alternative are presented in Appendix G.

### 5.3.3.5    Risks

RAA 3 would pose moderate short-term risks to Site and construction workers, similar to RAA 1, but for a longer duration. There would be significant controls required to prevent discharges to the Upper and Lower Ponds. Damage to the wildlife habitat is likely under this alternative since draining of the ponds would likely be required. A condition of NSR will be achieved for long-term human health by implementation of this alternative.

### 5.3.3.6    Benefits

RAA 3 reduces contaminant concentrations in Area 5 to background, however due to the environmental conditions remaining in other areas at the Site, an AUL for the Site would still be required. Groundwater quality in Area 5 would likely be improved due to complete removal of potential source contaminants. No maintenance or long-term monitoring would be required as a result of implementing this alternative.

### 5.3.3.7    Timeliness

Excavation and backfill of Area 5 could be achieved in approximately seven months.

### 5.3.3.8    Effect on Non-Pecuniary Interests

Increased truck traffic in the area related to transportation of all contaminated soil would have a short-term negative affect on local residents, traffic, and Site operations. Area 5 consists of both paved areas and bare soil. Reconstruction of the banks of the Upper and Lower Ponds would result in damage to the wildlife habitat and may require years to return to existing conditions. Seeding the unpaved areas following backfilling and grading would have a positive affect on Site aesthetics.

---

GEI Consultants, Inc.    44    CONFIDENTIAL INFORMATION
GEI SUPP 2 1098

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

# 7. Recommended Remedial Action Alternatives

Based on the risk characterization, the results of previous response actions at the Site, and the assumption that an AUL will be recorded for the property, the following areas at the Bostik Site do not require additional remedial actions to achieve or maintain a condition of No Significant Risk.

| | |
|---|---|
| Area 1: | Pilot Plant Area |
| Area 3: | Building 36 Area |
| Area 4: | Surface Water and Sediments |
| Area 9: | Building 4 Area |
| Area 10: | Building 29 UST Area |

Remedial alternatives were identified during the initial screening and detailed evaluation that were selected as the final remedial alternatives for Areas 2, 5, 6, 7, 8, and 11. Those remedial alternatives are summarized below.

**Area 2:** Old Tank Farm Area - Continued operation of the existing groundwater extraction and treatment to contain discharges to the Ipswich River, coupled with operation of SVE and air sparging system in the area around monitoring well MW503.

**Area 5:** Former Waste Disposal Area - Remedial Action Alternative 1: excavation, off-site ex-situ treatment and/or off-site disposal of soil exceeding risk-based standard, and backfill with clean, imported fill.

**Areas 6 and 7:** Building 9 Area and Churn Pit Room - SVE and air sparging in accordance with the current RAM.

**Area 8:** Building 1 Area - Installation of NAPL recovery wells adjacent to the foundations of Buildings 1 and 3 with passive NAPL recovery. Active NAPL recovery may be initiated if warranted by recovery rates.

**Area 11:** Old Dump Site Area - Test pits to evaluate the presence of drums, and removal of the drums if they serve as potential continuing sources of soil and groundwater contamination is the recommended remedial alternative.

CONFIDENTIAL INFORMATION
GEI SUPP 2 1110

# Phase IV Remedy Implementation Plan
## Bostik Findley, Inc.
### DEP RTN 3-1494
### Middleton, MA

 GEI Consultants, Inc.

CONFIDENTIAL INFORMATION
GEI SUPP 2 2841

EXHIBIT

BD 130

Phase IV Remedy Implementation Plan
Bostik Findley, Inc.
April 30, 2001

# 2. Site Description

## 2.1 Site Location and Land Use

The Site is located on 36 acres on the northwest side of Boston Street, near the intersection of Boston Street and Russell Street in Middleton (Fig. 1). Bostik maintains and operates an adhesive manufacturing facility at the Site. The Site is bounded by the Ipswich River along the northern border of the Site; Boston Street to the south and east; and the Lynnfield-Middleton town line to the west. The Site is currently occupied by approximately 25 buildings (Fig. 2).

## 2.2 Environmental Setting

### 2.2.1 Site Geology

The Site is underlain by glacial and post-glacial deposits. The overburden consists of both stratified and unstratified till overlain by kame terrace deposits of sand and gravel. Both types of till contain many cobbles and boulders, often lying close to the bedrock surface. Bedrock beneath the Site is primarily diorite and granodiorite and is present at depths ranging from 10 to 35 feet (ft) below ground surface (bgs).

Landscaping and filling activities have altered the topography and geology of the Site. A formerly undefined wetland area and its corresponding swamp deposits that once occupied more than three acres of the southwest portion of the Site, was reconfigured in 1967 to form two surface water bodies, Upper Pond and Lower Pond (Fig. 2). Fill covers most of the Site north of Upper Pond extending up to and slightly past the fence line north of Buildings 35 and 36. The depth of fill varies from approximately 10 ft by Upper Pond, to 5 ft south of Building 35, to greater than 10 ft north of Building 36. The fill is comprised mainly of fine sand and gravel.

### 2.2.2 Site Hydrogeology

Groundwater flow direction at the Site is predominantly to the north/northeast toward the Ipswich River. Based on historic groundwater and surface water elevation data, the Ipswich River is a point of general groundwater discharge in the vicinity of the Site. Based on data collected during the Phase II CSA, the hydraulic gradient across the Site ranges from approximately 0.014 at Area 5 to approximately 0.036 at Area 2. Assuming a porosity of 0.25, the groundwater velocity in Area 5 ranged from approximately 1.2 to 5.8 ft/year, and in Area 2 from approximately 3 to 12 ft/year.

---

GEI Consultants, Inc.                     5

CONFIDENTIAL INFORMATION
GEI SUPP 2 2852

Phase IV Remedy Implementation Plan
Bostik Findley, Inc.
April 30, 2001

# 3. Nature and Extent of Contamination

This section provides a summary of the nature and extent of contamination in each area of the Site where a CRA was selected during the Phase III evaluation. Potential or known sources of contamination are identified as appropriate. Contaminants at the Site consist primarily of non-chlorinated volatile organic compounds (VOCs), PCBs, total petroleum hydrocarbons (TPH), extractable petroleum hydrocarbons (EPH), and volatile petroleum hydrocarbons (VPH).

## 3.1 Area 2: Old Tank Farm Area (OTFA)

The OTFA is located on the northern portion of the Site, adjacent to the Ipswich River (Fig. 2). The general layout of the OTFA is shown on Figure 3. In 1986, approximately 28 underground storage tanks (USTs) were removed from the OTFA. The USTs stored solvents used by Bostik to manufacture adhesives. The primary contaminants observed in soil and groundwater during the Phase II CSA were VOCs, including toluene, methyl-cyclohexane, and methyl-cyclopentane, and were attributed to releases from the former USTs. PCBs were not detected in soil and groundwater in the OTFA.

Several remedial systems have been implemented in the OTFA to control the discharge of contaminants to the Ipswich River and to reduce the concentrations of contaminants in soil and groundwater. The systems have been successful in reducing contaminant concentrations in groundwater in most of the OTFA to levels that are approaching background conditions. A summary of the remedial systems implemented in the OTFA was included in the Phase III report.

## 3.2 Area 5: Former Waste Disposal Area (FWDA)

From the late 1940s until the mid 1960s, a waste disposal area was located adjacent to what is now Upper Pond. The general layout of the FWDA is shown on Figure 4.

The primary contaminants in soil and groundwater in the FWDA include PCBs, VOCs, and semivolatile organic compounds (SVOCs). VOCs detected in soil in Area 5 include 2-butanone (MEK), 4-methyl-2-pentanone, toluene, and xylene. VOCs detected in groundwater from monitoring wells in the FWDA include benzene, toluene, xylene, trichloroethene (TCE), and vinyl chloride. The primary SVOCs detected in the FWDA include benzo(a)anthracene, chrysene, benzo(b) fluoranthene, benzo(a)pyrene, indeno(1,2,3-cd)pyrene, and bis(2-ethylhexyl)phthalate. PCBs detected in FWDA soils primarily consist

CONFIDENTIAL INFORMATION
GEI SUPP 2 2854

Phase IV Remedy Implementation Plan
Bostik Findley, Inc.
April 30, 2001

of Aroclor-1248. TPH fingerprinting indicated the presence of lubrication oil and diesel oil
in soil and groundwater in the FWDA.

GEI has observed buried and partially buried refuse such as broken and melted glass, metal
scraps, cans, brick, 55-gallon drums, and burned and unburned adhesive waste in test pits in
the former waste disposal area.

The area of contaminated soil is along the northern bank of Upper Pond, south of
Building 35. It is mostly limited to the western portion of the FWDA, bounded on the west
by the eastern edge of Lower Pond. No evidence of PCB contamination was discovered in
the soil east of Building 34 during previous investigations and minor PCB concentrations
were detected in several soil samples of excavated soil during the Building 41 RAM. PCBs
were not detected above laboratory detection limits in soil samples collected from the limits
of the Building 41 RAM excavation. The highest total VOC concentrations from jar
headspace screening were detected in soil south of the paved access road. Elevated TPH and
PCB concentrations were detected at depths up to 6.5 ft bgs, and elevated VOC
concentrations were detected at depths up to 10 ft bgs. Higher concentrations of
contaminants coincided with the presence of waste debris and adhesive materials in the soil
and decreased with distance from the Upper Pond.

PCBs and VOCs, including benzene, trichloroethylene (TCE), cis-1,2 dichloroethylene
(DCE) and vinyl chloride, have been detected in the groundwater collected from the western
and eastern portions of the FWDA. Concentrations of contaminants generally decrease with
distance from the Upper Pond. PCBs were not detected in groundwater samples from
monitoring wells screened within the underlying till. In October 2000, PCBs were detected
in groundwater from only one monitoring well (MW406R), which is located in the eastern
portion of the FWDA (Fig. 2).

## 3.3  Area 6:  Building 9 Area

The Building 9 Area is located on the northern portion of the Bostik Site, south of and
upgradient from the OTFA (Fig. 2). The general layout of the Building 9 Area is shown on
Figure 5. Underground solvent piping formerly originated at Building 9, passed through the
Building 9 Area, and connected to USTs formerly located in the OTFA (Area 2). The USTs
in the OTFA were removed in 1986.

Similar to the OTFA, the primary contaminants in soil and groundwater in the Building 9
Area are VOCs, including toluene, methyl-cyclohexane, and methyl-cyclopentane, and are
attributed to releases from the underground solvent piping. Separate-phase product was
observed in a monitoring well in the Building 9 Area in March 1995 and has been observed
intermittently since that time. PCBs were not detected in soil and groundwater in the
Building 9 Area.

GEI Consultants, Inc.                                    8                    CONFIDENTIAL INFORMATION
GEI SUPP 2 2855

Phase IV Remedy Implementation Plan
Bostik Findley, Inc.
April 30, 2001

## 4.2  Area 5:  Former Waste Disposal Area (FWDA)

### 4.2.1  Goals of the Remedial Action

The goal of the Remedial Action selected for Area 5 is to reduce PCB concentrations in soil to levels that will not pose unacceptable risks, particularly to potential future Site construction workers. A risk-based remedial goal was developed for PCBs in soil in Area 5 using the cumulative exposure scenarios that were developed for the Site-wide Method 3 Risk Characterization. The derivation of the remedial goal included an evaluation of human health criteria, environmental criteria, public welfare and safety criteria, and feasibility and practicability criteria. A target cleanup level for PCBs of 26 milligrams per kilogram (mg/kg) was selected based on environmental criteria (potential leaching to groundwater). GEI will use a target remedial goal of 25 mg/kg in order to meet federal requirements for low occupancy areas, in accordance with the TSCA regulations (40 CFR 761.61[a][4]), when determining the extent of soil requiring remediation.

The TSCA regulations require a characterization of the Site using a grid with specific sample frequencies; notification to the EPA Regional Administrator; cleanup of the Site to levels specified in the regulation based on occupancy levels at the Site; and disposal of the remediation waste in accordance with the regulations. Therefore, GEI designed the RA for Area 5 to meet the requirements of TSCA as well as the MCP. Following the implementation of a soil sampling and pre-characterization program in Area 5, GEI will prepare clean-up plan for Area 5 that will be submitted to EPA for approval. A copy of the plan will also be submitted to DEP. The plan will include many of the same elements of this Phase IV RIP that are related to Area 5, as well as the results of the pre-characterization program.

### 4.2.2  Conceptual Plan

The remedial action generally consists of excavation of PCB contaminated soils that exceed the target remedial goal of 25 mg/kg. The work will consist of the following primary elements:

- **Implementation of a soil sampling and pre-characterization program** to define the limits of the excavation and to pre-characterize the soil for disposal.

- **Construction of pollution control systems**, such as hay bales, silt fences, and turbidity curtains, to protect adjacent surface water bodies from potential spills.

- **Construction of an excavation support and dewatering system** that will consist of a steel sheet-pile wall along the southern limit of the excavation and dewatering from sumps within the excavation.

CONFIDENTIAL INFORMATION
GEI SUPP 2 2861

Phase IV Remedy Implementation Plan
Bostik Findley, Inc.
April 30, 2001

The extent of the excavation into the bank of the Upper Pond will be determined during the pre-characterization program. Based on the horizontal extent of PCB contamination into the bank of Upper Pond, sheet-piling will be installed in the appropriate location to protect the stability of the bank, control the flow of water from the pond into the excavation, and minimize the potential for discharges of contaminated soil and groundwater into the pond. According to available information about the subsurface conditions in Area 5, GEI believes that a cantilever sheet pile system will be sufficient. The cantilever system is feasible if there is enough overburden above the till to support the sheet piles. If the results of the pre-characterization study show that the till is shallower than expected, the sheet piles will be braced or a precut will be made on the outside of the wall to provide additional support.

Because of the shallow groundwater table in Area 5 the excavation will require dewatering. After the sheet piles are installed, water in the excavation will be pumped into a fractionation tank. This tank will be located in front of Building 34 and Building 35. GEI will conduct a pilot water treatment study to determine whether the water is contaminated with PCBs and requires pre-treatment prior to pumping to the on-site water treatment plant. GEI estimates that the water will enter the treatment system at an approximate rate of 5 to 10 gallons per minute (gpm), which is within the treatment systems operating capacity.

Dewatering effluent will be treated to remove PCBs prior to discharging water to the on-site treatment system, if required. Decontamination of the effluent will be conducted in accordance with 40 CFR 761.79, which allows for filtering to remove or separate PCBs from liquids. Water will then be pumped to the on-site treatment system, which will remove VOCs prior to discharging to an on-site leachfield.

### 4.2.4.2   Expected System Efficiencies

Under this alternative, all contaminated soil exceeding the risk-based standard will be removed from Area 5, resulting in a Permanent Solution. Excavation of soil exceeding the risk-based standard reduces the toxicity, mobility, and volume of the contaminants at the Site. Therefore, this alternative, which includes an AUL, will be effective at limiting exposure of the Site construction workers to PCB contaminated soil. Groundwater quality is expected to improve as a result of the removal of soil that exceeds the risk-based standard. This alternative will not reduce the level of OHM remaining at the Site to background conditions.

The existing groundwater treatment system, which will be used to treat VOCs in the excavation dewatering effluent, operated at an average flow rate of 14.87 gallons per minute from April 2000 through September 2000. During that time, the VOC removal efficiency of the system approached 100 percent, reducing total benzene, toluene, ethylbenzene, and xylene concentrations from approximately 108 parts per billion (ppb) to non-detectable

CONFIDENTIAL INFORMATION
GEI SUPP 2 2863