EXHIBIT C

1  VOLUME 9                                          PAGES 1 - 101

2                  UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF MASSACHUSETTS

4  * * * * * * * * * * * * * * * * * * * *

5  Liberty Mutual Insurance Company          *

6  v.                                        *

7  The Black & Decker Corporation,           *     Civil Action

8  Black & Decker, Inc., Black & Decker      *     No. 96-10804-DPW

9  (U.S.) Inc., Emhart Corporation, and      *

10 Emhart Industries, Inc.                    *

11 * * * * * * * * * * * * * * * * * * * *

12

13

14          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

15            UNITED STATES DISTRICT COURT JUDGE

16                  JURY TRIAL - DAY 9

17               Wednesday, February 4, 2004

18             Courtroom No. 1 - Third Floor

19        1 Courthouse Way, Boston, Massachusetts 02210

20

21

22  - - - - - - - - - - -  J. EDWARD VARALLO, RMR, CRR  - - - - - - - - - - - - -

23                    COURT REPORTER

24        FARMER ARSENAULT BROCK LLC, BOSTON, MASS.

25                    617.728.4404

18 (Pages 66 to 69)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 9 - 2/4/2004

66

1  attention to that spot, Mr. Mansourian, you actually went
2  into the pilot plant itself during the 1960s. Correct?
3      A.   Yes.
4      Q.   And there were floor drains in the pilot plant?
5      A.   Yes. I believe there was two of them.
6      Q.   And those floor drains went into a culvert, if
7  we could go back up to a larger view, please. The floor
8  drains went into a culvert by the pilot plant. Correct?
9      A.   Right.
10     Q.   And that culvert then went into the pond by the
11 pilot plant. Correct?
12     A.   Right.
13     Q.   And then eventually that pond would go out into
14 an unnamed stream and the Ipswich River. Correct?
15     A.   Well, it would overflow from the big pond into
16 the little pond and then into that stream up to the river,
17 right.
18     Q.   And it is true that there were floor drains in
19 other buildings on the site that flowed into the Ipswich
20 River as well. Correct?
21     A.   Yes.
22     MS. MAIN: May I have a moment, your Honor,
23 please?
24     THE COURT: Yes.
25     MS. MAIN: No further questions. Thank you,

67

1  Mr. Mansourian.
2      MR. PIROZZOLO: No questions, your Honor.
3      THE COURT: All right. You may step down,
4  Mr. Mansourian.
5      (Witness excused)
6      MR. PIROZZOLO: Mr. Hewitt.
7      STANLEY G. HEWITT,
8  having been first duly sworn on oath,
9  was examined and testified as follows:
10     DIRECT EXAMINATION
11 BY MR. PIROZZOLO:
12     Q.   Mr. Hewitt, would you please give your name and
13 address?
14     A.   My name is Stanley Hewitt and I live at 19
15 Fremont Street in Lexington, Mass.
16     Q.   And did you work for Bostik for a long period of
17 time?
18     A.   Yes.
19     Q.   Would you tell us when you first went to work
20 for Bostik? And did you retire eventually?
21     A.   Yes.
22     Q.   Will you tell us when you first went to work for
23 Bostik and when you retired?
24     A.   I first went to work for Bostik in 1945 and I
25 retired in 1990.

68

1      Q.   Thank you. And would you give us a brief
2  description of your education and the type of work and
3  positions you had at Bostik?
4      A.   Well, after the Korean War I went to
5  Northeastern University and got a degree in mechanical
6  engineering, and I did that while I was working for Bostik
7  under the G.I. Bill. And that was the end of my formal
8  education.
9      Q.   And then did you work at -- Did Bostik at one
10 time have a facility in Cambridge?
11     A.   Yes. I worked in the research facility in
12 Cambridge.
13     Q.   And briefly what kind of work did you do at the
14 research facility?
15     A.   I started working as a lab technician and then
16 got a job in the engineering department, and that's when I
17 started school.
18     Q.   And from time to time when you were working in
19 Cambridge did you visit the Middleton facility?
20     A.   Yes.
21     Q.   About how often?
22     A.   Well, could be three, four, five times a year.
23 I don't really remember.
24     Q.   What was your purpose in visiting the Middleton
25 facility while your principal place of work was Cambridge?

69

1      A.   Well, it was project engineering and it was to
2  install generally some kind of equipment to make a
3  product.
4      Q.   Now, at some point in time were you transferred
5  or did you transfer to the Middleton facility?
6      A.   1963 I was promoted from project engineer to
7  plant engineer.
8      Q.   And what were your duties as plant engineer?
9      A.   The overall plant, all the mechanical devices,
10 and maintenance.
11     Q.   Did you eventually become plant manager?
12     A.   No.
13     Q.   Did you have another position after plant
14 engineer?
15     A.   I had several positions. Plant engineer, there
16 were two periods of my time at Bostik that I was an energy
17 engineer and a project engineer and somebody else took my
18 position as plant engineer.
19     Q.   I see.
20     A.   Then I was given the plant engineer's job back
21 at the last part.
22     Q.   Did you have any work with the maintenance
23 department?
24     A.   Yes.
25     Q.   Give us an idea in the 1960s of what the

24 (Pages 90 to 93)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 9 - 2/4/2004

90

1      You see in that paragraph Mr. Molberg wrote "To
2   the best of Mr. Hewitt's and my recollection, your verbal
3   instructions were:  Contamination of the water if less
4   than 100 parts per million need not be reported.  Soil
5   having an NU meter reading of less than 10 on the most
6   sensitive scale could not be replaced."  I'm sorry.  "Soil
7   having an NU meter reading of less than 10 on the most
8   sensitive scale could be replaced in the hole."
9      A.   Yes.
10     Q.   Do you recall that was the instructions that you
11  and Mr. Molberg received?
12     A.   Yes.
13     Q.   And do you recall that you followed those
14  instructions?
15     A.   Yes.
16     Q.   And as it says at the bottom, do you recall that
17  Bostik sampled the water, sent the samples to Cambridge
18  Analytical, and continued the abandonment according to
19  DEQE's instructions?
20     A.   Correct.
21     Q.   If we could go to the top of the next page,
22  please.  Please highlight the first paragraph.
23     Does that refresh your recollection that no
24  further contamination was found and all oil removed tested
25  less than 10 on the NU meter's most sensitive scale.

91

1   Therefore, all soil was replaced in the holes left by the
2   tank removal?
3      A.   Correct.
4      Q.   So that basically means the soil that was
5   removed in connection with removal of the tanks was put
6   back in the hole?
7      A.   Yes.
8      Q.   And do you recall that was done?
9      A.   Yes.
10     Q.   Now, if we go to the paragraph that begins "Your
11  recent...."
12     Do you remember that the letter that came
13  addressed to you and to which Mr. Molberg replied came as
14  a surprise?
15     A.   Yes.
16     MR. LEPORE:  Objection, your Honor.  This is
17  well beyond the scope.  I mean, he's asking questions --
18     THE COURT:  No, I think it is responsive so I'm
19  going to permit it.
20  BY MR. PIROZZOLO:
21     Q.   Could I ask you to highlight part 4.  You read
22  part 4 and it says "No Chapter 21E site assessment has
23  been made.  Bostik obtained a copy of Chapter 21E from the
24  State House bookstore but there is no mention of a site
25  assessment.  A phone call to DEQE indicates that this may

92

1   be a DEQE policy but no information has been sent to
2   Bostik; therefore, we cannot perform one."  Do you see
3   that?
4      A.   That's correct.
5      Q.   Does that refresh your recollection as to the
6   status of the 21E site assessment?
7      A.   Yes.
8      MR. PIROZZOLO:  I have no further questions.
9      MR. LEPORE:  I have no questions, your Honor.
10     THE COURT:  All right, you may step down,
11  Mr. Hewitt.  Thank you.
12     (Witness excused)
13     MR. PIROZZOLO:  Mr. Beaulier?
14          DUANE R. BEAULIER,
15     having been first duly sworn on oath,
16     was examined and testified as follows:
17          DIRECT EXAMINATION
18  BY MR. PIROZZOLO:
19     Q.   Mr. Beaulier, could you give your full name and
20  address?
21     A.   Duane Beaulier, 10 Robert Road, Danvers,
22  Massachusetts.
23     Q.   And have you worked for Bostik?
24     A.   Yes.
25     Q.   Will you tell us briefly what your period of

93

1   employment was and what your duties and responsibilities
2   were?
3      A.   My employment was, I went to work in July of
4   1960 and went into the Army in October of 1961 and then
5   returned to Bostik in October-November of 1964 and then
6   retired in August of 2000.  And my job responsibilities
7   were multiple, from being foreman, supervisor, plant
8   manager.
9      Q.   I would like to focus on the earliest part of
10  your employment.
11     A.   Okay.
12     Q.   Did you work for a short time for Bostik before
13  you went into the Army?
14     A.   Yes, I did.
15     Q.   And during that time did you have a chance to
16  either see or participate in the activities in the area
17  described as the burn area?
18     A.   Yes.  Now, at the beginning of my --
19     Q.   If I may, could we project the plan, please.
20     Could you show us where that area is on the
21  plan?
22     A.   Around Building 34 and the pond.  Yes.
23     Q.   Have we placed the cursor in the right place?
24     A.   Yes.  That area, yes.
25     Q.   Now, would you describe that as you saw it

94

1  before you went into the Army?
2      A.   When I first went to work to Bostik, I was
3  working for maintenance and my job was painting the
4  buildings.  And on Saturday, one Saturday or maybe more, I
5  worked overtime and dumped solvent, adhesives and solvent
6  waste into a pit that was in that area; and then we would
7  burn it.
8      Q.   And did you participate in the burning of it?
9      A.   I participated in the dumping of the waste into
10  the pit.
11      Q.   Did you ever see it burn?
12      A.   Actually lighting it?  Yes, I saw it burning.
13  Actually, I didn't light it, though.
14      Q.   And how long were you in the Army?
15      A.   Three years.
16      Q.   When you came back, did you have an occasion to
17  see that area?
18      A.   When I came back, the area had been done away
19  with.  It was moved, cleaned, whatever.
20      Q.   And what did it look like?
21      A.   I think there was a lawn there by then.
22      MR. PIROZZOLO:  No further questions, your
23  Honor.
24      THE COURT:  Mr. Lepore or Ms. Main?
25      MR. LEPORE:  Yes, Ms. Main.  May I have just a

95

1  moment, your Honor.
2      THE COURT:  Yes.
3          CROSS-EXAMINATION
4  BY MS. MAIN:
5      Q.   Good afternoon, Mr. Beaulier.  Again, my name is
6  Robin Main and I represent Liberty Mutual.
7      Turning your attention back to the waste dump
8  area, when you did participate in the burning off of the
9  spent material there, the waste dump area was a pit, just
10  a hole in the ground.  Correct?
11      A.   Where the material was dumped was a hole in the
12  ground, yes.
13      Q.   And the walls of the pit, they were dirt.
14  Correct?
15      A.   To the best of my knowledge they were.
16      Q.   Do you remember seeing that they were dirt at
17  the time?
18      A.   Vaguely.  I don't really remember.
19      Q.   And when you began working at Bostik in the
20  1960s you were aware that there were floor drains in some
21  of the buildings.  Correct?
22      A.   Yes.
23      MR. PIROZZOLO:  Pray your Honor's judgment;
24  beyond the scope.
25      THE COURT:  Overruled.

96

1  BY MS. MAIN:
2      Q.   And you were told that those floor drains led to
3  the Ipswich River.  Correct?
4      A.   To be honest, I didn't know where they led to.
5  I just assumed they did.
6      Q.   Do you recall being deposed, Mr. Beaulier --
7      A.   Yes.
8      Q.   -- a couple of months ago?  Or years ago,
9  rather.
10      A.   A few years ago, yes.
11      Q.   A few years ago, yes.
12      MS. MAIN:  And may I approach the witness, your
13  Honor?
14      THE COURT:  You may.
15  BY MS. MAIN:
16      Q.   In regard to the floor drains leading to the
17  Ipswich River, I would like to turn your attention to page
18  64, sir.
19      A.   Yes.
20      Q.   And you reference that the floor drains went to
21  the river.  And were you aware of any verbal or written
22  procedures at the time that the chemicals used at the
23  plant were not to get into the drains that eventually went
24  to the river?
25      A.   No, I was not aware of any procedures.  I did

97

1  personally get involved when some oil got into one of the
2  drains and was part of the cleanup.
3      Q.   If I could turn your attention to page 64, sir,
4  lines 18 through 21, and the question was "And were there
5  any verbal or written procedures that chemicals were not
6  to get into the drains to eventually get into the river?"
7  And your answer was "Yes."  Correct?
8      A.   Yes.
9      Q.   Turning over to the next page, page 65,
10  Mr. Beaulier, lines 6 through 9, the question was "So by
11  1961 you were made aware that materials were not to go
12  down, chemicals were not to go down into the drains
13  because they were not to go into the river?"  Is that
14  correct?
15      A.   I did say yes, I guess.
16      Q.   Thank you.
17      A.   You're welcome.
18      Q.   And you're familiar with the old tank farm area
19  that was at the site.  Correct, Mr. Beaulier?
20      A.   Yes.
21      Q.   And that tank farm again as we've heard earlier
22  today was about 25 feet from the banks of the Ipswich
23  River.  Correct?
24      A.   Yes.
25      Q.   And you recall that the tanks were removed at

VOLUME 10                                          PAGES 1 - 138

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * *

Liberty Mutual Insurance Company          *

v.                                        *

The Black & Decker Corporation,           *     Civil Action

Black & Decker, Inc., Black & Decker      *   No. 96-10804-DPW

(U.S.) Inc., Emhart Corporation, and      *

Emhart Industries, Inc.                   *

* * * * * * * * * * * * * * * * * * *

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT JUDGE

JURY TRIAL - DAY 10

Friday, February 6, 2004

Courtroom No. 1 - Third Floor

1 Courthouse Way, Boston, Massachusetts 02210


------------- J. EDWARD VARALLO, RMR, CRR ---------------

COURT REPORTER

FARMER ARSENAULT BROCK LLC, BOSTON, MASS.

617.728.4404

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

22

1    Q.   Could you describe what that is?
2    A.   That is the area around the pipe trench that
3    connected the tank farm to Building 9; and there were
4    accidental releases in the trench in this area here that
5    resulted in groundwater contamination in this area.
6    Q.   There is a number 5, former waste disposal area.
7    Could you describe what that is?
8    A.   Yes.  Prior to the mid or late '60s Bostik
9    disposed of some of its solid waste at the facility that
10   contained PCBs and VOCs.  They also used an accelerant to
11   help burn the material at this location.  And as a result
12   of those activities, there is soil and groundwater
13   contamination in this area.
14   Q.   Now, there are some unlabeled areas.  I'm going
15   to ask you what this is, which is to the southeast of the
16   most northeast building?
17   A.   This Building 1 here, down here?  This is an
18   area that is affected by a release from petroleum fuel
19   tanks in this area.
20   Q.   And there also is an area to the south of the
21   upper pond.  What is that?
22   A.   That is another -- I think that's a portion of
23   the disposal area.  I'm not actually familiar with this
24   area here.
25   Q.   And there is another area to the northwest, I

23

1    believe.
2    A.   Yes.
3    Q.   What is that?
4    A.   That is a building, I think that's Building 36,
5    and there was a Struthers well at that area.  There was a
6    polyester distillate operation there and there had been a
7    spill historically and some other releases that occurred
8    in that area.
9    Q.   May we see the next slide?
10   MR. LEPORE:  Excuse me, your Honor.  Before we
11   show it, may I speak to Mr. Pirozzolo about this?
12   THE COURT:  Yes.
13   MR. LEPORE:  Can you take that off, please.
14   (Pause)
15   MR. PIROZZOLO:  Can we keep this screen up.
16   BY MR. PIROZZOLO:
17   Q.   Ms. Hanley, can you explain whether there --
18   Withdrawn.  Is there groundwater on the site?
19   A.   Yes.
20   Q.   And are you familiar with the way in which the
21   groundwater behaves?
22   A.   Yes.
23   Q.   And would you describe that?
24   A.   Groundwater flows generally toward the Ipswich
25   River.  Areas immediately adjacent to a water body may

24

1    flow directly to the water body, but ultimately
2    groundwater flows into the Ipswich River.
3    MR. PIROZZOLO:  Is there any objection to the
4    next slide?
5    (Mr. Lepore and Mr. Pirozzolo conferred.)
6    BY MR. PIROZZOLO:
7    Q.   Can you give a little more detail as to the
8    elevations and the way groundwater flows?
9    A.   Groundwater elevation across the site is highest
10   in this area here and lowest along the river, and as a
11   result groundwater flows toward the lower point to the
12   river and then discharges in to the river.
13   Q.   May we see the next slide, please.  Does that
14   slide illustrate anything about the groundwater flow?
15   A.   Yes.
16   Q.   Would you please explain that?
17   A.   Groundwater flow -- Well, let's start over by
18   the pilot plant area.  The groundwater flow here is
19   generally toward the river.  Obviously the upper pond gets
20   in the way, and so it locally discharges to upper pond.
21   The former disposal area here, because of the effect of
22   some mounding in this area, groundwater locally flows
23   toward upper pond here and then into the ditch and into
24   the Ipswich River.
25   The trench area here, groundwater generally

25

1    flows toward the Ipswich River.  It also flows through the
2    former tank farm area to the Ipswich River and then here
3    is the tank farm.  That's very close to the river, and it
4    flows directly into the river.
5    Q.   Is there any flow of surface water in the
6    vicinity of the upper pond?
7    A.   Yes.  Surface water in upper pond flows into
8    lower pond and then down into the unnamed ditch, drains
9    from there and then into the cove and into the river.
10   Q.   May we see the next slide.  And the next one,
11   please.
12   Going back, can I ask you what this is?
13   A.   Yes.  Those are concentration contours for
14   solvent contamination in the vicinity of the tank farm and
15   the trench area of Building 9.
16   Q.   And by "this," I have pointed to the area of the
17   old tank farm and the pipe trench.  Is that right?
18   A.   Yes.
19   Q.   Can we go to the next slide.  Does that show in
20   more detail that particular area of the pipe trench and
21   the old tank farm?
22   A.   Yes.  This is the pumphouse for the pipes for
23   the distribution of the solvent.  This is the trace of the
24   pipeline that connected the tank farm to Building 9.  And
25   this is the general area of the former tank farm, the old

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

34

1   time. We identified the uses of each of the buildings at
2   the site and the types of materials used at the facility.
3        We also did a preliminary evaluation of the
4   groundwater. We put, I think there were ten monitoring
5   wells that were installed at the site to help us map the
6   direction of groundwater flow and to collect some initial
7   groundwater quality samples at the site. And I believe we
8   also evaluated -- We did some geophysical or remote
9   sensing. We used soil gas to evaluate the extent of a
10  plume in the old tank farm area as part of the Phase 1.
11      Q.   And as a result of that did you do a report?
12      A.   Yes, a Phase 1 report was issued.
13      Q.   And was that sent to the DEP?
14      A.   It was, yes.
15      Q.   What is the Phase 2 report? Excuse me. The
16  Phase 2 site assessment report.
17      A.   The Phase 2, once you identify that
18  contamination has actually occurred at the property, the
19  objective of the Phase 2 is to evaluate the source,
20  nature, extent and impact of the contamination.
21           So having identified that there was
22  contamination there, we went back and I looked at each
23  individual source of contamination, mapped how that
24  release could migrate in the environment, and then
25  evaluated where the impacts were occurring, in

35

1   groundwater, in wells, in surface water, in sediments, and
2   then conducted a risk assessment to determine if those
3   levels were posing a significant risk to public health and
4   the environment.
5       Q.   In the course of doing the Phase 1 and Phase 2
6   work did you learn anything about historic practices at
7   the site?
8       A.   Yes.
9       Q.   And what did you learn?
10      A.   We learned that there was a large old tank farm
11  area on the property. We learned that there was
12  landfilling, open burning facilities of waste, or burning
13  of waste at the facility in a disposal area. We learned
14  of the historical spills that had occurred at the
15  property. And we identified locations on the site where
16  there was evidence of contamination, basically stained
17  soils.
18      Q.   In the course of the Phase 1 and Phase 2 site
19  assessment work, did you learn what substances were a
20  problem on the property?
21      A.   Yes.
22      Q.   And what were those substances?
23      A.   They were primarily the solvents that had been
24  used in the manufacturing process, toluene, methyl ethyl
25  ketones. There were other solvents as well.

36

1   Polychlorinated biphenyls or PCBs were also identified,
2   especially in the area around the pilot plant and in the
3   disposal area.
4       Q.   And when were those substances first called out
5   as hazardous waste or hazardous substances in regulations?
6       A.   Well, they were identified as hazardous
7   materials in the early '70s. It wasn't until after the
8   Resource Conservation and Recovery Act that, if they had
9   been disposed of, they were identified as a hazardous
10  waste.
11      Q.   Were there regulations regarding acceptable or
12  unacceptable concentrations in soil and groundwater?
13          MS. ROWAN: Objection, your Honor, time frame.
14          THE COURT: Address her to a particular time
15  frame, counsel.
16  BY MR. PIROZZOLO:
17      Q.   Do you know when there were first regulations on
18  the acceptable concentrations of those materials in soil
19  and groundwater?
20      A.   I am not aware of any regulation until around
21  1980 when EPA identified the priority pollutant list.
22      Q.   Did the Phase 1 and Phase 2 work involve
23  investigation with respect to the Ipswich River?
24      A.   Yes.
25      Q.   Could you explain or describe that?

37

1       A.   During the performance of the Phase 1
2   investigation, surface water contamination was noted and a
3   periodic surface water monitoring program was implemented,
4   and established that there were VOCs or solvents in the
5   surface water in the Ipswich River. In addition to that,
6   we established that there were PCBs in sediments in the
7   Ipswich River and also in upper and lower pond and the
8   unnamed stream.
9       Q.   And did the investigations reach any conclusions
10  as to the source of these contaminants in the river?
11      A.   Yes.
12      Q.   And what were those conclusions?
13      A.   That the primary source of VOCs in the river was
14  identified as the former tank farm area, the old tank farm
15  area. The source of the PCBs was determined to be
16  releases at the property which mobilized via sediment and
17  carried through the surface water system to the Ipswich
18  River.
19      Q.   Could you differentiate between the surface
20  water carrying of PCBs and the groundwater carrying of
21  solvents?
22      A.   Yes.
23      Q.   Describe that.
24      A.   The solvents are moderately soluble in water and
25  can be carried with groundwater, so when they're

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

38

1  discharged to the groundwater they can migrate with the
2  groundwater and discharge directly to the Ipswich River.
3  The PCBs are much less soluble. They tend to attach
4  themselves to soil particles, and those soil particles
5  during rain events and storm runoff and erosion of the
6  soil will basically be transported into the surface water
7  body and then migrate down that unnamed stream and into
8  the Ipswich River.
9      Q.  Now, were there recommendations as to what to do
10  to remediate the river?
11     A.  For the purpose of the solvents, the remediation
12  was to prevent the release of the contaminated groundwater
13  to the river; and that was done in two parts. The first
14  part was a Phase 1 short-term measure, which was a
15  groundwater extraction system that basically intercepted
16  the groundwater and treated it before it discharged to the
17  river. The second part of that was an air sparging soil
18  vapor extraction system to basically remove the
19  contamination from soil and groundwater where the releases
20  occurred, basically in the tank farm and in the trench,
21  the Building 9 trench area. So it was a source removal
22  action to prevent the groundwater from continuing to be
23  contaminated and discharging to the river.
24     Q.  Was the purpose of the remediation to prevent
25  the migration of the contamination to the river?

39

1      A.  Yes.
2      Q.  And with respect to the PCBs, what was done?
3      A.  The PCBs? The result of the PCB remediation was
4  to remove contaminated soils and sediments from locations
5  where they could continue to migrate into surface water at
6  the site.
7      Q.  And was the purpose of that to prevent migration
8  of the PCBs into the river?
9      A.  Yes.
10     Q.  Were any observations made of the river itself
11  which led to some conclusions during the Phase 1 and Phase
12  2 examinations?
13     A.  Well, yes, there was evidence of solvent in the
14  surface water adjacent to the tank farm; there were
15  sheens. In addition to that, samples were collected.
16  Many samples were collected of sediment throughout the
17  Ipswich River adjacent to the Bostik facility to determine
18  the extent and the range of concentrations of PCBs in
19  sediment.
20     Q.  In the Phase 1/Phase 2 site assessment work, did
21  you reach any conclusions regarding the pilot plant?
22     A.  Yes.
23     Q.  And what were those?
24     A.  That accidental releases at the pilot plant had
25  resulted in soil contamination. Well, it resulted in

40

1  contamination in the building and also in the soil
2  adjacent to the building and stormwater runoff from this
3  area basically entered north pond -- I'm sorry -- not
4  north pond, the upper pond.
5      Q.  Was there an area, I think it's the Building 1
6  area -- Could you project the site, please? I'm sorry. I
7  don't remember the number of the building.
8          Did the site assessment concern itself with this
9  area, the amber on the southeast side of the plant?
10     A.  I'm sorry, I don't see your cursor here.
11     Q.  Right there.
12     A.  That area was assessed as part of the Phase 1
13  and Phase 2.
14     Q.  And what did you find in that area?
15     A.  There was contamination associated with
16  petroleum storage tanks in that area.
17     Q.  And was there any recommendation regarding that?
18     A.  The recommendation was to remove the
19  contaminated soil. And later when a separate-phase
20  product was identified in that area, there was a
21  recommendation to remove that.
22     Q.  Following the Phase 1 and Phase 2 reports, was a
23  remedial program put into place?
24     A.  Yes. That was in '95-96. The data that had
25  been collected during the Phase 1 and the Phase 2 was used

41

1  to develop the basis for a feasibility assessment of
2  remedial actions at various locations on the property.
3  Some of the areas were remediated through release
4  abatement measures, which are remedial actions that are
5  taken because they're cost-effective and they're very
6  efficient at removing contamination at that area.
7      Q.  The bulk of the actual remediation was done on
8  Mr. Ash's watch. Is that right?
9      A.  Prior to 1995 the remediation really focused on
10  a Phase 1 treatment system to prevent the discharge of the
11  solvent contamination to groundwater and also in the pilot
12  plant area. After 1995, the remediation focused on the
13  pipe trench area, which is adjacent to the tank farm area,
14  and the former waste disposal area.
15     Q.  And could you describe the remediation that was
16  done prior to 1995?
17     A.  Yes. The pilot plant area, that remediation
18  included both cleaning of the interior of the building,
19  removing grossly contaminated portions of the building,
20  and removing soil contamination, soil that was
21  contaminated with PCBs as a result of the accidental
22  releases at the pilot plant. The old tank farm area
23  remediation included the installation of a groundwater
24  interception system that prevented the contamination from
25  migrating from that former tank farm area and discharging

12 (Pages 42 to 45)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

---

42

1  to the river.
2      Q.   And what was the further remediation that was
3  planned as of 1995?
4      A.   At that time we were evaluating upgrading the
5  groundwater extraction system to address the source areas.
6  The first part was intended to protect the river, and
7  specifically to prevent the discharge of solvents to the
8  river. The second part was to eliminate the source of the
9  contamination to the river, and that was the air sparging
10 soil vapor extraction system.
11     Q.   And Mr. Ash is familiar with that, the actual
12 functioning of that?
13     A.   Yes.
14     Q.   Is he also familiar with pre-1995 the actual
15 functioning of those systems?
16     A.   Yes.
17     Q.   With respect to the work on Phase 1 and Phase 2,
18 did GEI keep track of its costs and render bills?
19     A.   Yes, we did.
20     Q.   With respect to the remediation work subsequent
21 to January 1, 1995, did GEI keep track of its costs and
22 render bills?
23     A.   Yes.
24     Q.   In some cases did it use subcontractors during
25 that time?

---

43

1      A.   We did.
2      Q.   And in some cases did Bostik provide its own
3  labor and materials?
4      A.   Yes.
5      MR. PIROZZOLO: Your Honor, we are deferring
6  until Monday the presentation of the expenses.
7      THE COURT: Yes.
8      MR. PIROZZOLO: So we would re-call Ms. Hanley
9  regarding that at that time.
10     THE COURT: Okay.
11 BY MR. PIROZZOLO:
12     Q.   Now, I would like to ask you some questions area
13 by area. And probably this is the best plan to use for
14 that purpose.
15     If you would focus on the former waste disposal
16 area, which is area 5. Do you have an understanding as to
17 what caused the contamination in that area?
18     A.   Yes. It was the land disposal and the burning
19 of wastes prior to 1969.
20     Q.   And do you have an opinion as to whether
21 contamination of that area reached or threatened to reach
22 the Ipswich River?
23     A.   Yes.
24     MS. ROWAN: Objection. May we know what type of
25 contamination and the time frame?

---

44

1      THE COURT: Yes.
2  BY MR. PIROZZOLO:
3      Q.   What was the contamination in that area?
4      A.   It was solvent contamination in the groundwater
5  and PCBs.
6      Q.   And you've said that that contamination reached
7  or threatened to reach the Ipswich River. Is that right?
8      A.   Yes.
9      Q.   Could you explain your answer?
10     A.   Well, in the case of PCBs, there was waste
11 adjacent to upper pond that was exposed to upper pond or
12 could be exposed to upper pond through erosion and there
13 was evidence of PCB contamination in upper pond, lower
14 pond, and the unnamed ditch system. So the PCBs in the
15 waste materials in the old disposal area found their way
16 into upper pond and then lower pond and then into the cove
17 and the Ipswich River.
18     Q.   And do you have an opinion as to whether the
19 remedial measures that were taken in whole or in part
20 remediated, prevented, or abated migration or threatened
21 migration of contaminants off the Bostik site?
22     A.   Yes.
23     MS. ROWAN: Objection.
24     THE COURT: Ground?
25     MS. ROWAN: Compound.

---

45

1      THE COURT: Overruled.
2  BY MR. PIROZZOLO:
3      Q.   Did you say yes?
4      A.   Yes.
5      Q.   Thank you.
6      What is your opinion?
7      A.   Well, my understanding is the remedial action
8  for that area is a removal action. The PCBs, the
9  contaminated debris and soil from that area was removed
10 and therefore is no longer able to migrate to the river.
11     Q.   And do you have an opinion as to what caused the
12 contamination?
13     A.   The landfilling and the burning of solid waste
14 in the former disposal area.
15     Q.   Do you have an opinion as to whether those
16 practices were standard industrial practices at the time?
17     A.   Yes.
18     Q.   And what is that opinion?
19     A.   It was common practice to landfill and burn
20 solid waste. And during that period of time prior to 1969
21 those materials that were reportedly disposed of there,
22 the paper, the off-spec waste products, were materials
23 that otherwise might have gone to a municipal dump. So I
24 do believe that that was standard practice, and it's
25 consistent with what I have seen at other industrial

---

14 (Pages 50 to 53)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

50

1    A.  Well, the releases in that area were
2  attributable to the delivery practices, the storage of the
3  material in the underground storage tanks, and also the
4  distribution system associated with the tank farm.
5    Q.  And when did that occur?
6    A.  Prior to 1969.
7    Q.  Do you have an opinion as to whether the
8  operations at the old tank farm area, in the pipe trench
9  and in the filling of tanks were consistent with
10  industrial practices before 1969?
11    A.  Yes.
12    Q.  And what is that opinion?
13    A.  My opinion is that those practices, the
14  practices that were described by the Bostik employees,
15  were typical for the practices at manufacturing facilities
16  during the '50s and '60s.
17    Q.  Do you have an opinion as to whether the
18  contamination found in the old tank farm area and in the
19  pipe trench area reached or threatened to reach the
20  Ipswich River?
21    A.  Yes.
22    Q.  And what is that opinion?
23    A.  Groundwater flow direction, the presence of VOCs
24  or solvents in the sediments and in the Ipswich River
25  indicate that the releases were occurring to the river.

51

1    Q.  And remedial action was taken in this area?
2    A.  Yes.
3    Q.  What was the purpose of the remedial action?
4    A.  To prevent the release of the VOCs, the
5  solvents, to the river.
6    Q.  And do you have an opinion as to whether the
7  remedial action was taken in whole or in part to prevent
8  or abate migration or threatened migration of the
9  contaminants from the old tank farm area and the Building
10  9 area to the river?
11    A.  Yes.
12    Q.  And what is that opinion?
13    A.  My opinion is that the primary purpose of the
14  remediation in the old tank farm area and in the Building
15  9 and pipe trench area was to prevent the release of
16  contamination to the river and to abate the source of the
17  contamination to the river.
18    Q.  I may have neglected to ask you about the time
19  of the releases in the former waste disposal area. Do you
20  have an understanding as to when those releases occurred?
21    A.  Prior to 1969.
22    Q.  And with respect to the pilot plant area, do you
23  have an understanding as to when those releases occurred?
24    A.  Based on the testimony of Mr. Mansourian, I
25  understand they took place in the '60s.

52

1    MR. PIROZZOLO:  May I have a moment, your Honor?
2    THE COURT:  Yes.
3    (Pause)
4  BY MR. PIROZZOLO:
5    Q.  Ms. Hanley, you testified concerning the
6  migration of PCBs in the former waste disposal area. Were
7  there also VOCs in the former waste disposal area?
8    A.  Yes, there were.
9    Q.  And what are VOCs?
10    A.  Volatile organic compounds. They're the
11  solvents.
12    Q.  And were those contaminating substances?
13    A.  Yes.
14    Q.  And was there a migration or threat of migration
15  of those substances off-site?
16    A.  Yes.
17    Q.  And would you explain how that occurred?
18    A.  Groundwater in the former disposal area
19  discharged to upper pond and upper pond drains directly to
20  the Ipswich River.
21    Q.  And was a purpose of the remediation to abate or
22  prevent migration or threatened migration of the VOCs from
23  that area to the Ipswich River?
24    A.  Yes.
25    Q.  Is the Ipswich River a public water body?

53

1    A.  Yes.
2    Q.  To your understanding, it belongs to the
3  Commonwealth?
4    A.  Yes.
5    Q.  In connection with the remediation phase of the
6  project, were reports done?
7    A.  Yes.
8    Q.  Could you in a general way give us an overview
9  of the reports and type of reports that were done with
10  respect to the remediation and to whom they were given?
11    A.  GEI prepared a number of reports. There was a
12  PCB investigational report for the pilot plant area that
13  evaluated the extent of contamination around the pilot
14  plant and made recommendations for remediation in that
15  area. Following the remediation of the pilot plant area,
16  there was a PCB remediation report that summarized what
17  had been done and the levels of PCBs that remained at the
18  site after the remediation.
19    The Phase 1, what we refer to as the Phase 1
20  short-term measure was that initial groundwater
21  interception system, which was an initial assessment to
22  determine what type of treatment system and what
23  configuration of the treatment system would be required.
24  That was submitted to Bostik, who in turn submitted that
25  to DEP. And following that, there were update reports on

FARMER   ARSENAULT   BROCK   LLC

32 (Pages 122 to 125)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

122

1  Is that right?
2      A.   Yes.
3      Q.   And that is a part of the Phase 1 environmental
4  site assessment?
5      A.   That's right.
6      Q.   And that would have been the first study,
7  detailed study that GEI did?
8      A.   Yes.
9      Q.   And it refers to the history of building of
10  different buildings on the site?
11      A.   Yes.
12      Q.   And it notes that the site is in proximity to
13  the river?
14      A.   Yes.
15      Q.   Now, I believe on direct examination you said
16  many old industrial sites are in proximity to rivers?
17      A.   Yes.
18      Q.   And going back to the 19th century, one of the
19  reasons for that was for water power to power the mills?
20      A.   Yes.
21      Q.   In fact, did Bostik utilize the river for its
22  industrial operations?
23      A.   I don't think Bostik utilized it, but I think
24  some of the predecessor companies did.
25      Q.   Do you see at the bottom there's reference to a

123

1  water pumping system which included Building 8, pumphouse?
2      A.   Yes.
3      Q.   Had been installed to supply surface water from
4  the Ipswich River to the mill complex.
5      A.   Yes.
6      Q.   So you're thinking a predecessor of Bostik would
7  have used river water in connection with its operations?
8      A.   Yes.
9      Q.   So would it be correct that historically
10  industrial operations, it was considered a favorable
11  condition to have industrial operations proximate to
12  rivers?
13      A.   Yes.
14      Q.   In that time was it considered insidious to put
15  an industrial operation near a river?
16          MS. ROWAN:  Objection.
17          THE COURT:  Sustained.
18  BY MR. PIROZZOLO:
19      Q.   Ms. Rowan asked you about the PCB contamination.
20  You recall that subject?
21      A.   Yes.
22      Q.   Did some of that come from the burn area and
23  some from the pilot plant?
24      A.   Yes.
25      Q.   And you testified earlier about the mechanism of.

124

1  transport of the solvents being in groundwater?
2      A.   Yes.
3      Q.   And I believe you testified that the mechanism
4  of transport of PCBs is surface water.  Is that right?
5      A.   Primarily.
6      Q.   Because the PCBs adhere to soil --
7      A.   Yes.
8      Q.   -- and become affixed to grains of sand or soil?
9      A.   Yes, to sediment.
10      Q.   And then when it rains, what happens with these
11  PCBs that are adhered to soil or sediment?
12      A.   They're mobilized and they migrate downstream
13  towards discharge points, which in this case was the upper
14  pond, the lower pond and then the river.
15      Q.   And when such PCBs get mobilized and discharged
16  to surface water, do they then threaten contamination of
17  the surface water body?
18      A.   Well, PCBs can become mobile in groundwater but
19  primarily they reside in the sediment that is in contact
20  with the surface water and they're present in sediments
21  beneath the surface water in the Ipswich River.
22      Q.   Maybe I'm belaboring the obvious but let me ask
23  a question or two.  If it rains and there's soil with PCBs
24  in it, through sort of classic erosion does some of that
25  soil start washing into nearby water?

125

1      A.   Yes.
2      Q.   And when it washes into the nearby water, the
3  PCB goes with the soil?
4      A.   That's right, yes.
5      Q.   Then when it gets to the water, what happens?
6      A.   It poses a risk to aquatic life in the surface
7  water body.
8      Q.   Apart from the risk, physically what happens?
9  It gets in the water.  Does it get into solution, does it
10  sink, does it float?
11      A.   It sinks.
12      Q.   It sinks and it goes to the bottom?
13      A.   To the bottom, yes.
14      Q.   And then if there's a flow in the surface, what
15  happens?
16      A.   Well, it can be mobilized in that water body as
17  well.
18      Q.   And there are today standards regarding levels
19  of remediation, levels of contamination by PCBs that
20  require remediation?
21      A.   That's right.
22          MS. ROWAN:  Objection.
23          THE COURT:  Overruled.
24  BY MR. PIROZZOLO:
25      Q.   Is that right?

1                          Volume 11, Pages 1-134

2                  UNITED STATES DISTRICT COURT

3                    DISTRICT OF MASSACHUSETTS

4      ----------------------------------------

5      LIBERTY MUTUAL INSURANCE COMPANY,

6                         Plaintiff

7      vs.                                    CA-96-10804-DPW

8

9      THE BLACK & DECKER CORPORATION, BLACK

10     & DECKER, INC., BLACK & DECKER (U.S.)

11     INC., EMHART CORPORATION, and EMHART

12     INDUSTRIES, INC.,

13                      Defendants

14     ----------------------------------------

15        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

16          UNITED STATES DISTRICT COURT JUDGE

17              JURY TRIAL - DAY 11

18              February 9, 2004

19            9:09 a.m. to 1:07 p.m.

20          Courtroom No. 1 - 3rd Floor

21      1 Courthouse Way, Boston, Massachusetts 02210

22      --------- Alan H. Brock, RDR, CRR ---------

23           Farmer Arsenault Brock LLC

24      50 Congress Street, Boston, Massachusetts 02109

25          617.728.4404   Fax 617.728.4403

4  (Pages 10 to 13)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

---

10

1   area involved the removal of contaminated soil and drums
2   from a piece of this area, next to the upper pond.
3       Q.   And what was the purpose of the remediation in
4   the old waste disposal area?
5       A.   In the former waste disposal area, the
6   remediation served a variety of purposes, one of which
7   was to prevent the potential future migration of
8   contaminants in soil in the former waste disposal area,
9   whether into the upper pond, the lower pond, and
10  eventual into the Ipswich River.
11      Q.   Did it also relate to worker safety and
12  animals and ecology?  Did it have other purposes?
13      A.   Yes.
14      Q.   Could you explain that.
15      A.   There are a variety of exposure pathways for
16  contaminants in soil, and part of our job is to evaluate
17  all of those different potential exposure scenarios.
18  They would include a trespasser on the property, a site
19  worker, a construction worker, that may be working in
20  the area or anywhere else in the Bostik property, for
21  that matter.
22      So we evaluate all of the different potential
23  pathways for that exposure and calculate the risks
24  associated with that.  In the case of the former waste
25  disposal area, in fact, future -- potential future

---

11

1   construction worker, our risk calculations showed
2   unacceptable risks to that worker due to exposure to
3   both soil and groundwater.
4       Q.   With respect to the PCBs, what was the path of
5   migration -- is that the phrase, path of migration -- of
6   the PCBs to the Ipswich River and other water bodies?
7       MR. LEPORE:  Objection.  There's a foundation
8   issue here with respect to that, Your Honor.
9       THE COURT:  I'm going to let him answer the
10  question.  You can explore it if you wish to.
11      You can answer.
12      A.   The migration pathway for PCBs from the former
13  waste disposal area is likely the transport of soil via
14  surface-water runoff into the upper pond, thence into
15  the lower pond, and into the Ipswich River.
16      The migration pathway from the former waste
17  disposal area was not current.  That is to say, we did
18  not identify an existing migration pathway for PCBs from
19  the former waste disposal area into those water bodies
20  at the time we were making the evaluation.
21      However, the presence of PCBs in sediment in
22  both the upper pond, lower pond, and Ipswich River
23  showed us that in fact there had been a pathway for that
24  migration of contaminated soil, and therefore a lot of
25  our work was to address that potential future pathway as

---

12

1   well, in the event that conditions changed in that
2   location, those types of considerations.
3       Q.   Now, with respect to the VOCs, what did the
4   soil -- the removal of soil accomplish, and how?
5       A.   VOCs were present in soil in the former waste
6   disposal area.  There were similar compounds to those
7   that we found in the old tank farm area -- toluene,
8   benzene, ethyl benzenes.
9       The removal of the PCB-contaminated soil also
10  served to remove the VOC-contaminated soil.  PCBs in the
11  soil were the driver for that work, but a secondary
12  benefit, and an important one, was to remove the soil
13  that also contained the VOCs, such as toluene.  Those
14  compounds had been detected in groundwater in the former
15  waste disposal area at high concentrations, so it was
16  also an important reason for that remediation.
17      Q.   And did that groundwater migrate to the river?
18      A.   The direction of groundwater flow across the
19  site is generally this direction.  There's some local
20  turning of the groundwater-flow direction toward the
21  lower pond.
22      We had not identified an existing migration
23  pathway for VOCs in groundwater from this area directly
24  into a surface-water body.  The potential existed for
25  that migration; we had not measured it.

---

13

1       Q.   Was the purpose of the remediation to prevent
2   future migration?
3       A.   Yes, it was.
4       Q.   And with respect to the soil extraction, did
5   you in fact find that the contaminants were in soil?
6       A.   Yes.
7       Q.   And was soil sort of scooped out of the
8   ground?
9       A.   Yes.
10      Q.   To what grade or to what level was the soil
11  scooped out of the ground?
12      A.   Are you referring to in the former --
13      Q.   The former waste disposal area.
14      A.   The soil was scooped out of the ground from
15  essentially the ground surface up to depths, I think
16  close to 12 feet -- my recollection is the average depth
17  was more on the order of 8 to 9 feet -- and was
18  approximately down to the groundwater table.  We did see
19  groundwater in the excavation at the bottom of that
20  excavation, but much of the excavation of material
21  occurred above the groundwater surface.
22      Q.   Were you in court the other day when workers
23  in Bostik described the way burning was done in that
24  area?
25      A.   Yes.

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

---

46

1  system.
2         In the Building 1 area, where the little oil
3  recovery system was shown inside that building, that
4  system is currently operating around the clock.
5         In the former waste disposal area, we
6  completed the excavation of contaminated soil in the
7  summer of 2003. The next step we're going to take is to
8  install monitoring wells in that area, to confirm that
9  in fact groundwater quality had improved as a result of
10  the soil removal.
11  Q.  And what is the purpose of, in general terms,
12  of the future work?
13  A.  The future work is intended -- for instance,
14  in the old tank farm area, is to continue to confirm
15  that contaminants in groundwater are not migrating to
16  the Ipswich River.
17         In the case of the Building 9 area, it's,
18  again, to remove contaminants from groundwater, to
19  eliminate their threat for potential migration.
20         Similarly, in the Building 1 area, to remove
21  oil from the subsurface, to prevent its potential future
22  migration or exposure of other receptors to that.
23         In the case of the former waste disposal area,
24  we're substantially done, although we need to collect
25  monitoring data to confirm that the goals of that

---

47

1  remediation were met.
2         MR. PIROZZOLO: Could you show Exhibit 218.
3         Your Honor, Exhibit 218 is an exhibit as to
4  which there is agreement. May I explain it briefly to
5  the jury?
6         THE COURT: Yes.
7         MR. PIROZZOLO: Exhibit 218 collects the
8  expenses paid by Black & Decker for the remediation and
9  Phase I and Phase II site assessment costs at the Bostik
10  site, and it's made up of four components. The first
11  one is Phase I/Phase II site assessment costs before
12  November 3, 1994, and that figure is $378,437.96.
13         And then there are the expenses that Black &
14  Decker paid to Total in 1995, which is $420,174.08.
15         And then the next group are expenses from 1996
16  to 2003, which is the $3,919,133.48.
17         And then estimated cost to complete, which is
18  the $415,000 figure -- totaling $5,132,745.52.
19  Q.  Mr. Ash, the first two items on that Exhibit
20  218 were costs incurred prior to your watch; is that
21  right?
22  A.  Yes.
23  Q.  And those were done -- those were completed
24  when Ms. Hanley was in charge of the job?
25  A.  Yes.

---

48

1  Q.  The last two were on your watch; correct?
2  A.  Yes.
3         MR. PIROZZOLO: Could I ask that Exhibit 187
4  be projected.
5  Q.  Now, is Exhibit 187 a collection of costs that
6  were incurred during your time?
7  A.  Yes.
8  Q.  And that corresponds to the figure that
9  appears on Exhibit 218 of $3,919,133.48?
10  A.  Yes.
11  Q.  Which is the total.
12         Have you categorized the costs in this
13  exhibit?
14  A.  Yes.
15  Q.  And could you tell us what the categories are,
16  the large categories?
17  A.  I categorize costs associated with remediation
18  activities in each of the areas at the Bostik site,
19  which we had described previously. For instance, the
20  old tank farm area is listed at the top. That list, A
21  through J, shows costs incurred by Bostik from January
22  of 1996 until 2003.
23         Similarly, subsequent sections for other areas
24  of the Bostik site.
25  Q.  So you have the old tank farm, Building 9,

---

49

1  Building 1 USTs, the former waste disposal area,
2  Building 41, and another catchall category for all
3  areas.
4  A.  Yes.
5  Q.  Could you go through the old tank farm and
6  tell us what the expenses that are so categorized there
7  are for.
8  A.  Yes. Item A shows GEI fees, expenses, and
9  outside services. It shows a cost of $450,352.43. This
10  is a sum of the costs invoiced by GEI to Bostik for that
11  period for our work associated with the old tank farm
12  area, including the operation of the groundwater
13  extraction system, the monitoring of that system, the
14  installation and operation of the soil vapor extraction
15  system, monitoring of the surface water in the Ipswich
16  River, activities such as that.
17         The next item -- and in fact, each of the
18  following items on that list, B through J, were also
19  associated with the remedial activities in the old tank
20  farm area but were costs that were paid directly by
21  Bostik, rather than passed through a GEI invoice, for
22  example.
23         The first item, B, the SVE blower, occurred in
24  1996. The contractor was TerraVac. The cost was
25  $4,300. That was for the blower that was used to

---

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

54

1  Building 1, USTs. I'm going to ask him only when did he
2  do it, because that's a relevant issue with respect to
3  this entire case.
4       With respect to 4 and 5, we are not
5  challenging the numbers. We are challenging your right
6  to recover those numbers. It has to do with the
7  liability issue. But again, I'm not challenging the
8  numbers as reasonable or necessary.
9       The same thing with No. 6. And the only one
10  I'm even going to ask questions about is D, which is
11  that. I am not challenging the numbers as reasonable or
12  required under the circumstances.
13       THE COURT: You've got the numbers in. Let
14  him do something and you can come back at it. This is
15  really very likely. You're losing the jury.
16       MR. LEPORE: The cross questions will be no
17  more than ten minutes.
18       THE COURT: Well, whatever. We'll take our
19  break.
20       (Recess taken.)
21       THE COURT: I will see counsel at sidebar.
22       (Sidebar conference off the record.)
23       (Jury in at 11:15 a.m.)
24       THE COURT: Ladies and gentlemen, I think we
25  can move on from the numbers involved at issue here.

55

1  For the most part, they aren't challenged for purposes
2  of reasonableness and so on. There's a challenge, of
3  course, but Black & Decker is entitled to ask. But
4  there may be an inquiry that Mr. Lepore will want to
5  make, but I don't think we have to go through each of
6  the questions.
7       You may move on, Mr. Pirozzolo.
8       MR. PIROZZOLO: With that, I'll streamline the
9  examination of Mr. Ash.
10       Could we have 187 again. A couple of
11  questions.
12       Q. Mr. Ash, if you can move to Item 3, this is
13  Building 1, USTs, and there are certain expenses
14  collected there. What was the time during which that
15  work was done?
16       A. The time was approximately late 1998 until
17  2003, late 2003.
18       Q. Was that the work you described when you were
19  showing the site?
20       A. Yes.
21       Q. Generally.
22       A. A portion of the work.
23       Q. Thank you. Now if you go to Item 4. Does
24  that relate to the former waste disposal area that you
25  described from the aerials and from the plant?

56

1       A. Yes.
2       Q. Was that the area of the excavation?
3       A. Yes.
4       Q. And are the costs collected in Item 4 costs
5  associated with the excavation of that soil and the
6  disposal of it?
7       A. Yes.
8       Q. If you go to Item 5, the Building 41 area,
9  former waste disposal area. There is an Item 5 B,
10  excavation. What was that for?
11       A. That was for excavation of drums and
12  contaminated soil from the Building 41 area, which was a
13  portion of the former waste disposal area.
14       Q. And when was that done?
15       A. That was in 1997.
16       Q. And then if you go to Item 6 D, there's an
17  entry MCP Phase IV Design and Report. What is that?
18       A. That is for the work that we did to design the
19  remedial actions for multiple areas. The former waste
20  disposal area was included within that design effort.
21  The Building 1 UST oil recovery system was included
22  within that effort.
23       Q. Now. Now, you've described the
24  remediation work. During the time that you were on the
25  job, did you do any assessment type of work?

57

1       A. Yes.
2       Q. What did that consist of, just generally?
3       A. Assessment -- for instance, the Building 9
4  area, we would assess the nature of the contaminant
5  conditions, source areas, in order to design an
6  appropriate remedial action.
7       We did some Phase II assessment activities
8  early in my tenure as the project manager to close out
9  the Phase II evaluation.
10       Q. And did you submit reports to the DEP during
11  that time?
12       A. Yes.
13       Q. Could you generally describe the reports and
14  their purpose.
15       A. Generally, the reports were provided to
16  present the results of our monitoring and assessment
17  activities, for instance in the case of the additional
18  Phase II investigation work; to present the results of
19  risk-characterization activities; to present the designs
20  and the basis for our designs of remediation systems;
21  and then also regular reports to report on the operation
22  of those systems and whether they were meeting their
23  goals.
24       Q. And were you operating under the LSP system?
25       A. Yes.

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

---

86

1    A.  No.
2    Q.  Do you know why they were removed in 1998?
3    A.  I have an understanding that in 1998 that the
4  underground storage tank regulations required that tanks
5  either be upgraded to comply with new regulations for
6  underground storage tanks or removed.
7    Q.  So these were removed because of new
8  regulations that were put in place; right?
9    A.  That's my understanding, yes.
10   Q.  They weren't removed because -- as part of any
11  remediation; right?
12   A.  Not at that time, no.
13   Q.  Let's jump to the former waste disposal area
14  for a minute.  You've heard some testimony about the
15  former waste disposal area -- we've heard a lot about
16  it.  But do you remember the testimony about when it was
17  closed?
18   A.  Yes.
19   Q.  And when was that?
20   A.  My recollection of the testimony, it was in
21  the mid-1960s.
22   Q.  And in fact, when you went through the history
23  of the aerials, dating back decades and so forth, it
24  became almost clear that it happened somewhere between
25  one aerial of '64 and one of '68; right?  Because that's

---

87

1  when all of the larger pond was changed and shifted and
2  so forth?
3    A.  I recall that the configuration of the pond
4  changed between that period, yes.
5    Q.  So one could infer that that's when it was
6  shut down.
7    A.  I do not know.
8    Q.  But it's consistent, certainly, with the
9  testimony that it was shut down in the mid-'60s.
10   A.  The testimony -- the testimony was that it was
11  shut down -- or that they stopped that practice in the
12  1960s.
13   Q.  And in fact, wasn't it covered over at that
14  time?
15   A.  I do not know.
16   Q.  Now, that was in '65, roughly, in the mid-
17  '60s.  The excavation took place when?
18   A.  Summer of 2003.
19   Q.  So it was just last year.
20   A.  That's right.
21   Q.  So the excavation -- this former waste
22  disposal area was shut down in the mid-'60s and you
23  didn't do any excavation until almost 40 years later?
24  Is that a fair statement?
25   A.  Yes.

---

88

1    Q.  Now, you were talking about groundwater flow,
2  and you showed that it went from the left of that over
3  to the right, over to the Ipswich River?
4    A.  Yes.
5    Q.  Do you remember that?
6    A.  Yes.
7    Q.  Is there any evidence that the groundwater
8  flow changed in that area, on the way, to the right?
9    A.  I do not know of any overall changes in
10  groundwater flow direction at the Bostik site.  As I
11  mentioned, there are locations where there's localized
12  flow in different directions.  For instance, I have seen
13  a groundwater contour plan that shows an element of flow
14  ward the lower pond, in this vicinity.  But overall,
15  regionally, the direction is from left to right, to the
16  north, toward the Ipswich River.
17   Q.  Do you remember Ms. Hanley having a chart up
18  there and there seemed to be a groundwater reversal from
19  the former waste disposal area back into the upper pond?
20  Do you remember that?
21   A.  Yes.
22   Q.  How did that happen?
23   A.  I do not believe that there was a groundwater
24  flow reversal in the vicinity of the former waste
25  disposal area.  There may be local flow in a small

---

89

1  portion of the former waste disposal area toward the
2  upper pond, but I believe that that figure was a
3  depiction of surface water flow toward the upper pond.
4    Q.  And the surface water flow was because of
5  what?  It was higher and it was mounded, or what?  How
6  would the surface water be changed?
7    A.  Surface water flows along the ground
8  surface -- stormwater flow, for instance, from high
9  elevation to low elevation.  So in the former waste
10  disposal area, surface water that lands over here in the
11  form of rain would run off down the slope of the bank
12  toward the upper pond.
13     Groundwater, which overall flows in this
14  direction, could be going in the opposite direction from
15  surface water flow.
16   Q.  Now, the surface water also generally flowed
17  in that direction; correct -- at the site, except for
18  that localized area that you just described?
19   A.  No.  Surface water flow is a function of the
20  ground surface elevation, so it would flow in any number
21  of different directions locally, depending on the
22  elevations in those spots.  As I just mentioned, surface
23  water flow toward the pond here in the former waste
24  disposal area is this direction, whereas surface water
25  flow in the parking lot, over here, may be in that

---

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

94

1    A.   Yes.  My understanding is that two locations,
2   the former waste disposal area and the pilot plant area,
3   both likely contributed PCBs to contaminants in sediment
4   in the Ipswich River.
5    Q.   And where did you get that information from?
6    A.   Based on the proximity of the PCBs in soil in
7   the vicinity of the upper pond in that area and my
8   understanding of the mechanisms for transport of those
9   contaminants, and also the proximity of PCB contaminants
10  in soil in the vicinity of the pilot plant and the
11  mechanisms for transport in that area.
12   Q.   As far as the magnitude of the contamination
13  that was found in the Ipswich River, do you have an
14  understanding as to whether more came from the pilot
15  plant or more from the former waste disposal area?  Or
16  can you not differentiate?
17   A.   The contaminant concentrations and extent in
18  the former waste disposal area were far greater than the
19  extent of PCB contaminants in soil in the pilot plant
20  area.  By that comparison of quantities and extent and
21  proximity, my opinion is that the former waste disposal
22  area may have contributed a higher amount to the upper
23  pond and the Ipswich River.
24   Q.   Well, that's interesting, because you got on
25  the site in '95; right?

95

1    A.   Yes.
2    Q.   The pilot plant had already been demolished;
3   right?
4    A.   Yes.
5    Q.   And the primary reason for its being
6   demolished is because of the PCB contamination; right?
7    A.   I do not know the reason for the demolition of
8   the building, no.
9    Q.   Well, you heard Ms. Hanley describe how
10  whenever they tried to even wash the walls, more PCB
11  contamination came into the environment.  Do you
12  remember that?
13   A.   Yes.
14   Q.   You don't disagree with that?
15   A.   Disagree that PCBs, oil were leaking from,
16  seeping from the walls?
17   Q.   Right.
18   A.   I have no reason to, no.
19   Q.   Exactly.  Now, you also know that the NOR in
20  this case started in 1986; right?  So that investigation
21  of this particular site began in '86?
22   A.   That's my understanding.
23   Q.   You're also aware that during the Phase I and
24  Phase II site assessments the PCB focus was on the pilot
25  plant; correct?

96

1    A.   Yes.
2    Q.   And in fact, the short-term measure was
3   ordered for the pilot plant; correct?
4    A.   Yes.
5    Q.   And in fact, that led to the demolition of the
6   pilot plant in 1994; right?
7    A.   I believe I recall that from testimony.
8    Q.   And during this period of time, nothing was
9   being done at the former waste disposal area; right?
10   A.   No.
11   Q.   With respect to PCBs?  Was anything being
12  done?
13   A.   There were no remediation activities being
14  done in the former waste disposal area until 2003.
15   Q.   Exactly.  So we have a situation where the NOR
16  starts the process in 1986.  PCBs are found somewhere in
17  the Ipswich River sometime.  The PCBs that are known to
18  exist -- we focus on the pilot plant; right?  Nothing is
19  being done in the former waste disposal area; right? --
20  until 2003, almost 40 years after the former waste
21  disposal area is shut down; right?
22   A.   Yes.
23   Q.   Now, you were involved, weren't you, in the
24  planning and implementation of the removal of the PCB-
25  contaminated soil from the FWDA, the former waste

97

1   disposal area; right?
2    A.   Yes.
3    Q.   And that was the result of a Phase IV remedy
4   that you prepared -- or a proposal prepared in either
5   2000 or 2001?
6    A.   That was the design of the remedy, yes.
7    Q.   Now, a few minutes ago I think you showed Mr.
8   Pirozzolo that you -- that the bill for that was
9   five-hundred-something thousand?  Do you remember that?
10   A.   For the Phase IV design and report?
11   Q.   Yes.
12   A.   I do recall that, yes.
13   Q.   And it was Exhibit 187, Section 6 D.  It says
14  $519,000, roughly.  Now, you said that that had to do
15  the former waste disposal area and the USTs at Building
16  1?
17   A.   Yes, among others.  That was not the only two,
18  but -- but it included those two.
19   Q.   What others?
20   A.   The old tank farm area and Building 9 area
21  were also included in the Phase IV remedy and
22  implementation plan.
23   Q.   So the $519,000, what portion of the Phase IV
24  design and report is attributable to the former waste
25  disposal area?  Half?

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

110

1    A.    That's correct.
2    Q.    With respect to the former waste disposal
3    area, what you did in the summer of 2003, let me just
4    ask you a couple of follow-up questions. Are you
5    familiar with dump closure requirements in Massachusetts
6    today?
7    A.    No.
8    Q.    Do you know what capping is?
9    A.    Yes.
10   Q.    Would capping at this particular site have
11   been required regardless of the remedial assessment that
12   was being undertaken?
13   A.    I do not know.
14   Q.    Did you look into that issue?
15   A.    No.
16   Q.    Why not?
17   A.    Did I look into other regulatory requirements?
18   Q.    Yes, all regulatory requirements that could
19   impact the site.
20   A.    I looked into the regulatory requirements that
21   applied to this site.
22   Q.    But you didn't look into the dump closure
23   requirements?
24   A.    No.
25   Q.    So you ended up excavating and then capping

111

1    it; right?
2    A.    We excavated material and removed it for
3    off-site disposal.
4    Q.    And then did what?
5    A.    Then we backfilled with clean imported fill.
6    Q.    And what did you do with that at that point,
7    after it was filled? Did you put grass on it?
8    A.    The contractor I think is still going to plant
9    grass, yes.
10   Q.    And that's "cover," isn't it? Isn't that what
11   that's called, "cover"?
12   A.    Sure. You mean grass? Is grass cover?
13   Q.    Yes.
14   A.    Yes, grass is cover for soil.
15   Q.    And that's one of the things that's involved
16   in closing a dump, isn't it? You cover it? You don't
17   know?
18   A.    I don't know.
19   MR. LEPORE:    May I have one moment, Your
20   Honor?
21   THE COURT:    Yes.
22   (Pause.)
23   MR. LEPORE:    No further questions of the
24   witness. We can address Exhibits 150 and 151 to make
25   sure they're in evidence at some point. Thank you, Your

112

1    Honor.
2    THE COURT:    Mr. Pirozzolo?
3    MR. PIROZZOLO:    Thank you, Your Honor.
4    REDIRECT EXAMINATION
5    BY MR. PIROZZOLO:
6    Q.    Mr. Ash, do you have Exhibit 129 handy?
7    A.    I don't believe I do.
8    MR. PIROZZOLO:    Do you have a copy of 129 for
9    Mr. Ash?
10   Q.    Mr. Ash, before we go to that exhibit, is
11   there a concept of something that drives a remediation?
12   Is that a concept you're familiar with, the driver?
13   A.    Yes.
14   Q.    Could you explain what that means? What is a
15   driver, in the context of remediation?
16   A.    Well, for instance, if there were a variety of
17   different exposure scenarios for contaminants in soil or
18   groundwater, the worst one -- for instance, the one that
19   results in the highest risk -- perhaps would drive the
20   other remedial effects as well. For instance, if you
21   constructed a remedial action that dealt with the
22   worst-case scenario, then that same remedial action
23   would likely eliminate the exposure perhaps to a more
24   secondary exposure pathway.
25   Q.    Let's see if we can explore that concept a

113

1    minute. Let's say you have Substance A and Substance B
2    to deal with on a site. Substance A is really terrible,
3    but Substance B is bad. If you conclude that Substance
4    A has to be remediated, do you need to study Substance B
5    in detail?
6    A.    Only if the remediation for Substance A did
7    not address Substance B; but if it did, you wouldn't
8    have to, no.
9    Q.    So if you reached the conclusion that you need
10   to address Substance A and in the course of doing that
11   you're addressing Substance B, then you don't need to go
12   any further, you know that Substance B will be addressed
13   whatever the need may be.
14   A.    Yes.
15   Q.    But if you were dealing -- if Substance A
16   didn't exist and all you had was Substance B, what would
17   you have to do with respect to Substance B?
18   A.    You would perform the same evaluation of risks
19   associated with Substance B and select a remedial
20   alternative that would address those pathways, if that's
21   the conclusion you reach.
22   Q.    And we could keep going with that, involving
23   many substances. But it's basically the idea is, if
24   you're going to do the job for one thing, it's got to be
25   done for everything else.

30 (Pages 114 to 117)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

114

1    A.   That's correct.
2    Q.   Now, in the former waste disposal area, what
3    were the substances that were involved?
4    A.   There was a wide range of contaminants in the
5    former waste disposal area, including PCBs, a variety of
6    volatile organic chemicals, petroleum hydrocarbons, and
7    even several detections of chlorinated volatile organic
8    compounds.
9    Q.   Now, at other parts of the Bostik site you
10   were extracting contaminants from soil by use of the
11   soil vapor extraction method.
12   A.   Yes.
13   Q.   And that method primarily addressed getting
14   the contaminants out of the soil so that they wouldn't
15   then go into groundwater and then go into the river.
16   A.   Yes.
17   Q.   Okay. Now, supposing you had decided to take
18   all the soil out of the Bostik site and put nice, fresh
19   soil in, would you need a soil vapor extraction system?
20   A.   No.
21   Q.   Now, if we go now to the former waste disposal
22   area, was there a finding that, whatever else might have
23   been there, something had to be done about the PCBs?
24   A.   Yes.
25   Q.   And was that the dominant substance?

116

1    highly PCB-contaminated soil, we also removed soil with
2    high VOC concentrations, and expected that to improve
3    the quality of groundwater.
4    Q.   Now, do you have Exhibit 129 up there?
5    A.   Yes.
6    Q.   Could I ask you to turn to Page 37.
7    A.   I'm there.
8    Q.   Mr. Lepore asked you a number of questions
9    regarding the reason for having remediation of the PCBs.
10   A.   Yes.
11   Q.   If you read on Page 137, in Part 5.3.1.1,
12   Effectiveness.
13   A.   Read the paragraph?
14   Q.   Does it say something about groundwater?
15   A.   Yes.
16   Q.   In that section does it say that the
17   alternative, of scooping the dirt out, would limit
18   exposure of construction workers to contaminated soil?
19   Correct?
20   A.   Yes.
21   Q.   But then what does it say, following that?
22   A.   It says "Groundwater quality would be expected
23   to improve as a result of the removal of affected soil
24   that exceeds the risk-based standard."
25   Q.   Now can we go to, in that same report, Page

115

1    A.   Yes.
2    Q.   And was the conclusion, as you've testified
3    to, that it was cheapest to scoop all the dirt out and
4    put fresh dirt in?
5    A.   No. I would characterize it as the most
6    effective. It was not the cheapest.
7    Q.   The most effective way of doing it was that
8    way.
9    A.   Yes.
10   Q.   And in the course of doing it that way, did
11   you get rid of volatile organic compounds and other
12   matter that was in that area?
13   A.   Yes.
14   Q.   And was there any need to study all the other
15   things that were going to come out as long as you had
16   made the decision that you had to do it this way to get
17   the PCBs out effectively?
18   A.   No.
19   Q.   Would you explain that.
20   A.   Well, for instance, in the case of VOCs in
21   soil, they present a potential for migration in
22   groundwater. VOCs dissolve readily into groundwater.
23   The removal of the soil that had high PCB
24   concentrations also removed soil that had high VOC
25   concentrations. Therefore, as a result of removing the

117

1    39, Section 5.3.1.6, under the section that's headed
2    Benefits.
3    A.   Would you like me to read that section?
4    Q.   Once again, that refers -- if I may ask a
5    question. Once again, that refers to construction
6    workers. What does it say about groundwater?
7    A.   The second sentence says, "Groundwater quality
8    may be improved by removal of soil with elevated PCB and
9    VOC concentrations."
10   Q.   And then?
11   A.   "Under this alternative, a cap would not be
12   constructed, and no long-term maintenance or
13   environmental monitoring would be required."
14   Q.   Is that a description of the benefits that you
15   anticipated or your company anticipated in following the
16   scooping-out-of-the-soil method?
17   A.   Yes.
18   Q.   Can I ask you to turn to Page 41. We once
19   again have a section regarding benefits.
20   A.   Yes.
21   Q.   And there is reference to construction
22   workers, but it says something else about groundwater.
23   Would you read that?
24   A.   Yes. The second sentence says, "Groundwater
25   quality may be improved by removal of soil with elevated

1                          Volume 12, Pages 1-171

2                  UNITED STATES DISTRICT COURT

3                   DISTRICT OF MASSACHUSETTS

4     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5     LIBERTY MUTUAL INSURANCE COMPANY,

6                        Plaintiff

7     vs.                                      CA-96-10804-DPW

8

9     THE BLACK & DECKER CORPORATION, BLACK

10    & DECKER, INC., BLACK & DECKER (U.S.)

11    INC., EMHART CORPORATION, and EMHART

12    INDUSTRIES, INC.,

13                        Defendants

14    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

16             UNITED STATES DISTRICT COURT JUDGE

17         JURY TRIAL AND CHARGE CONFERENCE- DAY 12

18                Tuesday, February 10, 2004

19                  9:07 a.m. to 3:44 p.m.

20               Courtroom No. 1 - 3rd Floor

21         1 Courthouse Way, Boston, Massachusetts 02210

22         - - - - - - - - - Alan H. Brock, RDR, CRR - - - - - - - - -

23               Farmer Arsenault Brock LLC

24      50 Congress Street, Boston, Massachusetts 02109

25             617.728.4404   Fax 617.728.4403

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 12 - 2/10/2004

---

118

1    Q.   When you say -- I'm sorry, what types of
2    hazardous waste sites are these?
3    A.   A full range, ranging from disposal sites,
4    that would be, say, Superfund sites, sites that were
5    listed on the Federal Superfund list or CERCLA list;
6    state Superfund sites; and many industrial plants that
7    had a variety of contamination problems resulting from
8    all sorts of things.
9    Q.   Mr. Roux, at these sites, your role was what?
10   Do you have a title at these sites?
11   A.   It's varied over the years.  When I first
12   started, I was sort of the field technician and then
13   became project manager.  When I started Roux, I pretty
14   much did everything because I was by myself, so I did a
15   lot of fieldwork as well as writing reports, analyzing
16   data, making presentations to clients and regulatory
17   agencies.  And then as Roux Associates grew, of course I
18   have a staff that does a lot of those things and now I
19   focus more on analyzing situations and advising on
20   remedial approaches.
21   Q.   How many of those hazardous waste sites have
22   you been involved in over the last 25 years?
23   A.   Dozens and dozens.
24   Q.   And did any of them involve contamination with
25   chlorinated solvents?

---

119

1    A.   Many of them did, yes.
2    Q.   And did any of them involve contamination with
3    PCBs?
4    A.   Yes.
5    Q.   Now, you're here today on behalf of Liberty
6    Mutual as an expert; is that correct?
7    A.   Yes.
8    Q.   Now, prior to today, have you ever done any
9    environmental consulting work for insurance companies?
10   A.   Yes.
11   Q.   Now, how much of your environmental consulting
12   work is done for insurance companies?
13   A.   Myself personally?
14   Q.   Yes.
15   A.   I've had four projects over the past 30 years,
16   so I would say it's substantially less than 10 percent.
17   Q.   What about the company as a whole?  What
18   percentage can you put on the work that you've done for
19   insurance companies?
20   A.   I don't have an exact number, but I would say
21   it's probably around 10 percent.
22   Q.   Now, has Roux Associates and you sometimes
23   been retained to perform remedy review and cost analysis
24   services for groups comprised of policyholders?
25   A.   Yes.

---

120

1    Q.   And again, you're being retained here today to
2    express an expert-witness opinion on behalf of Liberty
3    Mutual; is that correct?
4    A.   That's correct.
5    Q.   And is Roux Associates being compensated for
6    your time?
7    A.   Yes.
8    Q.   And at what rate, sir?
9    A.   $275 an hour.
10   Q.   Are you a licensed site professional in
11   Massachusetts?
12   A.   No, not currently.
13   Q.   Did you at some point have a provisional LSP?
14   A.   Yes, I did.
15   Q.   When was that?
16   A.   I believe it was about 1993, when the
17   requirement for LSP first started.  At that time I
18   didn't have a licensed LSP on staff, so I got a
19   provisional license myself.
20       A couple of years later a test was required to
21   make it a permanent license.  At that time I had several
22   LSPs on staff, and so opted not to take the test.
23   Q.   Now, has not being an LSP had any impact on
24   your ability to render an opinion about the Bostik site?
25       MR. PIROZZOLO:  Objection.

---

121

1        THE COURT:  He can answer.  That's his
2    conclusion.
3    Q.   Go ahead.
4    A.   No, I don't believe so.
5    Q.   And why is that, sir?
6    A.   Well, I mean, the situation at the Bostik site
7    is what I do, what I look at, what I evaluate all the
8    time, and I do have some familiarity with the MCP, so I
9    think I'm qualified.
10   Q.   Would it be fair to say that, with your
11   training and experience, you have an understanding of
12   the environmental reports and the other documents that
13   we see in this case?
14   A.   Yes.
15   Q.   Now, at some point you became familiar with
16   the Bostik Middleton site?
17   A.   Yes.
18   Q.   Now, what did you do to make yourself familiar
19   with that site?
20   A.   Well, I reviewed numerous reports, numerous
21   consulting reports.  GEI particularly prepared a number
22   of investigative reports, and I read through all those.
23   There were several other consultant reports.  Basically
24   about four or five file drawers of material that I went
25   through.

32 (Pages 122 to 125)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 12 - 2/10/2004

122

1    I looked at historical air photos of the site.
2    I read the expert reports as they were produced in this
3    case. I visited the site for a tour. That's primarily
4    it, I think.
5    Q.    And have you reviewed any affidavits prepared
6    by witnesses?
7    A.    Yes, I have.
8    Q.    And have you heard some of the testimony of
9    former employees as well?
10   A.    I have.
11   Q.    Now, you said you visited the plant?
12   A.    Yes.
13   Q.    When was that, sir?
14   A.    Sometime in 2001; I believe in the spring.
15   Q.    Have you had a chance to review the major
16   areas where cleanup activities were conducted at the
17   site?
18   A.    Yes.
19   Q.    And if we could take a look at Slide 101.
20        MR. LEPORE: Your Honor, this is just a chalk.
21        THE COURT: All right.
22   Q.    Mr. Roux, could you just show us, where's the
23   pilot plant? Is the pilot plant Building No. 30, on the
24   lower left?
25   A.    Yes.

123

1    Q.    And the old tank farm is between 38 and 5?
2    A.    That's correct.
3    Q.    And the former waste disposal area is right in
4    the middle there, again?
5    A.    Yes, it's identified on --
6    Q.    The Building 1 area is over to the right?
7    A.    Yes.
8    Q.    Let's just focus for a minute on the tank farm
9    as well as the Building 9 area. That's where the pipe
10   trenches were located; is that correct?
11   A.    Yes.
12   Q.    I mean the pipe trench; sorry.
13        I would ask, could you briefly summarize, a
14   summary of the layout of the tank farm and the pipe
15   trench and tell us what materials were contained there?
16   And very briefly. We've heard a lot of testimony about
17   this.
18        MR. PIROZZOLO: Objection, Your Honor.
19        THE COURT: He may do that.
20        MR. PIROZZOLO: Time frame?
21        THE COURT: I guess this time frame.
22        MR. PIROZZOLO: What he saw the other day?
23        THE COURT: Yes.
24        MR. PIROZZOLO: Or in --
25        THE COURT: This is reflecting his

124

1    observations currently. Is that right, Mr. Lepore?
2        MR. LEPORE: For right now, and then we'll see
3    what else he has.
4    Q.    What did you observe?
5    A.    Well, when I visited the site in 2001, of
6    course, the tanks had all been removed, so it was like
7    an open, gravelly area. The treatment facility was
8    there and operating, which is identified as Building 38.
9    Q.    Now, you've had a chance to review all of the
10   GEI documents, historical documents and so forth?
11   A.    There's a lot of them; I believe most of them,
12   yes.
13   Q.    And do you have an understanding as to the
14   layout of the old tank farm when you saw the pipe
15   trench?
16   A.    Yes.
17   Q.    Do you have an understanding as to what
18   materials were contained in the tanks?
19   A.    Yes.
20   Q.    And what kind of solvents and materials were
21   in there, those tanks?
22   A.    I think the main ones were toluene, xylene,
23   and MEK, although there were a number of other
24   similar-type, we call them nonchlorinated solvents that
25   were contained there.

125

1    Q.    And do you have any reason to disagree with
2    the testimony that you've heard about the tanks had
3    infill pipes, outfill pipes that went through the trench
4    and Building 9 or that the pipe trench was unlined, made
5    with cinder blocks, with concrete slabs on top?
6    A.    No, I don't disagree with any of that.
7    Q.    Now, at some point, the word underground
8    storage tanks and the tank farm, obviously -- and you
9    read the GEI reports historically about when some of the
10   tanks were put in?
11   A.    Yes.
12   Q.    You remember some discussion or some -- well,
13   some discussion in those documents about the four
14   underground tanks being installed in 1928?
15   A.    Yes, as I recall, in 1928 there were four
16   tanks that had previously been installed.
17   Q.    They could have been installed earlier. We
18   don't know that for a fact. Correct?
19   A.    Correct.
20   Q.    Now, there were 22 tanks at some point in the
21   '40s; is that right?
22   A.    That's my recollection.
23   Q.    And sometime in the '70s there were either 31
24   or 32 tanks?
25   A.    Yes.

34 (Pages 130 to 133)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 12 - 2/10/2004

130

1  shallow at that point.
2     Q.   Let me just jump to the pilot plant.
3     A.   Okay.
4     Q.   Do you remember that?  If we could show that.
5  The pilot plant is Building 30, again.
6     A.   Yes.
7     Q.   I'm not going to spend a lot of time.  But
8  you've seen a bunch of testimony so far that the
9  groundwater -- I'm sorry, the surface water flow is from
10  the pilot plant towards the Ipswich River, generally?
11     A.   Generally, yes, that's correct.
12     Q.   And would you agree with that?
13     A.   Yes.
14     Q.   Now, when you were there, the pilot plant --
15  this was in 2001 -- the pilot plant didn't exist any
16  more; right?
17     A.   Right.
18     Q.   What was it at that time?  Was it a parking
19  lot?
20     A.   Yeah, I mean, I recall the other two
21  buildings, but I don't remember exactly what was in the
22  location of Building 30.
23     Q.   Do you remember seeing any description of the
24  pilot plant when it was in existence prior to 1994?
25     A.   Yes, I read some descriptions of it.

131

1     Q.   Was there a parking lot?  Do you remember
2  that?
3     A.   There was a parking lot between the pilot
4  plant and the area down to the north between the pilot
5  plant and the upper pond, and there may have been also a
6  parking lot off to the other side, the western side of
7  the pilot plant.
8     Q.   I'm sorry to belabor this, but with respect to
9  my questions about a parking lot, what does that have as
10  an impact on surface water?
11     A.   Well, obviously, a parking lot, paved, has
12  mobility, so rain falling on it will all run off --
13  well, except for what might evaporate -- but as opposed
14  to an unpaved surface, where some of the water would
15  soak into the ground.  So it increases runoff.
16     Q.   So generally, given the surface water flow
17  from the pilot plant towards the Ipswich River,
18  including into the upper pond, is it fair to suggest
19  that the stormwater also would drain into the upper
20  pond, if it didn't evaporate?
21     A.   Yes.  In fact, in order to prevent puddling in
22  the parking lot, they put drains in, and those drains
23  would collect surface runoff and pipe that water
24  directly to the upper pond.
25     Q.   There were actually stormwater drains that

132

1  connected to the upper pond?
2     A.   Correct.
3     Q.   Now, at the pilot plant there was a lot of
4  contamination involving PCBs; correct?
5     A.   Yes.
6     Q.   And it was in the soil; correct?
7     A.   Yes.
8     Q.   And it was on the walls?
9     A.   Yes.
10     Q.   And it was everywhere at that time.  But you
11  never saw it; right?
12     A.   I saw -- I didn't physically see it, of
13  course, but I saw at least one drawing illustrating a
14  staining, extensive staining on the floor, walls, and
15  the blacktop outside of the pilot plant and the soil
16  around the sides of the pilot plant.
17     Q.   Did you review the GEI documents with respect
18  to how the PCBs came to be located in the soil and the
19  surfaces around the building?
20     A.   Yes, to the extent that GEI recorded
21  historical information, yes.
22     Q.   And you also heard Mr. Mansourian testify?
23     A.   Yes.
24     Q.   And you heard the testimony about the leaks
25  from the seals?

133

1     A.   Yes.
2     Q.   That there were leaks on the floors and walls;
3  right?
4     A.   Well, there was staining on the floors and
5  walls as a result of the leaking and drips.
6     Q.   Now, have you reviewed how GEI did their
7  investigation?
8     A.   Yes.
9     Q.   And what did they identify as the source of
10  the contamination?
11     A.   As the source of the contamination?
12     Q.   Yes, as the source, and then we'll get to....
13     A.   Again, the source was the pumps that
14  recirculated the heat-transfer fluid and they had seals
15  on them, and there were apparently routine drips from
16  the seals that were one source, and then there were at
17  least two instances where the seals failed and a larger
18  amount of material escaped out onto the floor, and
19  reportedly some of that even went out the front door and
20  down the steps and out into the parking lot.
21     Q.   Now, they made a recommendation about
22  remediation; correct?
23     A.   Yes.
24     Q.   And there was some word used about priority.
25  Do you understand what that was?

```
 1                              Volume 13, Pages 1-116
 2              UNITED STATES DISTRICT COURT
 3                DISTRICT OF MASSACHUSETTS
 4    ----------------------------------------
 5    LIBERTY MUTUAL INSURANCE COMPANY,
 6                      Plaintiff
 7    vs.                                    CA-96-10804-DPW
 8
 9    THE BLACK & DECKER CORPORATION, BLACK
10    & DECKER, INC., BLACK & DECKER (U.S.)
11    INC., EMHART CORPORATION, and EMHART
12    INDUSTRIES, INC.,
13                      Defendants
14    ----------------------------------------
15        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
16           UNITED STATES DISTRICT COURT JUDGE
17                  JURY TRIAL - DAY 13
18             Wednesday, February 11, 2004
19                9:07 a.m. to 12:11 p.m.
20             Courtroom No. 1 - 3rd Floor
21      1 Courthouse Way, Boston, Massachusetts 02210
22      --------- Alan H. Brock, RDR, CRR ---------
23             Farmer Arsenault Brock LLC
24      50 Congress Street, Boston, Massachusetts 02109
25            617.728.4404  Fax 617.728.4403
```

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

6

1    A.   Actually, remediation at the pilot plant was
2  -- my recollection, that was completed in 1990, so that
3  had already been completed for several years.
4    Q.   Now, with respect to the studies, those, you
5  think, were done in about '93-'94?
6    A.   That's my recollection, yes.
7    Q.   And do you know when the actual excavation of
8  the former waste disposal area occurred?
9    A.   Yes. The actual excavation was last summer,
10  in 2003.
11    Q.   About nine or ten years after they did the
12  study?
13    A.   Yes, that's about right.
14    Q.   Now, when the -- are you familiar with the
15  excavation that was done with respect to the former
16  waste disposal area?
17    A.   Generally, yes.
18    Q.   Could you just describe what they did?
19    A.   Sure. The investigation that preceded the
20  remediation defined an area of PCB contamination that
21  exceeded a cleanup goal, which was established at 10.5
22  parts per million PCBs in the soil. That area was
23  carefully defined, and then the plan was to dig out the
24  area that had the PCBs above that level. In order to
25  stabilize that large hole which was dug right next to a

7

1  pond, the upper pond, the sheet piling was put in for
2  structural purposes, engineering purposes, and Mr. Ash
3  explained that yesterday and showed pictures of it.
4    Q.   And did you understand that they did any
5  excavation along the bank of the pond?
6    A.   No. In fact, the sheet piling separated the
7  excavation from the pond, but I guess it came as close
8  as 5 or 6 feet and in other places was 20 feet away.
9  And in order to establish the extent of the cleanup,
10  they had to establish that the sediments between that
11  steel curtain and the pond were below the cleanup
12  standards, so they could leave them there. So that was
13  established prior to the excavation.
14    Q.   So you have an understanding that the
15  sediments along the bank were below the PCB level of 45
16  parts per million?
17    A.   Yes, that's my understanding from reading the
18  plan.
19    Q.   Do you have any understanding as to what was
20  done with respect to groundwater at the FWDA?
21    A.   Yes, I do.
22    Q.   What is that, sir?
23    A.   No groundwater remediation was undertaken at
24  the FWDA.
25    Q.   Now, are you familiar with the risk assessment

8

1  for the site with respect to the FWDA, the former waste
2  disposal area?
3    A.   Yes, I am.
4    Q.   And do you have an understanding as to what it
5  concluded with respect to PCB contamination and the
6  impact on human health?
7    A.   Yes.
8    Q.   And what is that?
9    A.   The risk assessment found that there was an
10  unacceptable risk for direct exposure to PCBs in the
11  former waste disposal area to future construction
12  workers; in other words, people who might be excavating
13  in that area and come in contact with that material.
14    Q.   And so the thing that they recommended was
15  what?
16    A.   The ultimate recommendation was to simply dig
17  out all of the PCB-contaminated soil above 25 parts per
18  million.
19    Q.   Now, the risk assessment you've reviewed;
20  correct?
21    A.   Yes.
22    Q.   Other than PCBs, did they consider anything
23  else?
24    A.   Yes. The risk assessment by its nature is
25  required to look at all chemicals of concern, which are

9

1  pretty much all the chemicals that were detected at the
2  area. So all of those were evaluated as part of the
3  risk assessment.
4    Q.   And was there a conclusion with respect to the
5  other chemicals at the former waste disposal area?
6    A.   Yes.
7    Q.   And what was that?
8    A.   At the end of the risk assessment, only the
9  PCBs were determined to present an unacceptable risk, so
10  all of the other chemicals were determined not to
11  present an unacceptable risk.
12    Q.   So with respect to the unacceptable risk, that
13  related to the construction workers in the future;
14  correct?
15    A.   That's my understanding, yes.
16    Q.   And they recommended something to deal with
17  that, and that was the excavation of the PCB-
18  contaminated soil?
19    A.   Correct.
20    Q.   And you've already described how they did
21  that.
22       So prior to the excavation, are you aware of
23  any remediation of anything at the former waste disposal
24  area, including groundwater?
25    A.   Prior to the excavation, I'm not aware of any

4 (Pages 10 to 13)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

---

10

1  remediation of anything at the former waste disposal....
2  Q.  Do you recall Mr. Ash's testimony explaining
3  about treatment of water in the former waste disposal
4  area?
5  A.  Yes, I do.
6  Q.  Was that groundwater?
7  A.  Well, it was a dewatering system.  In other
8  words, when you dig a hole in the ground and the bottom
9  of that hole goes below the groundwater level, just for
10 engineering structural purposes you have to dewater or
11 bring the water level down to the bottom of the hole.
12      It was groundwater before it got into the
13 hole.  Once it's in the hole it's surface water.  But
14 it's not a groundwater remediation system; it's a
15 dewatering system; and it only impacts the water that's
16 at the very surface that's getting into the hole.
17 Q.  What was done to the sediments along the upper
18 pond?
19 A.  The sediments -- are you asking the sediments
20 in the upper pond?
21 Q.  Along the bank -- yes, I am.  I misspoke.  The
22 sediments, the PCB contaminants that were allegedly
23 found in the upper pond.
24 A.  There was no remediation recommended or
25 undertaken for sediments in the upper pond because it

---

11

1  was determined that there was no unacceptable risk from
2  just leaving them where they are.
3  Q.  Do you have an opinion as to the likelihood of
4  PCB-contaminated sediments migrating?
5  A.  In general or --
6  Q.  With respect to the former waste disposal
7  area.
8  A.  With respect to the former waste disposal
9  area?  Yes, I do.
10 Q.  And what is that opinion, sir?
11 A.  Well, the PCB soil, contaminated soil in the
12 former waste disposal area is -- or prior to the
13 excavation was contained within the landfill.  It was
14 capped back in the '60s, and it was concluded by GEI
15 when they did their investigation that there was no
16 migration away from the landfill of any of the
17 contaminants.  And I concur with that, I think, that
18 there was no potential for that to happen.
19 Q.  Can we shift gears, sir, and look at Building
20 1 just for a moment.
21 A.  Sure.
22 Q.  Building 1 is in the upper right-hand corner.
23      MR. PIROZZOLO:  Could we see the Court at
24 sidebar?
25      THE COURT:  Yes.

---

12

1      MR. PIROZZOLO:  Your Honor, based on
2  yesterday's discussion, we're going to take the Building
3  1 off the table.
4      THE COURT:  Okay.
5      MR. LEPORE:  Fine.  Thank you.
6      (Sidebar conference ended.)
7  Q.  Mr. Roux, that was a very quick discussion of
8  Building 1.
9      Let's turn to Building 41.
10 A.  Okay.
11 Q.  Where is Building 41?
12 A.  Building 41 is not shown on the site plan
13 that's been projected.
14 Q.  Yet.  There it is.
15 A.  There it is.  Okay.
16 Q.  Is that Building 41?
17 A.  Yes.
18 Q.  Now, what contamination was found in Building
19 41?
20 A.  My understanding is that when Building 1 was
21 under construction, when they went in to excavate -- to
22 construct Building 1, the construction crew ran into
23 buried drums, drums of waste material that had been
24 buried in that area, and that is what was found.  And
25 some contaminated soil, I guess, associated with those

---

13

1  buried drums was also found.
2  Q.  Do you know what was done to address that
3  problem?
4  A.  Yes, the drums that were dug up, that needed
5  to be dug up, to make way for the construction, were
6  removed from the site along with a certain amount of the
7  soil that was contaminated.
8  Q.  When was that done, sir?
9  A.  I believe that was done in 1997.
10 Q.  Now, are you aware of any groundwater
11 remediation having been done in the vicinity of Building
12 41?
13 A.  No, I'm not.
14 Q.  Let me switch again quickly to the old tank
15 farm and Building 9 area.  You're aware that a site
16 investigation was done with respect to that particular
17 location at the site?
18 A.  Yes.
19 Q.  And it identified contamination.  Is that
20 right?
21 A.  Yes, absolutely.
22 Q.  Now, you're familiar with site assessments in
23 general; right?
24 A.  Yes.
25 Q.  I mean, you've been working with them for

---

FARMER  ARSENAULT  BROCK  LLC

6 (Pages 18 to 21)
Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

18

1     MR. LEPORE:  Thank you, Your Honor.
2     (Sidebar conference ended.)
3     MR. LEPORE:  May I continue, Your Honor?
4     THE COURT:  The last question, do you have an
5  opinion, sir, as to the cause of the soil and
6  groundwater contamination in the vicinity of the old
7  tank farm?
8     A.   Yes.
9     Q.   And what is that opinion, sir?
10    A.   Primarily leakage from the buried underground
11 storage tanks in that area.
12    Q.   You've heard some testimony about holes in the
13 tanks?
14    A.   Yes.
15    Q.   And you heard about contamination through the
16 tank releases?  Is that what you heard, sir?
17    A.   Yes.
18    Q.   Do you have an opinion about whether or not
19 these holes were apparent in the tank farm?
20    A.   Yes.
21    Q.   What is that opinion, sir?
22    A.   I think they were very apparent because the
23 presence of water showing up in the underground storage
24 tanks indicated that there were holes allowing the
25 groundwater to come in, and there's testimony that water

19

1  was observed in a number of those tanks.
2     Q.   And sir, with respect to the solvent pipe
3  trench that connects the old tank farm and the Building
4  9 area, do you have an opinion about the cause of the
5  soil and groundwater contamination in that area?
6     A.   Yes.
7     Q.   And what is that opinion, sir?
8     A.   Leakage from the pipes that were in the pipe
9  trench that was testified to earlier.
10    Q.   And sir, do you have an opinion about whether
11 it was apparent that solvent had been released to soil
12 and groundwater in the solvent pipe trench?
13    A.   Yes.
14    Q.   And what is that opinion, sir?
15    A.   Based on the testimony that I recall, it was
16 very apparent.  It was visible and created odors.
17    Q.   And sir, do you have an opinion with respect
18 to the cause of the actual solvent contamination with
19 respect to the Ipswich River?
20    A.   Yes.
21    Q.   And what is that opinion, sir?
22    A.   There was solvent contamination of the Ipswich
23 River at the beginning of the investigation, yes.
24    Q.   And what was it caused by?
25    A.   Contaminated groundwater from the old tank

20

1  farm area discharging into the river.
2     Q.   Now, with respect to the former waste disposal
3  area, do you have an opinion about the cause of the
4  contamination there, sir?
5     A.   Yes.
6     Q.   What is that opinion, sir?
7     A.   The contamination in the former waste disposal
8  area was caused by the dumping or placing of waste
9  material, contaminated waste material, in that area.
10    Q.   Do you have an opinion, sir, with respect to
11 the cleanup that was taken last summer at the former
12 waste disposal area, whether it dealt with migration or
13 threatened migration off-site?
14    A.   Yes.
15    Q.   And what is that opinion, sir?
16    A.   There was no migration or threatened migration
17 from the former waste disposal area prior to the 2003
18 remediation, so the 2000 remediation was not intended to
19 address that.
20    Q.   I think you misspoke; you mean the 2003
21 remediation, sir?
22    A.   I'm sorry, the 2003 remediation was not
23 intended to address off-site migration, correct.
24    Q.   Thank you, sir.  Now, with respect to the soil
25 excavation at the former waste disposal area, do you

21

1  have an opinion as to whether or not the costs were
2  incurred solely with respect to the contaminated soil
3  located on Bostik's property there?
4     A.   Yes.
5     Q.   What is your opinion, sir?
6     A.   Again, the remediation was solely for the
7  contaminated soil on the property at that location.  So,
8  yes, it was.
9     Q.   Now, with respect to that former -- strike
10 that.  Do you have an opinion, sir, with respect to the
11 Ipswich River and whether it was contaminated by the
12 presence of PCBs in sediments in the river?
13    A.   Yes.
14    Q.   What is your opinion, sir?
15    A.   There are only very low levels of PCBs in the
16 sediments.  They were determined not to be a risk, and
17 no remediation was necessary, so the river was not
18 impacted by the presence of PCBs.
19    Q.   And with respect to Building 41, sir, do you
20 have an opinion about the cause of the contamination in
21 that area?
22    A.   Yes.
23    Q.   And what is your opinion, sir?
24    A.   There were drums of waste material buried in
25 that area at some point in the past.

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

---

22

1    Q.   And you do have an understanding as to what
2    work was done at Building 41; correct?
3    A.   Yes.
4    Q.   Was there a groundwater issue there, sir?
5    A.   No, there was not.
6    Q.   Do you have an opinion, sir, as to whether the
7    remediation costs incurred in Building 41 were incurred
8    with respect to contamination located solely on Bostik's
9    own property?
10   A.   Yes.
11   Q.   And what is that opinion, sir?
12   A.   It was solely on Bostik's own property.
13       MR. LEPORE:   May I have one moment, Your
14   Honor?
15       THE COURT:   Yes.
16       MR. LEPORE:   I have no further questions, Your
17   Honor.
18       THE COURT:   Mr. Pirozzolo?
19           CROSS-EXAMINATION
20   BY MR. PIROZZOLO:
21   Q.   Good morning, Mr. Roux.
22   A.   Good morning.
23   Q.   Mr. Roux, you are not an LPS; is that right?
24   LSP.
25   A.   As I testified originally, no, currently, I am

---

23

1    not an LSP.
2    Q.   You're not an LSP; correct?
3    A.   I am not an LSP; correct.
4    Q.   But your company has an office in
5    Massachusetts?
6    A.   In Burlington.
7    Q.   And Burlington isn't far from Middleton, is
8    it?
9    A.   Not too far.
10   Q.   And does your office do the type of work you
11   described that you do?
12   A.   Yes.
13   Q.   And does that office have anyone that is an
14   LSP?
15   A.   Yes.
16   Q.   And would the LSP in that office, people with
17   LSPs, be familiar with the procedures under the
18   Massachusetts Contingency Plan?
19   A.   Yes.
20   Q.   But you didn't take the examination for the
21   LSP license.
22   A.   That's correct.
23   Q.   Now, you've read thoroughly the GEI reports.
24   A.   Over the course of several years, yes.
25   Q.   Well, have you read every word of each of the

---

24

1    reports?
2    A.   Probably not.
3    Q.   Has somebody else read them for you?
4    A.   No.
5    Q.   You've read some of the GEI reports.
6    A.   No, I've read the GEI reports, but I can't say
7    that I've read every single word.  I mean, there are
8    large appendices attached to them.  But I read them
9    thoroughly.
10   Q.   Did you read the part of the GEI report in the
11   Phase 3 remedial action plan regarding Bostik that says
12   the following:  "Due to the proximity of Area 5 to the
13   upper and lower ponds, controls will be required to
14   prevent potential discharges of contaminated soil and
15   groundwater to the ponds during the work"?  Did you read
16   that?
17   A.   Yes.
18   Q.   And that the sheet piles were put in there for
19   the purpose of minimizing discharges of contaminated
20   soil and groundwater into the ponds?  Did you read that?
21   A.   Yes.
22   Q.   Did you read the part of that report that
23   describes the benefits of the remediation in Area 5?
24   A.   I believe that I did, yes.
25   Q.   And did you read the part that says,

---

25

1    "Groundwater quality may be improved by removal of soil
2    with elevated contaminants concentrations"?
3    A.   Did I read that?  Yes.
4    Q.   Now, you gave a deposition in this case?
5    A.   Two, actually.
6    Q.   Two depositions.  Do you remember testifying
7    in one of those depositions, "There was contaminated
8    groundwater in Area 5"?
9    A.   I don't specifically recall that testimony.
10       MR. PIROZZOLO:   May I approach the witness,
11   Your Honor?
12       THE COURT:   You may.
13   Q.   Mr. Roux, is that a deposition -- a transcript
14   of a deposition you gave in this case?
15   A.   Yes.
16   Q.   And on what date did you give that deposition?
17   A.   November 4th, 2003.
18   Q.   Not long ago.
19   A.   No, not too long ago.
20   Q.   And if you'd turn to Page 63.
21   A.   Okay.
22   Q.   Line 17.  Did you say, "Yes, I'm sorry, there
23   was contaminated groundwater in Area 5"?
24   A.   Yes.
25   Q.   And Area 5 is the former waste disposal area?

---

8 (Pages 26 to 29)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

26

1   A.   Yes.
2   Q.   And could you look at Line 24.
3   A.   Okay.
4   Q.   Were you asked, "And did the contaminated
5   groundwater in Area 5 flow into the Ipswich River"?
6   Were you asked that question?
7   A.   Yes.
8   Q.   And is this your answer: "I don't know
9   exactly where it went. It would either go into the
10  upper and lower ponds or into the Ipswich River"? Do
11  you remember giving that answer?
12  A.   Yes.
13  Q.   If you look -- and Area 5, of course, is the
14  former waste disposal area?
15  A.   Correct.
16  Q.   Could you turn to Page 59. Without belaboring
17  it, did you on Page 59 and 60 say that groundwater
18  flowed into the Ipswich River?
19  A.   Yes.
20       MR. PIROZZOLO:  Excuse me, Your Honor.
21       (Pause.)
22  Q.   Can I ask you to turn to Page 79. Were you
23  asked the question, "What are the contaminants you
24  understood came from direct discharges," at Line 5? Do
25  you see that?

27

1   A.   Yes.
2   Q.   And you said, "Potentially the PCB
3   contamination."
4   A.   Yes.
5   Q.   And if you go over to -- or go back to Page
6   77. Do you see, Page 17, you were asked, "Surface water
7   was contaminated as a result of the contamination of the
8   groundwater; is that correct?" And you answered, "At
9   least to some extent, yes." Did you say that?
10  A.   Yes.
11  Q.   If you go on to Page 78, were you asked,
12  "Those systems reduce or eliminate the flow of
13  contaminated groundwater into the surface water"? Did
14  you answer that "Yes"?
15  A.   The systems in Areas 2 and 6, yes.
16  Q.   "And they do that by pumping the groundwater
17  out of the ground before it flowed into the surface
18  water."
19  A.   Correct.
20  Q.   That's what you were referring to in the
21  former tank area.
22  A.   Right.
23  Q.   And isn't it so that contaminated soil above
24  groundwater will cause contamination to flow into the
25  groundwater?

28

1   A.   It can, yes.
2   Q.   And that would include PCBs?
3   A.   In my experience, no.
4   Q.   And in the former waste disposal area there
5   were solvents in the ground.
6   A.   Yes.
7   Q.   And those would percolate into the groundwater
8   for sure.
9   A.   Certainly more likely than the PCBs; but yes,
10  probably.
11  Q.   And that's because PCBs adhere to soil.
12  A.   Correct.
13       MR. PIROZZOLO:  May I have just a moment, Your
14  Honor?
15       THE COURT:  Yes.
16       (Pause.)
17  Q.   Mr. Roux, do you know what the issue is in
18  this case?
19  A.   I think so, yes.
20  Q.   There's not much point -- not much dispute as
21  to the source of the contamination, is there?
22  A.   I'm not sure of what you mean by that.
23  Q.   Well, the source of the contamination in the
24  tank farm area or the tanks.
25  A.   I don't think so.

29

1   Q.   You don't think --
2   A.   I don't think there's much dispute.
3   Q.   You don't think there's much dispute. And in
4   the pipe trench it's the lines that go through the pipe
5   trench.
6   A.   Yes.
7   Q.   And in the former waste disposal area it's the
8   disposal or burning of waste in that area.
9   A.   Correct.
10  Q.   And do you understand that the issue in this
11  case is whether Bostik's employees knew they were
12  causing environmental damage when they engaged in
13  activities on that site in running their business?
14       MR. LEPORE:  Objection, Your Honor.
15       THE COURT:  Well, he may answer this question,
16  again, as a preliminary to something else.
17  A.   Do I understand that that's an issue in the
18  case? Yeah, I think that's one of the issues in the
19  case.
20  Q.   Well, that's the ultimate issue in this case,
21  is it not?
22       MR. LEPORE:  Objection, Your Honor.
23       THE COURT:  Yes, I'll tell the jury --
24  Q.   You understand that.
25  A.   I don't.

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 13 - 2/11/2004

30
1    THE COURT:  I'll tell the jury what the
2 ultimate issue is.  If you have something that you want
3 to discuss with him, you can.
4    Q.    Mr. Roux, you had a long association with
5 Stauffer Chemical?
6    A.    I worked for Stauffer Chemical for two years,
7 yes.
8    Q.    And then after you stopped being an employee
9 of Stauffer Chemical, you consulted for Stauffer
10 Chemical?
11    A.    Yes, I did.
12    Q.    And Stauffer Chemical is one of the biggest
13 chemical manufacturers in the world, isn't it?
14    A.    Well, it's not around any more, but at the
15 time it was a large chemical manufacturer.
16    Q.    And it ran chemical manufacturing sites.
17    A.    Yes.
18    Q.    And it ran those sites in the 1960s.
19    A.    Yes.
20    Q.    And you became familiar with some of those
21 sites.
22    A.    Yes.
23    Q.    And some of your job was dealing with
24 contamination on those sites, wasn't it?
25    A.    Yes.

31
1    Q.    And to review the history of those sites.
2    A.    Yes.
3    Q.    And you became familiar with what the cause of
4 contamination was on those sites.
5    A.    Yes.
6    MR. PIROZZOLO:  Thank you.  I have no further
7 questions.
8    MR. LEPORE:  May I just have a moment?
9    (Pause.)
10    MR. LEPORE:  May I proceed, Your Honor?
11    THE COURT:  Yes.
12    CROSS-EXAMINATION
13 BY MR. LEPORE:
14    Q.    With respect to the former waste disposal
15 area, you just were asked a couple of questions with
16 respect to solvents.  You didn't mean to suggest that
17 the solvents in the ground actually got to the
18 groundwater in the former waste disposal area, did you?
19    MR. PIROZZOLO:  Objection, Your Honor. It's
20 leading.
21    THE COURT:  It is.  He can answer the
22 question.  The jury will have in mind the leading nature
23 of the question.
24    A.    Actually, there is solvent contamination of
25 the groundwater in the former waste disposal area. What

32
1 I testified to was that it was not migrating away from
2 the former waste disposal area, it was staying in the
3 former waste disposal area.
4    Q.    And did you testify with respect to the
5 remediation efforts at the former waste disposal area?
6    A.    Yes.
7    Q.    And did that take into account the solvents
8 that were there?
9    A.    The remediation had nothing to do with the
10 solvents.  It had only to do with the PCBs.
11    Q.    Now, you remember Mr. Pirozzolo showing you
12 some deposition transcripts?
13    A.    Yes.
14    Q.    There seems to be an inconsistency, and I ask
15 you:  Can you explain that inconsistency?
16    A.    Yes, I think I can.
17    Q.    Would you please do so.
18    A.    We were talking about in my deposition, about
19 groundwater flow, and we know groundwater flows through
20 the site.  The question was where would groundwater flow
21 from the former waste disposal area go, and I think I
22 said I wasn't sure but it would have to go either toward
23 the river or toward ponds.
24    But that doesn't mean that contaminated or
25 significantly contaminated groundwater is flowing to the

33
1 river or to the ponds, because we know from GEI's work
2 monitoring that there isn't significantly contaminated
3 groundwater flowing away from the ponds.
4    MR. LEPORE:  I have no further questions, Your
5 Honor.
6    MR. PIROZZOLO:  May I have a question, Your
7 Honor?
8    THE COURT:  Yes.
9    REDIRECT EXAMINATION
10 BY MR. PIROZZOLO:
11    Q.    Mr. Roux, you know that there was a soil vapor
12 extraction system on the site?
13    A.    I do.
14    Q.    And that system was designed to extract
15 solvents from the soil to prevent them from flowing into
16 the groundwater; isn't that right?
17    MR. LEPORE:  Objection, Your Honor.  This is
18 well beyond the scope.
19    THE COURT:  Overruled.
20    A.    Yes, that's right.
21    Q.    And you know that the former waste disposal
22 area was an area where Bostik had burned and disposed of
23 off-spec material and all kinds of waste.
24    A.    I do.
25    Q.    And you know from your study in preparing for

34

1  this case that Bostik used in its products solvents.
2    A.   Sure.
3    Q.   So you would expect that there were solvents
4  disposed of in the former waste disposal area.
5    A.   Yes.
6    Q.   And those solvents would be in the soil.
7    A.   Yes.
8    Q.   And if you take the soil away, as they did,
9  then that's one way to keep the solvents from migrating
10  to groundwater.
11    A.   There's a long answer to that question.
12    Q.   Is that correct?
13    A.   But I guess the answer you want is yes, that's
14  correct.
15    Q.   So one way to get the solvents out of the soil
16  was through the soil vapor extraction system.
17    A.   Now, you're not referring to the former waste
18  disposal area?
19    Q.   No, I'm referring to the soil vapor extraction
20  system that was used in the tank farm area.
21    A.   Yes, that's right.
22    Q.   That was one way of getting solvents out of
23  soil.
24    A.   Sure.
25    Q.   And another way of getting solvents out of

35

1  soil would be to take the soil away.
2    A.   Yes.
3    Q.   So if you were taking the soil away to get rid
4  of PCBs, you would also be taking the solvents away.
5    A.   Sure.
6       MR. PIROZZOLO:   Thank you.  No further
7  questions.
8       THE COURT:   You may step down.  Thank.
9       MR. LEPORE:   May we call Mr. Frank Woodard,
10  Your Honor.
11       THE COURT:   You understand you're still under
12  oath?
13       THE WITNESS:   Yes.
14       FRANKLIN E. WOODARD, Previously Sworn
15       DIRECT EXAMINATION
16  BY MS. MAIN:
17    Q.   Hello, Dr. Woodard.
18    A.   Good morning.
19    Q.   When you were last on the stand, we went
20  through your background, and so I won't belabor that at
21  this point.  But when we were going through the Whitman
22  phase of this trial, we were discussing primarily the
23  dumping of waste solvents and other materials into
24  cesspools, and I ask you whether the types of disposals
25  and releases at the Bostik site are similar to what we

36

1  had already discussed at Whitman.
2    A.   I would say they're similar, in that chemicals
3  moved from a place of storage or a place of confinement
4  to the environment.  But the situation is a bit
5  different at Bostik, because there are several different
6  areas involved:  the old tank farm area, piping trench,
7  the pilot plant, and the waste disposal area.
8    Q.   And again, earlier in the testimony at Whitman
9  we were talking about your experiences in the early
10  1960s and what you had learned over that period of time
11  regarding environmental issues.  Do you have any
12  experience from, you know, 40 years ago during your
13  consulting or teaching at the University of Maine,
14  regarding the types of systems at Bostik, such as
15  underground storage tanks?
16    A.   Yes, I have.
17    Q.   And briefly tell the jury of that experience,
18  please.
19    A.   In 1961 I worked on a consulting basis at a
20  very large pulp and paper mill belonging to
21  International Paper, in Jay, Maine.  That mill was very
22  sensitive to materials migrating from its site to the
23  Androscoggin River.  That mill had built a lagoon to
24  treat wastewater in the early 1950s and had found that
25  water was leaching through the bottom of the lagoon and

37

1  through the soil to the river.  And so they hired a
2  technical engineer from MIT, here in Boston --
3       MR. PIROZZOLO:   Pray Your Honor's judgment.
4       THE COURT:   I'll hear it.
5    A.   -- to design and help them build a liner for
6  that already-existing pond.  And that was built in about
7  1954 -- '53 and '54.
8       When I worked for them in 1961, between the
9  early '50s and the early '60s they had increased
10  production in the mill and were now overloading the
11  wastewater treatment plant.  And they hired me to help
12  them figure out how to reduce the load on that treatment
13  plant.
14    Q.   And so let me ask you at this point, Dr.
15  Woodard:  You were hired as what type of professional to
16  assist International Paper in Jay?
17    A.   I was hired as an environmental professional.
18    Q.   And we'll return to this in a moment.  But let
19  me ask you:  What have you reviewed concerning the
20  Bostik site?
21    A.   I reviewed a number of engineering reports,
22  reports written by GEI Consultants and some other
23  consultants.  I reviewed intercompany reports, reports
24  authored by Bostik people themselves.  I visited the
25  site.  I have reviewed affidavits and reports from other

```
 1                              Volume 13, Pages 117 - 138

 2                 UNITED STATES DISTRICT COURT

 3                 DISTRICT OF MASSACHUSETTS

 4      ----------------------------------------

 5      LIBERTY MUTUAL INSURANCE COMPANY,

 6                      Plaintiff

 7      vs.                                CA-96-10804-DPW

 8

 9      THE BLACK & DECKER CORPORATION, BLACK

10      & DECKER, INC., BLACK & DECKER (U.S.)

11      INC., EMHART CORPORATION, and EMHART

12      INDUSTRIES, INC.,

13                      Defendants

14      ----------------------------------------

15          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

16            UNITED STATES DISTRICT COURT JUDGE

17                      CONFERENCE

18              Wednesday, February 11, 2004

19                 3:45 p.m. to 4:24 p.m.

20              Courtroom No. 1 - 3rd Floor

21        1 Courthouse Way, Boston, Massachusetts 02210

22        --------- Janis T. Young, RDR, CRR ---------

23              Farmer Arsenault Brock LLC

24        50 Congress Street, Boston, Massachusetts 02109

25              617.728.4404   Fax 617.728.4403
```

4 (Pages 10 to 13)

Liberty Mutual Insurance Company v. The Black & Decker Corporation - CONFERENCE
Volume 13 - 2/11/2004

---

**10**

1        This is on Page 17, Your Honor.
2        I'm sorry; I apologize. This is Page 3, Your
3 Honor. It should be the same document.
4        THE COURT: Right.
5        MR. LEPORE: It's the next-to-the-last
6 paragraph, Your Honor, on Page 17.
7        THE COURT: Okay.
8        MR. LEPORE: And if you see, what that means
9 is, "Therefore, additional response actions are
10 warranted to achieve a condition of no significant
11 risk." That has to do with the future site construction
12 workers' health.
13        There is nothing in here, not one word, that
14 says remediation is directed towards groundwater.
15        The reference that Mr. Pirozzolo cited, I
16 think it was Page 37 -- is that 37?
17        MS. ROWAN: 39.
18        MR. LEPORE: 39; I'm sorry:
19        "Groundwater quality may be improved by
20 removal of soil with elevated PCB and VOC
21 concentrations."
22        Well, yes; I'll agree with that. But that's
23 not the point. There's a whole bunch of things that
24 could have happened. This is a benefit. This lists the
25 benefits that could have resulted from what the GEI

---

**11**

1 people suggested be done.
2        But that wasn't the purpose of it, because
3 groundwater did not need to be remediated there. It
4 just didn't, and still doesn't, and it never did; and
5 here it is -- you know, I mean, Your Honor has heard,
6 this place was closed 40 years ago, and they only got
7 around to doing it last year. And during that entire
8 period of time, the only concern they had was future
9 construction workers, if they started digging up the
10 soil.
11        There's no reference at all to impact on
12 groundwater. The fact that there were VOCs there is
13 interesting, but that didn't even impact the
14 groundwater.
15        MR. PIROZZOLO: Your Honor, if I may offer a
16 couple of other references, Stage II, Exhibit 123. It
17 deals specifically with Mr. Lepore's point and the PCB
18 issue as well, migrating and exposure of fish and so on.
19        THE COURT: All right. Let me see the
20 exhibit.
21        MR. PIROZZOLO: Your Honor, this is -- I
22 should take my notes off it, I guess. This page of
23 Exhibit 124, here and here.
24        THE COURT: When you say "this page," it's
25 Page 6 and Page 7.

---

**12**

1        MR. PIROZZOLO: Thank you. Exhibit 123, Pages
2 4, 5 and 6; it should be 6 on PCBs.
3        THE COURT: Well, I'm going to let the
4 question go to the jury on this. So, how do we phrase
5 the question?
6        MR. PIROZZOLO: Thank you, Your Honor.
7        THE COURT: How do you propose phrasing the
8 question, Mr. Lepore?
9        MR. LEPORE: That's what I'm looking at right
10 now, Your Honor. It's going to be limited solely, Your
11 Honor, to the former waste disposal area --
12        THE COURT: I think it has to be.
13        MR. LEPORE: I don't disagree, Your Honor --
14 and Building 41, which is adjacent to that. It's part
15 and parcel of the same thing. I think even
16 Mr. Pirozzolo acknowledged that.
17        THE COURT: Right.
18        MR. LEPORE: Building 41 is a small percentage
19 in terms of dollars as well. It's a very
20 small percentage.
21        THE COURT: Can you agree upon the dollars if
22 the jury returns a verdict of yes in this case?
23        MR. LEPORE: Yes.
24        MR. PIROZZOLO: I think they're called out in
25 Exhibit 187.

---

**13**

1        THE COURT: I don't want them making it; it's
2 your arithmetic decision.
3        MR. LEPORE: We can agree, certainly, on the
4 costs with respect to the waste disposal area. We can
5 certainly agree on Building 41, and I think the evidence
6 will -- we can agree that one-half of Phase IV relates
7 to this.
8        MR. PIROZZOLO: I think we can probably agree,
9 and I can say at this point I can certainly agree, and
10 the court will decide if we don't agree.
11        THE COURT: What you have is Mr. Ash saying 50
12 percent.
13        MR. PIROZZOLO: Mr. Ash said 50 percent, and
14 there are some line items; but of course, I'll agree
15 with Mr. Lepore on the line items.
16        THE COURT: I would far prefer having you do
17 it, on that, so I'm not sending some dollar figure to
18 the jury.
19        MR. PIROZZOLO: I don't think we should do
20 that, Your Honor.
21        MR. LEPORE: Agreed, Your Honor.
22        I think the question, simply, Your Honor, is,
23 do you find that the contamination of the former waste
24 disposal area and Building 41 remained on the property?
25 I mean, that's the simplistic approach.

---

Liberty Mutual Insurance Company v. The Black & Decker Corporation - CONFERENCE
Volume 13 - 2/11/2004

**14**

1    What we're trying to do is get across that if
2    the contamination at the former waste disposal area and
3    Building 41 stayed on the property, then it's excluded
4    from coverage.
5         In the original questions that we had
6    submitted, we had, do you find any contamination that
7    left the property boundary; but that doesn't really help
8    us.
9         MR. PIROZZOLO: Your Honor, I think the
10   question should be framed from the cases or from Your
11   Honor's decision than it is from the exact language.
12   You find that remediation was for the purpose of abating
13   third-party pollution to the property of others or to
14   prevent pollution of the property to others. I'm not
15   saying that artfully, but it's --
16        THE COURT: I think that is the way I'm going
17   to put it.
18        MR. PIROZZOLO: And I think Your Honor has it
19   in your opinion; I think it's in there.
20        THE COURT: Okay.
21        MR. LEPORE: I think that's true. In fact,
22   may I go one step further, Your Honor, with respect to
23   that? The Hakim decision sets forth the language
24   explicitly. It said, "Costs incurred for the sole
25   purpose of remediating one's own property are barred by

**15**

1    the own-property exclusion." That's a quote from the
2    Hakim thing. In fact, it's part of our memo that Janice
3    put together this morning.
4         THE COURT: Right.
5         MR. PIROZZOLO: Actually, I did find the
6    language. "If the cleanup is designed to remediate, to
7    prevent or to abate further migration of contaminants to
8    off-site property," and then adding the language, "or
9    for the purpose of modifying, remediating, preventing or
10   abating the threat of migration to off-site property."
11        MR. LEPORE: But there isn't any.
12        THE COURT: Well, the allegation is that there
13   is. There's nothing in the record, I think, to permit
14   the jury to find that there is off-site. So that's why
15   it's a jury question.
16        MR. PIROZZOLO: The solvents are off-site,
17   though, Your Honor. The solvents go off-site. We can
18   argue that.
19        THE COURT: You can argue it; yes.
20        MR. PIROZZOLO: Oh.
21        THE COURT: You're not foreclosed from arguing
22   it. The real question is, does the jury get to decide
23   whether or not Liberty Mutual has established, by a
24   preponderance of the evidence, that the contamination of
25   the former waste disposal area and Building 41 -- and

**16**

1    I'll plug it in the appropriate language. I'll show it
2    to you tomorrow morning.
3         MR. LEPORE: That's fine.
4         THE COURT: All right. So what else do we
5    need to talk about? There are only two legal questions,
6    factual questions: the "accident" and this thing.
7         MR. LEPORE: Right.
8         THE COURT: And my instructions to the jury
9    are likely to be relatively brief, including questions
10   of evaluating witnesses. I'll let you do the argument
11   on it; I gave them some preliminary instructions on it.
12   If I hear something in argument that I think needs some
13   expansion, I'll deal with that then. But I'm not sure
14   that there's much else that you need instruction on.
15        MR. LEPORE: Are you going to use the same
16   "accident" definition, I assume --
17        THE COURT: Yes.
18        MR. LEPORE: -- you've used, without change?
19        THE COURT: Not quite without change, but you
20   may expect some portion of the clarification memorandum
21   language to get introduced in.
22        MR. LEPORE: Understood, Your Honor.
23        MR. PIROZZOLO: Your Honor, I say, with some
24   respect and deference, I believe that in opening,
25   Liberty Mutual's argument regarding "accident"

**17**

1    effectively was an argument for jury nullification; and
2    I would ask that the court, in its instructions, caution
3    the jury to focus on Your Honor's definition of
4    "accident" in the subjective sense.
5         THE COURT: I will. And I'll listen to fair
6    argument on it.
7         MR. PIROZZOLO: The other request I would have
8    is, I believe an example or set of examples would be
9    very useful for the jury. I think the court has used
10   some in its opinion and did use some in opening; and I
11   dare not suggest the examples, but I think --
12        THE COURT: Don't count on me using examples
13   here. That, as far as I'm concerned, is argumentative.
14   And I'm loath to do it unless I think I have something
15   that really hits the spot. And I'm not sure I can think
16   of -- I can think of things, but I'm not sure that it's
17   something I'm going to do. So you think of examples
18   that you think fit in, and you can argue them. Burning
19   houses or frying bacon, I guess.
20        MR. PIROZZOLO: Or steak.
21        THE COURT: That shows you the difference.
22   The compensation levels for judges is bacon; for lawyers
23   it's steak. That's what's familiar.
24        MR. PIROZZOLO: Your Honor -- and I think Your
25   Honor did do this in the opening -- but I think a great

```
00001
 1                    Volume 14, Pages 1 - 123
 2              UNITED STATES DISTRICT COURT
 3               DISTRICT OF MASSACHUSETTS
 4      ---------------------------------------
 5    LIBERTY MUTUAL INSURANCE COMPANY,
 6                    Plaintiff
 7    vs.                           CA-96-10804-DPW
 8
 9    THE BLACK & DECKER CORPORATION, BLACK
10    & DECKER, INC., BLACK & DECKER (U.S.)
11    INC., EMHART CORPORATION, and EMHART
12    INDUSTRIES, INC.,
13                    Defendants
14      ---------------------------------------
15           BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
16             UNITED STATES DISTRICT COURT JUDGE
17                   JURY TRIAL - DAY 14
18                   February 12, 2004
19                 9:13 a.m. to 1:19 p.m.
20              Courtroom No. 1 - 3rd Floor
21        1 Courthouse Way, Boston, Massachusetts 02210
22         --------- Janis T. Young, RDR, CRR ---------
23              Farmer Arsenault Brock LLC
24        50 Congress Street, Boston, Massachusetts 02109
25              617.728.4404  Fax 617.728.4403
```

00013

1   harm caused unintentionally by an intentional act of the

2   insured.

3           Now, let me turn to Question B-2, and it's

4   really a subset in Bostik of the relevant issues here.

5           We've asked you the universal question; that's

6   the question of accident.  And the question of accident,

7   as I told you at the beginning of this, is going to

8   require you to do some historical reconstruction, in

9   evaluating what these people knew and intended at the

10  time that they committed those acts, and we're concerned

11  with the period May 1956 through January 1969.  So

12  you're going to have to project yourself back into that

13  time period when considering the question of accident.

14          Then there's a narrow question, and the

15  question is B-2.  That B-2 question has to do with the

16  costs of remediation at the former waste disposal area

17  and at Building 41.  And here, the contention of Liberty

18  Mutual is that the costs associated with that

19  remediation were not incurred to remedy or prevent

20  further -- this should be modified, I'm afraid -- or

21  provide for mitigation of contaminants off the Bostik

22  site.

23          And what I think I'm going to do is, before I

24  give the final version of this to you -- you have it in

25  hand -- when you see "prevent" in that question, it

00014

1    should be "provide."  We'll have a modification for you

2    that you can take into the jury room.

3            What are we talking about here?  Well, the

4    Liberty Mutual contention is that whatever they did at

5    the former waste disposal area, the taking of the soil

6    and so on, remediation, and the work they did with

7    Building 41, wasn't necessary to protect off-site or

8    adjacent areas.

9            You'll understand that in the insurance policy

10    that's been referenced here is included an exclusion for

11    own property.  You don't get to recover from damage to

12    your own property, under certain circumstances.  And

13    that's what's at the heart of this.

14            So what Question B-2 does is concerns itself

15    with the issue whether the remediation of the former

16    waste disposal plant and at Building 41 were necessary

17    only for purposes of cleaning up Bostik's property, and

18    not to address the problem of contaminant migration off

19    the Bostik site; and specifically here we're talking

20    about Question B-2.

21            We start with the proposition that costs

22    incurred for the sole purpose of remediating the Bostik

23    property are not costs as to which Liberty Mutual bears

24    responsibility.  But there are two important exceptions

25    that apply, and you're going to be evaluating those.

00015

1          First, if adjacent areas such as the Ipswich

2    River, not owned by Bostik, are actually contaminated by

3    migration from the Bostik property, then Liberty Mutual

4    is responsible when the cleanup at issue is designed to

5    remediate, to prevent, or to abate further migration of

6    the contaminants off site.

7          Second, if adjacent areas are threatened, not

8    actually contaminated but threatened by contamination

9    from Bostik, then Liberty Mutual is responsible even if

10   the contaminating substances are now solely on the

11   Bostik property.

12          This is the case if the contamination being

13   addressed on the Bostik property, particularly at the

14   former waste disposal area and Building 41, involves a

15   demonstrated danger to adjacent areas, including the

16   Ipswich River.

17          Now, that is because the law recognizes that

18   it would serve no legitimate purpose to assert that soil

19   and groundwater pollution must be allowed to spread over

20   boundary lines before they can be said to have caused

21   the damage to other property which liability insurance

22   in this case is intended to indemnify.

23          So you've got the global questions.  Were

24   these accidents at the Whitman site and the Bostik site?

25   And you've got the very narrow question at the Bostik

00016

1   site, having to do with whether or not that remediation

2   that was done at the former waste disposal area and

3   Building 41 is something for which Liberty Mutual is

4   responsible.

5           Now, with that, by way of general background,

6   we'll turn to counsel to begin closing arguments.

7           MR. LEPORE:  May we see you at sidebar, Your

8   Honor?

9           (Sidebar conference begins)

10          MR. LEPORE:  First of all, Your Honor, thank

11  you for picking up the correction on B-2.  I missed it,

12  and I appreciate that.

13          With respect to your instruction of accident,

14  I want to just object for the same reasons we've

15  objected before.

16          THE COURT:  That's adequate to put me on

17  notice.

18          MR. LEPORE:  Thank you, Your Honor.

19          MR. PIROZZOLO:  And I would repeat the burden-

20  of-proof objection on the Bostik site.

21          THE COURT:  In this course of the case, and

22  the way the parties have chosen to try the case, is such

23  that I think it would be unfair in the extreme to shift

24  the burden of proof at this time; and so the compromises

25  that the parties have made here do not in my mind

00017

1  necessitate the changing of the burden of proof;

2  although, as far as I'm concerned, with respect to the

3  Bostik site, duty to defend has been established.

4          MR. LEPORE:  Understood, Your Honor.  Thank

5  you.

6          MR. PIROZZOLO:  Your Honor, one other --

7          THE COURT:  Hold on.

8          MR. PIROZZOLO:  I just want to make clear also

9  our issue on the groundwater.  I ask that the

10 groundwater be defined --

11         THE COURT:  It's not in the case.  In any

12 event, I've made that determination, both in my summary

13 judgment motion; but the answer is, the proof in this

14 case doesn't make it a groundwater case.

15         MR. PIROZZOLO:  Thank you.

16         MR. LEPORE:  Your Honor, with respect to that

17 second question, my understanding is you're taking out

18 the word "further"?

19         THE COURT:  I'm taking out the word "prevent"

20 and making it "provide."

21         MR. LEPORE:  Is there any evidence of

22 migration?  I thought that we were taking out "prevent

23 migration" as opposed to --

24         THE COURT:  I think that's fair.

25         MR. LEPORE:  Thank you, Your Honor.

Page 1

 1                UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3
 4    _____
 5    LIBERTY MUTUAL INSURANCE CO.,
                 Plaintiff,      Civil Action No. 96-10804
 6
      V.                         February 13, 2004, 10:30 a.m.
 7
      THE BLACK & DECKER CORP.,
 8    BLACK & DECKER, INC.,
      BLACK & DECKER, U.S. INC.,
 9    EMHART CORP., and
      EMHART INDUSTRIES, INC.,
10               Defendants.
      _____
11
12
13
14           TRANSCRIPT OF JURY TRIAL DAY 15
15        BEFORE HONORABLE DOUGLAS P. WOODLOCK
16            UNITED STATES DISTRICT COURT
17          JOHN J. MOAKLEY U.S. COURTHOUSE
18               ONE COURTHOUSE WAY
19              BOSTON, MA  02210
20
21
22           DEBRA M. JOYCE, RMR, CRR
               Official Court Reporter
23        John J. Moakley U.S. Courthouse
            1 Courthouse Way, Room 5204
24              Boston, MA  02210
                 617-737-4410
25

1    occurred at the Whitman site during the period May 18, 1956 to

2    January 1, 1969?

3                  Answer:  No.

4                  Question one as to the Bostik site:  Has Black &

5    Decker established by a preponderance of the evidence that an

6    accident within the meaning of the Liberty Mutual policies

7    occurred at the Bostik site during the period May 18, 1956 to

8    January 1, 1969?

9                  Answer:  Yes.

10                  Question 2:  Has Liberty Mutual established by a

11   preponderance of the evidence that the costs associated with

12   mediation of the former waste disposal area and Building 41

13   were not incurred to remedy or prevent migration of

14   contaminants off the Bostik site?

15                  Answer:  Yes.

16                  Signed and dated this 13th day of February 2004.

17                  So say you, Mr. Foreperson, and so say you, members

18   of the jury?

19                  THE JURY:  Yes.

20                  THE COURT:  Anything further from counsel?

21                  MR. LEPORE:  No.  Thank you.

22                  THE COURT:  Ladies and gentlemen, what that means

23   is that your jury service is completed, and it also means I

24   can't tell you what to do anymore, but I can make some

25   suggestions.