UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br>THE BLACK & DECKER CORPORATION,<br>BLACK & DECKER, INC., BLACK & DECKER<br>(U.S.) INC., EMHART CORPORATION, and<br>EMHART, INC.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:04-CV-10657-DPW<br>(Bostik Middleton Site) |

## LIBERTY MUTUAL INSURANCE COMPANY'S
## OPPOSITION TO BLACK & DECKER'S RENEWED
## MOTION FOR JMOL OR FOR NEW TRIAL

Pursuant to Federal Rules of Civil Procedure 50(b) and 59(e), plaintiff,

Liberty Mutual Insurance Company ("Liberty Mutual"), hereby opposes the

Renewed Motion of defendants The Black & Decker Corporation, et al. ("Black &

Decker") for Judgment As A Matter Of Law Or For A New Trial.  As set forth in

more detail below, Black & Decker's request for judgment as a matter of law must

be denied, because there was a legally sufficient evidentiary basis for the jury's

determination that the Owned Property Exclusion ("OPE") in the USM Policies

precluded coverage for the costs of investigation and remediation at the Former

Waste Disposal Area and Building 41 at the Bostik Middleton site.  The jury's

verdict on Question B 2 of the special verdict form comported with the weight of the

evidence, so Black & Decker is not entitled to a new trial concerning the

applicability of the OPE.  Accordingly, Black & Decker's Renewed Motion should be denied in its entirety.

### Procedural History

During the Phase I trial, Black & Decker filed a Motion for Judgment as a Matter of Law with respect to the Bostik Middleton site (the "Site"), in which it argued, inter alia, that Liberty Mutual had not carried its burden of proving that the OPE applied to the investigation and remediation costs incurred with respect to the Former Waste Disposal Area ("FWDA") and the area around Building 41 at the Site.  While the Court implicitly denied Black & Decker's motion, it requested at the February 10, 2004 jury charge conference that Liberty Mutual submit an Offer of Proof concerning the applicability of the OPE.  On February 11, 2004, Liberty Mutual filed its Offer of Proof, in which it cited the documentary and testimonial evidence concerning the lack of actionable contamination of off-site property, such as the Ipswich River, which could have been impacted by migration of contaminants from the Site.  See Liberty Mutual's February 11, 2004 Offer of Proof (copy annexed hereto as Exhibit A).

After reviewing the Offer of Proof, the Court ruled that the issue of the applicability of the OPE would be presented to the jury for consideration.  See February 11, 2004 trial transcript, volume 13, at 12:3-4 (copy annexed hereto as Exhibit B).  The Court instructed the jury about the interpretation of the OPE, see February 12, 2004 trial transcript, volume 14, at 14:3-16:4 (copy annexed hereto as Exhibit C), and directed the jury to focus on whether "adjacent areas such as the

- 2 -

Ipswich River, not owned by Bostik", were contaminated or threatened by contamination from the Site. See id. at 15:1-16. The Court declined Black & Decker's request that groundwater be defined as third-party property. See id. at 17:8-15 ("It's not in the case . . . I've made that determination, . . . in my summary judgment [decision]; . . . the proof in this case doesn't make it a groundwater case.").

Question B 2 on the special verdict form submitted to the jury on February 12, 2004 required the jury to determine "[h]as Liberty Mutual established by a preponderance of the evidence that the costs associated with remediation of the former waste disposal area and Building 41 were not incurred to remedy or prevent migration of contaminants off the Bostik Site?". See Special Verdict Form, Question B 2 (copy annexed hereto as Exhibit D). On February 13, 2004, the jury returned its verdict, answering "yes" in response to Question B 2. Id.

## Argument

### I.    BLACK & DECKER IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.

This Court has already found that Black & Decker was not entitled to judgment as a matter of law concerning the application of the OPE to the investigation and remediation expenses incurred at the FWDA and Building 41 areas of the Site. The record citations and legal arguments presented in Black & Decker's Renewed Motion for Judgment as a Matter of Law do not contain any different or additional evidence or case law which would mandate a contrary decision, post-verdict. The Court should therefore deny Black & Decker's renewed motion.

It is well-established that a renewed motion for judgment as a matter of law is "measured by a . . . rigorous standard", under which the court "has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue." Wright & Miller, <u>Federal Practice</u>, §2531 at 302 (citing <u>Garrison v. U.S.</u>, 62 F.2d 41, 42 (4th Cir. 1932)("Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him . . . Verdict can be directed only where there is no substantial evidence to support recovery by the party against whom it is directed or where the evidence is all against him or is so overwhelmingly so as to leave no room to doubt what the fact is.")).  In considering Black & Decker's renewed motion, the Court "must view all the evidence in the light most favorable to [Liberty Mutual, as ]the non-moving party . . . [and] must grant the nonmovant the benefit of all inferences that may reasonably be drawn from the evidence." <u>Moore's Federal Practice 3d</u>, §50.64[1] at 50-96 & n.1 (citing <u>CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.</u>, 144 F.3d 35, 42 (1st Cir. 1998) ("on review, all evidence is examined in light most favorable to nonmovant, drawing all possible inferences in its favor"); <u>Lama v. Borras</u>, 16 F.3d 473, 477 (1st Cir. 1994) ("denial of JMOL motion sustained unless evidence, and all reasonable inferences in favor of verdict, lead reasonable person to only one conclusion – that movant is entitled to judgment.")).  The reviewing court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence", all of which are activities reserved for the jury. <u>Id</u>. at 50-98. Accordingly, "if there is conflicting evidence that may reasonably lead

jurors to inconsistent conclusions, judgment as a matter of law is improper. . .

[because] such a case appropriately falls within the jury's fact finding province." Id.

at 50-99.

In the instant case, the documentary and testimonial evidence raised at least

a triable issue of fact as to whether the OPE was applicable to the costs Black &

Decker incurred in investigating and remediating the FWDA and Building 41 areas

of the Site.  The record citations presented in Black & Decker's renewed motion are

at least counterbalanced by the documents and testimony cited by Liberty Mutual

in its Offer of Proof, which show that the Ipswich River has not been damaged from

actionable levels of any contaminants which could have migrated from the FWDA or

Building 41.  These facts, which came from documents created and testimony given

by Black & Decker's environmental consultants, constitute substantial evidence in

support of Liberty Mutual's position.  Contrary to Black & Decker's assertions,

Liberty Mutual presented more than a "scintilla of evidence" in support of its

contention that the OPE bars coverage for the FWDA and Building 41 clean-up

costs.  Indeed, Liberty Mutual presented substantial evidence which raised at least

a triable issue of fact, which the jury resolved in Liberty Mutual's favor.  Black &

Decker therefore cannot satisfy its burden of proving that it is entitled to judgment

as a matter of law, and its renewed motion should be denied.

## II.   BLACK & DECKER INCORRECTLY FOCUSES ON THE PRESENCE OF ON-SITE CONTAMINATION, RATHER THAN DAMAGE TO OFF-SITE PROPERTY FROM ACTIONABLE LEVELS OF CONTAMINANTS.

In its Renewed Motion, Black & Decker devotes the vast majority of its brief to record citations allegedly demonstrating that soil and groundwater at the FWDA and Building 41 were contaminated, and that such contamination would have migrated to the Ipswich River. Black & Decker's alleged proofs are misplaced, however, because the focus of the OPE inquiry is on whether any third-party property has actually been damaged, or is threatened with being damaged, as a result of migration of the on-site contamination. See Hakim v. Massachusetts Insurers' Insolvency Fund , 424 Mass. 275, 280 (1997) ("where . . . there was contamination of adjacent property, the costs of remedial efforts to prevent further contamination of that property are not excluded from coverage by the owned property clause.").

In the instant case, it is undisputed that no third-party property adjacent to the Site, such as the Ipswich River, has been damaged by actionable levels of contaminants which migrated from the Site. See Section III, infra. Under Hakim, the OPE applies when the off-site property has not been damaged by contamination from the policyholder's property. See Hakim, 424 Mass. at 280, n.8 ("We . . . do not consider whether the owned property exclusion bars coverage if there is an imminent threat of, but no actual contamination of, the property of another."). The SJC specifically declined to adopt the holding of some other courts that "[e]ven in the absence of contamination of third-party property, . . . the owned property

- 6 -

exclusion does not bar recovery for cleanup costs of the insured's property if these were incurred to prevent the imminent migration of contamination to third-party property." Id.   Accordingly, under Hakim, there is no basis for refusing to apply the OPE, as a matter of law, since the undisputed facts produced by Black & Decker's own environmental consultants demonstrate that there is no damage to property adjacent to the Site.   Black & Decker's proffered evidence about on-site contamination is therefore not germane to the relevant inquiry about the applicability of the OPE, and cannot serve as the basis for entry of judgment as a matter of law.

Black & Decker ignores the record and testimonial evidence presented by its own environmental consultants concerning the lack of actionable levels of contamination in the Ipswich River, and instead contends that Liberty Mutual relied solely upon a conclusory statement by its expert witness, Paul Roux, concerning the migration of contaminants from Area 5 of the Site.  As set forth infra, however, Liberty Mutual relied on both Mr. Roux's testimony and the evidence presented by Black & Decker's own environmental consultants, all of which demonstrated that there was no damage to the Ipswich River from contaminants allegedly contributed from the Site.  All of this evidence, taken together, constitutes more than the requisite "scintilla" that Black & Decker erroneously contends that Liberty Mutual failed to produce.

Black & Decker also attempts to avoid the preclusive effect of its environmental consultants' evidence by arguing, in a footnote, that Liberty Mutual

"cannot properly rely upon the levels of contamination" in demonstrating that the OPE is applicable here.  Contrary to Black & Decker's assertion, the levels of contamination of off-site property such as the Ipswich River are directly relevant, because they determine whether the off-site property has actually been *damaged* within the meaning of the OPE and the property damage provisions of the insurance policy.  The cases construing the applicability of the OPE to pollution claims are all predicated on a finding by the court or jury that the third-party property at issue had been damaged and required clean-up.  See, e.g., Hakim, 424 Mass. at 278 (stream, pond, and river adjacent to policyholder's property were found to be contaminated by oil released from policyholder's property, and were cleaned up); Rubenstein v. Royal Ins. Co., 44 Mass. App. Ct. 842, 854-5 (1998) (off-site groundwater found to be contaminated with oil that had migrated from policyholder's property).  See also Allstate Ins. Co. v. Quinn Const. Co., 713 F. Supp. 35, 37 (D. Mass. 1989), vacated as a result of settlement, 784 F. Supp. 927 (D. Mass. 1990) (gasoline discovered underground vault adjacent to policyholder's property) (citing Bankers Trust Co. v. Hartford Acc. & Indem., 518 F. Supp. 371 (S.D.N.Y. 1981)(fuel oil released from policyholder's property cleaned up in adjacent river and park)).  The fact that these sites all required clean-up demonstrates that actionable levels of contaminants were present in the subject soil, surface water, or groundwater, thereby constituting the damage which is a prerequisite to rendering the OPE inapplicable.

- 8 -

The Wasserman case cited by Black & Decker does not support its contention about the purported irrelevance of levels of contaminants, and instead supports Liberty Mutual's position.[1]  See Wasserman v. Commerce Ins. Co., 2002 Mass. Super. LEXIS 319 (Super. Ct., Middlesex Cty, July 9, 2002).  In Wasserman, the Superior Court implicitly found that the Charles River had been contaminated by oil which had migrated from the policyholder's property, noting that "it is likely that the delay in cleaning up the spill has meant that the great bulk of the oil has already moved elsewhere."  See id. at *24.  Although the Charles River had not been tested for the presence of contaminants, the Wasserman court ruled that the OPE would not bar coverage for remediation costs on the policyholder's property, based on the assumed damage to the Charles River, which had not been tested.  Id.  By contrast, the Ipswich River has been tested by Black & Decker's environmental consultants, who have determined that the levels of contaminants in the River are not sufficiently elevated to require clean-up.  The holding in Wasserman is therefore inapposite, because the assumed damage to off-site property in Wasserman has been shown not to exist in the instant case.

As set forth above, the undisputed evidence created by Black & Decker's own environmental consultants demonstrates that the Ipswich River has not been damaged by contamination from the site.  This substantial evidence is more than adequate to carry Liberty Mutual's burden of proof regarding the applicability of the OPE under Hakim.  Since the OPE bars coverage for on-site remediation costs when

---

[1] Liberty Mutual discussed the Wasserman case in footnote 1 of its February 11, 2004 Offer of Proof.

there is no damage to off-site property, Black & Decker's references to evidence about on-site contamination and migration are irrelevant and unavailing, and cannot warrant the entry of judgment as a matter of law.

### III.    THE EVIDENCE DEMONSTRATES THAT THE OPE BARS COVERAGE FOR THE CLEAN-UP ACTIVITIES AT THE FORMER WASTE DISPOSAL AREA AND BUILDING 41.

As summarized in Liberty Mutual's February 11, 2004 Offer of Proof, which is incorporated herein by reference, the trial record is replete with evidence that the Ipswich River has not been damaged by receiving actionable levels of PCBs or VOCs from the FWDA and Building 41, and that the clean-up activities there were directed solely to Black & Decker's own property.   Accordingly, there is substantial evidence to support the jury's conclusion that the OPE bars coverage.

First of all, there is no evidence that the levels of PCBs in Upper Pond sediments which could be transported via surfacewater runoff to the River exceeded any actionable threshold.  The Method 3 Risk Characterization Addendum reported that there were no significant risks to human health based on potential exposure to PCB-contaminated sediments in the FWDA.  See Method 3 Risk Characterization Addendum dated April 27, 2000, BD 124, at 16 (copy annexed hereto as Exhibit E). Bostik's environmental consultant, GEI, found that the levels of PCBs in the soil along the bank of the Upper Pond, which could potentially become sediment through erosion, did not exceed the 25 ppm clean-up threshold, and therefore did not have to be excavated.  Instead, GEI installed a sheet-piling wall and excavated soil behind that wall which exceeded the 25 ppm clean-up standard.  See generally

- 10 -

Phase IV Remedy Implementation Plan dated April 30, 2001, BD 130 at 14and 16 (copy annexed hereto as Exhibit F).

Moreover, there is no evidence that the presence of PCBs or VOCs in the Ipswich River rises to actionable levels constituting damage and requiring remediation. GEI's November, 1995 Phase II Comprehensive Site Assessment Addendum Report found that "no PCBs or TPH [total petroleum hydrocarbon] compounds were identified above detection limits in any of the samples" of surface water in the River. See BD 104, Section 5.4.4, p.36 (copy annexed hereto as Exhibit G). Significantly, the Phase II Addendum also concluded that "[n]o immediate hazard has been identified due to PCB or VOC contamination in the River. No surface water quality impact from the contaminated sediments was identified in surface water samples." Id. at Section 6.4, page 46. Five years later, these findings of no damage to the River were corroborated by the April 27, 2000 Stage II Ecological Risk Assessment, which found that "[b]ody burdens of PCBs in fish from the Ipswich River are comparable to other fish from non-contaminated areas of Massachusetts, and do not reach levels known to be associated with toxicity". See BD 123, p. 9 (copy annexed hereto as Exhibit H). Furthermore, as reported in the Self-Implementing On-Site Cleanup and Disposal Plan dated March 2003, "[t]he results of the Method 3 Risk Characterization Addendum indicated that no significant risks to human health are present based on potential exposure to surface water, sediment, or fish fillets" with respect to the PCB contamination at the FWDA. See BD 135 at pp. 3-4 (copy annexed hereto as Exhibit I).

- 11 -

Instead, the Method 3 Risk Assessment found that the only risk posed by PCBs at the site was to construction workers who might come in contact with PCB-contaminated soil.  See Method 3 Risk Characterization Addendum, Exhibit E hereto, at 19.  The Method 3 Risk Assessment also analyzed the impact of VOC-contaminated groundwater at the FWDA, and found that the only potential risk would be to on-site workers, through exposure to airborne concentrations of one type of VOC in the on-site workplace.  See id. at 19 ("a potential risk of harm to human health exists to a Site worker from migration of volatiles from the subsurface into indoor air from groundwater").  The Method 3 Risk Assessment found no risks to off-site receptors from either the PCB or VOC contamination at the FWDA, concluding that "[t]he potential risks to other receptors from direct contact with surface water, sediment, or ingestion of fish were within acceptable limits." Id.

Based on these Risk Assessment findings, GEI determined that the remedial objective for the FWDA was to "[r]educe PCB concentrations in soil to levels which will not pose unacceptable risks to potential future Site construction workers." See Phase III Remedial Action Plan dated December 29, 2000, BD 129, at 28 (copy annexed hereto as Exhibit J)(emphasis added).  GEI did not identify remediation of contaminated groundwater at the FWDA as a remedial objective for the clean-up activities conducted there.  Instead, GEI dealt with groundwater only as a by-product of the soil excavation process, noting that in order to de-water the excavation hole, groundwater would be collected and treated sufficiently to permit it

- 12 -

to be re-deposited on-site. See Phase IV Remedy Implementation Plan, Exhibit F

hereto, at 16 ('Because of the shallow groundwater table in Area 5 the excavation

will require dewatering.").

       The trial testimony of Black & Decker's environmental consultants Margaret

Hanley and James Ash corroborates the documentary evidence that the Ipswich

River has not been damaged by the presence of VOCs or PCBs, and that the clean-

up activities at the FWDA and Building 41 dealt with Bostik's own property.  For

example, Ms. Hanley testified that the Ipswich River sediments did not require

remediation to address VOCs or PCBs from the FWDA or Building 41 area.  See

February 6, 2004 trial transcript at 85:9 – 86:13 (no excavation or remediation of

sediments from River bed) (copy of transcript excerpts annexed hereto as Exhibit

K).  Ms. Hanley also testified that Bostik had not received any complaints from

third parties about contamination in the River, and had not been required to

remediate any off-site wells. Id.  Moreover, Ms. Hanley confirmed that although

PCBs had been transported to the Upper Pond by means of stormwater runoff, the

levels of PCBs that had been found in sediments in the Upper Pond did not require

remediation, and none had been performed.  See id. at 92:21 – 93:18; 93:24 – 94:4

("Based on the evaluations that were performed by GEI, it was determined that

remediation of the sediments [containing PCBs in the Upper Pond] was not

required.").  Ms. Hanley also confirmed that GEI had not recommended that any

PCB remediation be conducted in groundwater or sediments at the FWDA, and

instead had only prescribed soil excavation at the FWDA in order to reduce PCB

- 13 -

concentrations to levels that would not pose a risk to construction workers.  See id. at 97:9-19.

Mr. Ash, who succeeded Ms. Hanley in working on the Bostik site, also testified that the risk assessment performed with respect to the Ipswich River found that the PCB concentrations in the River did not require remediation.  See February 9, 2004 trial transcript at 102:15-17 (copy of transcript excerpts annexed hereto as Exhibit L).  In addition, Mr. Ash testified that the only unacceptable risk posed by PCBs in the FWDA was to future construction workers who could be exposed to PCB-containing soil.  See id. at 102:18-25; 103:1-3 and 14-17.  GEI recommended only that soil be excavated at the FWDA to address this unacceptable risk; no other remedial activity was required.  Id. at 103:18-20.  Mr. Ash also implicitly identified the source of potential VOC exposure from contaminated groundwater in the River as the Old Tank Farm, rather than any contaminated groundwater originating at the FWDA.  See id. at 120:11-23 (no exposure of aquatic species in River to VOCs present in groundwater, because groundwater extraction system at Old Tank Farm prevented discharge of such contaminated groundwater to River).

Liberty Mutual's expert witness, Paul Roux, confirmed that the environmental studies produced by Black  Decker's consultants demonstrate that there are no actionable levels of contamination requiring clean-up of the Ipswich River.  Based on GEI's studies, Mr. Roux concluded that the River was "not impacted by the presence of PCBs", because the very low levels of PCBs in the

- 14 -

sediments "were determined not to be a risk, and no remediation was necessary."
See February 11, 2004 trial transcript at 21:10-18 (copy of transcript excerpts
annexed hereto as Exhibit M). Mr. Roux also testified that that any solvent
contamination in the Ipswich River had been caused by discharges from the Old
Tank Farm area, rather than the FWDA. See id. at 19:17-20:1.

Moreover, Mr. Roux testified that there had been "no migration or threatened
migration from the [FWDA] prior to the 2003 remediation", so the soil remediation
activities conducted at the FWDA in 2003 were "solely for the contaminated soil on
the property at that location". Id. at 20:10-21:8. Mr. Roux explained that the
contaminated soil at the FWDA had been covered by a cap in the 1960's, and that
GEI had concluded that "there was no migration away from the landfill of any of the
contaminants." Id. at 11:11-18. Many years later, when the risk assessment was
conducted, GEI determined that the only risk posed by the presence of PCB-
contaminated soil at the FWDA was to construction workers who might be exposed
to the soil during construction projects. Id. at 8:4-13. While the risk assessment
considered all chemicals that were detected at the FWDA, "[a]t the end of the risk
assessment, only the PCBs were determined to present an unacceptable risk, so all
of the other chemicals were determined not to present an unacceptable risk." Id. at
9:4-11. Accordingly, the only remedy performed at the FWDA was excavation of
PCB-contaminated soil, in order to prevent exposure to construction workers on-
site. Id. at 8:14-18; 9:12-19.

- 15 -

Mr. Roux further testified that "[t]here was no remediation recommended or undertaken for sediments in the Upper Pond because it was determined that there was no unacceptable risk from just leaving them where they are." Id. at 10:24-11:2. In addition, Mr. Roux explained that the PCB levels in the sediments along the banks of the Upper Pond were sufficiently low that they could be left in place while the actionable levels of PCBs were excavated from soil located behind the sheet piling barrier installed by GEI. See id. at 6:18-7:18.

With respect to alleged groundwater contamination and migration at the FWDA, Mr. Roux stated that "[n]o groundwater remediation was undertaken at the FWDA." Id. at 7:19-24. He explained that the groundwater treatment at the FWDA described by Mr. Ash was actually a function of the collection of groundwater as part of the dewatering of the soil excavation hole, rather than any remediation of the groundwater itself. Id. at 10:2-16 ("it's not a groundwater remediation system; it's a dewatering system; and it only impacts the water that's at the very surface that's getting into the hole."). Mr. Roux acknowledged that there was solvent-contaminated groundwater at the FWDA, but testified that "it was not migrating away from the [FWDA], it was staying in the [FWDA]. . . . The remediation had nothing to do with the solvents. It had only to do with the PCBs." Id. at 31:24-32:3; 32:9-10. See also id. at 15:19-16:1 and 16:11-22.

Mr. Roux explained that his deposition testimony about groundwater flowing through the site, which had been raised by Black & Decker in its cross-examination, related to the general direction of groundwater flow at the site. See id. at 32:11-23.

Mr. Roux emphasized, however, that the groundwater flow direction "doesn't mean that contaminated or significantly contaminated groundwater is flowing to the River or to the ponds, because we know from GEI's work monitoring that there isn't significantly contaminated groundwater flowing away from the ponds." Id. at 32:24-33:3.

Furthermore, Mr. Roux testified that in the Building 41 area, drums and a small amount of contaminated soil were dug up in connection with construction of the building. See id. at 12:18-13:7. Mr. Roux testified that no groundwater remediation was performed in the vicinity of Building 41, and concluded that drum and soil removal costs at the Building 41 area were incurred with respect to contamination "solely on Bostik's own property." Id. at 13:10-13 and 22:6-12.

As detailed above, the documentary and testimonial evidence provides an adequate foundation for the jury's conclusion that the OPE applies to bar recovery of investigation and remediation costs at the FWDA and Building 41. Black & Decker's Renewed Motion should therefore be denied.

### IV.   BLACK & DECKER CANNOT CIRCUMVENT THE OPE BY DECLARING THAT GROUNDWATER CONTAMINATION CONSTITUTES DAMAGE TO THIRD-PARTY PROPERTY UNDER MASSACHUSETTS LAW.

In an effort to circumvent the OPE's coverage bar based on the lack of damage to the Ipswich River, Black & Decker contends that this Court should declare the groundwater beneath the Site to constitute third-party property which has been damaged by contaminant releases at the FWDA and Building 41. Black &

- 17 -

Decker apparently asserts that the evidence of soil and groundwater contamination at the FWDA and Building 41 compels the conclusion that all of the clean-up activities undertaken there were directed at remedying or preventing damage to third-party property, and therefore should be covered.  Black & Decker's argument fails as a matter of law, however, and is not supported by the facts.

This Court has previously rejected Black & Decker's entreaties to overrule the SJC's decision in Gamer v. Town of Milton , 346 Mass. 617, 620 (1964), in which the SJC stated that a property owner owns the groundwater beneath his property.[2] The SJC did not overrule or distinguish Gamer in the Hakim case, which involved the issue of the definition of third-party property for purposes of the OPE.  The SJC issued its Hakim decision in 1997, long after enactment of CERCLA and  M.G.L. c.21E, and issuance of the UTC and Marks Superior Court decisions which Black & Decker cites as persuasive.  Since the SJC has not declared Gamer inapplicable to groundwater pollution cases, it is still binding upon this Court, which previously recognized its applicability.  See Allstate, 713 F. Supp. at 40 n.7.  Black & Decker should therefore not be permitted to argue that Gamer's purported inapplicability supports either entry of judgment as a matter of law or the granting of a new trial.

Furthermore, the documentary and testimonial evidence raised at least a triable issue of fact as to whether the contamination levels in soil and groundwater at the FWDA and Building 41 required remediation.  Black & Decker's

_____

[2]  Black & Decker requested that the Court rule that Gamer is inapplicable at the jury charge conference, as well as in its original Motion for Summary Judgment and in its Motion for Partial Summary Judgment concerning the Beverly site.  The Court declined each of Black & Decker's invitations.

environmental consultants conceded that the contaminants in those areas had not been addressed for more than fifteen years after remediation activities commenced at the Site.  The documents and testimony presented by Black & Decker also demonstrated that the primary reason why soil excavation activities were ultimately undertaken was to prevent construction workers from being exposed to contaminants, rather than to remedy soil and groundwater contamination.   In view of this evidence, Black & Decker could not show that the jury's verdict was unsupported, even if groundwater were found to constitute third-party property.

## V.    BLACK & DECKER IS NOT ENTITLED TO A NEW TRIAL CONCERNING THE OPE.

Black & Decker has failed to show that it is entitled to a new trial under Federal Rule of Civil Procedure 59.  While the standard for granting a new trial is more relaxed than that for granting judgment as a matter of law, "[a]s a general rule, courts will not disturb jury verdicts in the absence of extreme circumstances, such as a case of manifest injustice or abuse of the jury's function."  Moore's Federal Practice , §59.13[2][a].  It is well-established that "trial courts must exercise their discretion in favor of granting a new trial very sparingly, since 'a jury's verdict on the facts should only be overturned in the most compelling circumstances.'" Rayburn v. San Juan Marriott Resort and Stellaris Casino , 259 F. Supp. 2d 110, 112 (D.P.R. 2003)(quoting Wells Real Estate, Inc. v. Greater Lowell Bd. Of Realtors, 850 F.2d 803, 811 (1st Cir. 1988)).  Accordingly, a trial court "shall order a new trial 'only if the verdict, though rationally based on the evidence, "was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice."'" Id.

- 19 -

(quoting <u>Fernandez v. Corporacion Insular De Segueros</u>, 79 F.2d 207, 211 (1st Cir. 1996)).

For the reasons discussed above, the jury's verdict on Question B 2 was not clearly against the weight of the evidence, but instead was soundly supported by the substantial evidence produced by Black & Decker's environmental consultants. Accordingly, Black & Decker cannot demonstrate that it is entitled to a new trial under Rule 59, and its alternative request therefor should be denied.

## CONCLUSION

For the foregoing reasons, Black & Decker's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, should be denied in its entirety.

LIBERTY MUTUAL INSURANCE COMPANY

By its attorneys,

Ralph T. Lepore III (BBO 294420)
Janice Kelley Rowan (BBO 265520)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 15, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2004, I caused a copy of the foregoing document to be served by hand upon Jack R. Pirozzolo, Esq. of Willcox, Pirozzolo & McCarthy, P.C. at 50 Federal Street, Boston, MA 02110.

Janice Kelley Rowan