# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE BLACK & DECKER CORPORATION, BLACK & DECKER, INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART, INC.,<br>Defendants. | CIVIL ACTION<br>No. 96-10804-DPW |

## LIBERTY MUTUAL INSURANCE COMPANY'S OFFER OF PROOF WITH RESPECT TO THE OWNED PROPERTY EXCLUSION IN THE 1956 TO 1969 USM POLICIES

Pursuant to Federal Rules of Civil Procedure 16 and 51, and the Court's request at the February 10, 2004 charge conference, plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), hereby respectfully submits this offer of proof with respect to the evidence demonstrating that the applicability of the Owned Property Exclusion (the "OPE") in the USM policies should be presented to the jury as a Special Question regarding the availability of coverage for certain alleged pollution damages at the Bostik site in Middleton, Massachusetts.

As more fully set forth below, the OPE is applicable to the costs of cleaning up PCBs in the Former Waste Disposal Area ("FWDA"), because the Ipswich River has not been damaged from contamination by actionable levels of PCBs in

sediments that could have traveled from the FWDA to the River. Similarly, the OPE applies to preclude recovery of any costs associated with the clean-up of contaminated soil and non-aqueous phase liquid ("NAPL") in the Building 1 Area, because there is no evidence that any petroleum hydrocarbons or other pollutants from the Building 1 Area have contaminated the Ipswich River adjacent to the Bostik property. Where, as in the instant case, there has been no demonstration that the off-site property has actually been damaged by the presence of actionable levels of the particular contaminants which are the subject of the challenged clean-up action on the policyholder's own property, the OPE applies to preclude coverage for the costs of cleaning up. See Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280 n.8 (1997) ("We . . . do not consider whether the owned property exclusion bars coverage if there is an imminent threat of, but no actual contamination of, the property of another."). The jury should therefore be permitted to consider whether the costs of clean-up at the FWDA and Building 1 are excluded from coverage by the OPE.

## Argument

I.    **THE OWNED PROPERTY EXCLUSION APPLIES WHEN THE OFF-SITE PROPERTY IS NOT DAMAGED BY ACTIONABLE LEVELS OF THE CONTAMINATION AT ISSUE IN THE ON-SITE CLEAN-UP.**

The Liberty Mutual policies issued to USM Corporation during the period November 1, 1957 to January 1, 1969 contain an "owned property exclusion" which states that "[t]his policy does not apply . . . (d) under Insuring Agreement I (b), to injury to or destruction of (1) property owned or occupied by or rented to the

insured." See policy in effect November 1, 1957 to January 1, 1959 at B&D MA LM 0000155. This exclusion applies to Insuring Agreement I (b), which provides that Liberty Mutual will pay "all sums which the insured shall become obligated to pay by reason of the liability imposed upon it by law, . . . because of . . . b) injury to or destruction of property, including the loss of use thereof, caused by accident." Id. at 000153. Thus, the owned property exclusion in the USM policies applies to the property damage component of those policies, and precludes coverage for costs incurred with respect to injury to or destruction of property which is owned by USM. Id.

Construing the OPE in the context of a claim for pollution damage, the Massachusetts Supreme Judicial Court established that "[c]osts incurred for the sole purpose of remediating the [policyholder's] property are barred by the owned property exclusion of the policy." Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 282 (1997). The SJC also held that "where . . . there was contamination of adjacent property, the costs of remedial efforts to prevent further contamination of that property are not excluded from coverage by the owned property clause." Id. at 280.

The SJC noted, however, that its holding was restricted to the facts of the Hakim case, in which "it [was] undisputed that there was contamination of the waterways adjacent to the Hakims' property." Id. at 280 n.8. The SJC declined to adopt the holding of some other courts that "[e]ven in the absence of contamination of third-party property, . . . the owned property exclusion does not bar recovery for

- 3 -

cleanup costs of the insured's property if these were incurred to prevent the imminent migration of contamination to third-party property." Id. Instead, the SJC specifically stated that "[w]e therefore need not and do not consider whether the owned property exclusion bars coverage if there is an imminent threat of, but no actual contamination of, the property of another." Id. Thus, the OPE remains applicable where, as here, the off-site property has not actually been damaged by actionable levels of the contaminant involved in the challenged on-site clean-up activity.

The cases holding that the OPE cannot bar coverage for the costs of clean-up actions on the policyholder's property that are undertaken in order to prevent actual or threatened migration of contaminants onto off-site property involve factual scenarios in which the off-site property has already been damaged by the presence of levels of contaminants from the policyholder's property that require clean-up. See, e.g., Hakim, 424 Mass. at 278 (stream, pond, and river adjacent to policyholder's property were found to be contaminated by oil released from policyholder's property, and were cleaned up); Rubenstein v. Royal Ins. Co., 44 Mass. App. Ct. 842, 854-5 (1998) (off-site groundwater found to be contaminated with oil that had migrated from policyholder's property).   See also Allstate Ins. Co. v. Quinn Const. Co., 713 F. Supp. 35, 37 (D. Mass. 1989), vacated as a result of settlement, 784 F. Supp. 927 (D. Mass. 1990) (gasoline discovered underground vault adjacent to policyholder's property) (citing Bankers Trust Co. v. Hartford Acc. & Indem., 518 F. Supp. 371 (S.D.N.Y. 1981)(fuel oil released from policyholder's

property cleaned up in adjacent river and park)).[1]  In those instances of confirmed actionable levels of contamination which have required clean-up actions off-site, this Court and others have held that the OPE should not be enforced, because measures to prevent further or recurring contamination of the off-site property should be encouraged.  See, e.g., Allstate, 713 F. Supp.  at 41 ("It is entirely consistent with this purpose [to cover damage to third-party property] to interpret liability policies to cover pollution cleanup activities necessary to *prevent* costly damage to the property of others.") (underscoring added).

In the case at bar, however, the contamination condition of the subject off-site property (the Ipswich River) has been studied, and the levels of PCB contamination have been determined not to require any clean-up.  The rationale for eliminating the OPE therefore does not exist in this case, because the Ipswich River has not been damaged by the contaminants that are the subject of the challenged clean-up actions on the Bostik property.  The jury should therefore be permitted to determine whether the costs of remediating the FWDA and the Building 1 Area are barred from coverage by the OPE in the USM policies.

_____

[1] In Wasserman v. Commerce Ins. Co., 2002 WL 31187681 (Super. Ct. Middlesex County, July 9, 2002), no sampling of the off-site property (the Charles River) had been done, so there was no information as to whether oil from the policyholder's property had caused contamination with actionable levels of pollutants that would require clean-up.  The court noted, however, that "it is likely that the delay in cleaning up the spill has meant that the great bulk of the oil has already moved elsewhere." Id. at *8.  By contrast, in the instant case, the PCB contamination in the River has been studied, and has been determined not to rise to an actionable level that would require clean-up.  The PCB contamination in the River sediments therefore cannot be considered to constitute damage to third-party property which would warrant eliminating the applicability of the OPE.

## II.    THE IPSWICH RIVER HAS NOT BEEN DAMAGED BY ACTIONABLE LEVELS OF CONTAMINANTS FROM THE FORMER WASTE DISPOSAL AREA.

The record at trial is replete with evidence that the Ipswich River has not been damaged by receiving actionable levels of PCBs from the Former Waste Disposal Area.  First of all, there is no evidence that the levels of PCBs in Upper Pond sediments which could be transported via surfacewater runoff to the River exceeded any actionable threshold.  As reported in the Self-Implementing On-Site Cleanup and Disposal Plan dated March 2003, "[t]he results of the Method 3 Risk Characterization Addendum indicated that no significant risks to human health are present based on potential exposure to surface water, sediment, or fish fillets" with respect to the PCB contamination at the FWDA.  See BD 135 at pp. 3-4.  Indeed, the Method 3 Risk Assessment stated that "[t]he potential risks to other receptors from direct contact with surface water, sediment, or ingestion of fish were within acceptable limits."  BD 124 at p. 19.

Moreover, GEI found that the levels of PCBs in soil along the bank of the Upper Pond, which could potentially become sediment through erosion, were below the clean-up standard of 25 ppm that GEI established for removal of contaminated soil in the FWDA.  GEI therefore did not excavate those soils, and confined its excavation activities to areas behind the sheetpiling wall where PCBs exceeded the 25 ppm clean-up standard.

Furthermore, there is no evidence that the presence of PCBs in the Ipswich River rises to actionable levels constituting damage and requiring remediation.  The

November, 1995 Phase II Comprehensive Site Assessment Addendum Report found

that "no PCBs or TPH [total petroleum hydrocarbon] compounds were identified

above detection limits in any of the samples" of surface water in the River.  See BD

104, Section 5.4.4, p.36.  The Phase II Addendum also concluded that "[n]o

immediate hazard has been identified due to PCB or VOC contamination in the

River.  No surface water quality impact from the contaminated sediments was

identified in surface water samples."  Id.  at Section 6.5, page 46.  The April 27,

2000 Stage II Ecological Risk Assessment found that "[b]ody burdens of PCBs in

fish from the Ipswich River are comparable to other fish from non-contaminated

areas of Massachusetts, and do not reach levels known to be associated with

toxicity".  See BD 123, p. 9.

Excerpts from trial testimony of Ms. Hanley and Mr. Ash relating to these

subjects are attached.  Mr. Roux's testimony on February 11, 2004 is expected to

also address these issues.

### III.   THE IPSWICH RIVER HAS NOT BEEN DAMAGED BY CONTAMINANTS FOUND IN THE BUILDING 1 AREA.

The trial transcript excerpts attached hereto demonstrate that there has

been no need for groundwater remediation in the Building 1 Area with respect to

the soil contamination resulting from tank leaks there.  Accordingly, there cannot

have been any damage to the River resulting from those contamination conditions,

and the  remedial actions taken in the Building 1 Area address only the on-site

conditions at that area.

## CONCLUSION

For the foregoing reasons, the jury should be allowed to consider the applicability of the Owned Property Exclusion in the Liberty Mutual policies.

LIBERTY MUTUAL INSURANCE COMPANY

By its attorneys,

_____

Ralph T. Lepore III (BBO 294420)
Janice Kelley Rowan (BBO 265520)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February, 2004, I served a copy of the foregoing document by hand upon Jack R. Pirozzolo, Esq. of Willcox, Pirozzolo & McCarthy, P.C. at the Federal Courthouse at 1 Courthouse Way, Boston, Massachusetts.

_____

Janice Kelley Rowan

# 1672261_v1

- 8 -

|  |  | *Hanley* |
|---|---|---|
| *Transcript Date 2/6/04* | *Page: Lines* | *Testimony* |
|  | 85-86:9-13 | Q: And the Ipswich River sediments have not been remediated either. Isn't that right? A: That's correct. Well, I take that -- Not exactly. There were VOCs present in sediments adjacent to the tank farm and as a result of the Phase 1 treatment plan, the groundwater flow in the vicinity of that extraction system has been reversed, which brings the contamination back toward the site. So the sediments in fact have been remediated adjacent to the extraction system. Q: But there has been no excavation of those sediments from the riverbed. Is that correct? A: That's correct. Q: Now, are you aware through your work on the project with GEI of any complaints having ever been made against Bostik by third parties about contamination in the river? A: No. Q: And you're not aware of any complaints having been made against Bostik by third parties for contamination of properties that were located beyond the borders of the Bostik site. Is that correct? A: I don't remember if there were complaints. There was a concern about water quality in the wells across the river, the bedrock wells across the river, and they were tested as part of the assessment. Q: And the conclusion of those tests was that there was no remediation required for those wells. Is that correct? A: That's correct. |
|  | 88:8-25 | Q: Is it correct that under the MCP, Bostik had to reduce the levels of soil contamination in the old tank farm? A: Yes. Q: And it would have to engage in some remedial activity in order to accomplish that. Is that correct? A: Yes. Q: Is it also correct that Bostik had to reduce the level of groundwater contamination located within the old tank farm itself? A: Yes, in order to prevent the migration of the |

| | | *Hanley* |
|---|---|---|
| *Transcript Date 2/6/04* | *Page: Lines* | *Testimony* |
| | | groundwater to the river, yes.<br>Q: But they also, because of the levels of contamination there and the extent to which they exceeded permissible levels, had to deal with the groundwater itself at the old tank farm, didn't they?<br>A: Yes, the groundwater in the old tank farm area needed to be cleaned up to surface water standards. |
| | 91-92:24-1 | Q: And there was no groundwater cleanup done at the pilot plant itself. Correct?<br>A: That's right. |
| | 92-93:21-18 | Q: Now, if PCBs had moved by means of stormwater runoff into the upper pond, they should be found in the upper pond where the stormwater enters into it through the drainage outfall. Is that right?<br>A: That's one location, yes.<br>Q: And in fact did GEI investigate in 1989 the levels of PCBs there were found at the outfall in the upper pond?<br>A: Yes.<br>Q: And isn't it correct that the levels that were found at the two outfalls in the upper pond didn't exceed permissible levels for PCBs?<br>A: They indicated transport of PCBs to the ponds.<br>Q: But the levels that were found there didn't exceed permissible levels. Correct?<br>A: They did not require remediation, no.<br>Q: Did you require any remediation, okay. So in fact the November 1989 PCB investigation report that GEI prepared recommended that no action be taken with respect to the sediments at the upper pond other than monitoring to ensure that PCB levels didn't exceed 10 parts per million. Is that right?<br>A: Yes. |
| | 93-94:24-4 | Q: ... Has there ever been a finding of levels of PCBs in sediments at the upper pond that have required remediation?<br>A: Based on the evaluations that were performed by GEI, it was determined that remediation of the sediments was not required. |
| | 95-96:22-8 | Q: Ms. Hanley, if you look here at the excerpt from the Phase 3 remedial action plan that was done in December |

| Transcript Date 2/6/04 | Page: Lines | *Hanley* Testimony |
|---|---|---|
| | | of 2000, I call your attention, please, to Section 4.1 which is concluding there and the discussion of the recommended work to be done at the former waste disposal area.  Do you see that reference there?<br>A:  I do.<br>Q:  And could you read that for us, please?<br>A:  "Former waste disposal area.  Reduce PCB concentrations in soil to levels that will not pose unacceptable risk to potential future site construction workers." |
| | 97:9-19 | Q:  Certainly.  Could you put that page up, please?  And my question to you was, you don't see any recommendation there that any work be done with respect to PCB contamination in groundwater at the former waste disposal area, do you?<br>A:  It does not indicate that in this statement.<br>Q:  And there's no reference there to a recommendation that any work be done with respect to PCB contamination in sediments in connection with the former waste disposal area.  Is that correct?<br>A:  Not in this paragraph, no. |
| | 99-100:18-1 | Q:  And there was no actual remediation of groundwater itself at Building 1.  Is that right?<br>A:  I'm not aware of any, no.<br>Q:  And when GEI did the work there at Building 1 in 1996 when the release abatement measure was done, it was found that the foundations in Building 1 and in Building 3 acted as a barrier to prevent movement of that NAPL from that Building 1 area to the river.  Isn't that right?<br>A:  That's my understanding. |

| | | *Ash Direct* |
|---|---|---|
| *Transcript Date* | *Page: Lines* | *Testimony* |
| 2/9/04 | 11:16-20 | The migration pathway from the former waste disposal area was not current. That is to say, we did not identify an existing migration pathway for PCBs from the former waste disposal area into those water bodies at the time we were making the evaluation. |
| | 12:22-25 | We had not identified an existing migration pathway for VOCs in groundwater from this area directly into a surface-water body. The potential existed for that migration; we had not measured it. |
| | 46:11-16 | Q: And what is the purpose of, in general terms, of the future work? A: The future work is intended -- for instance, in the old tank farm area, is to continue to confirm that contaminants in groundwater are not migrating to the Ipswich River. |
| | 101:10-17 | Q: ...That's part of your overall risk assessment, an ecological risk assessment? A: Right. Q: That's found in there. A: Yes. Q: -- found that the PCB levels in the fish from the Ipswich River were comparable to those found in fish from noncontaminated areas of the Commonwealth; correct? |
| | 102:2-25 | Q: So that meant that the PCB levels didn't reach levels known to be associated with toxicity; correct? No? A: No. Q: Oh. Why is that? A: A risk characterization for the Ipswich River -- risk characterization for the Ipswich River would consider the local conditions and the pathways for risk associated with that site. PCBs at similar concentrations could pose toxic hazards under different exposure conditions, for instance. So that risk characterization considered the effects on the local environment at that site, at the Bostik site. Q: So at this particular site they didn't reach the levels that needed to be dealt with; right? A: Yes. Q: And in fact, one of the rational reasons for your excavation recommendation was based on your |

| | | *Ash Direct* |
|---|---|---|
| *Transcript Date* | *Page: Lines* | *Testimony* |
| | | conclusion that the only unacceptable risk from PCBs were presented by current or reasonable foreseeable future land uses at the site; correct? A:  The only unacceptable risk? Q:  Yes, for PCBs. A:  Yes. |
| | 103:9-23 | Q:  And so you and your colleagues determined that the only remedial action necessary to address the only unacceptable risk presented was to excavate the PCB-contaminated soil; correct? A:  The only remedial action necessary? Q:  Let's just clarify this, Mr. Ash.  You've already said that the only unacceptable risk was to future construction workers; right? A:  Yes. Q:  And you've also said that the only thing you recommend was excavation; correct? A:  That is what we recommended, yes. Q:  So putting those two together, isn't that what was done? In order to address the only unacceptable risk, you recommended that it be excavated. A:  Yes. |
| | 109:16-1 | A:  ...we essentially constructed the sheet pile wall outside of the soil concentrations that exceeded that goal. Q:  Right.  That's what I was asking you. A:  Yeah. Q:  So really the answer to my question is that there were no remedial -- strike that.  On the bank, you didn't find anything that exceeded the remedial action number of 25 parts per million of PCBs, did you? A:  That's correct. |
| | 120:11-23 | A:  ..."VOCs are currently not detectable in the river due to the groundwater treatment system Q:  What does that mean? A:  We were collecting samples from surface water in the river, and due to operation of the groundwater extraction system, it was preventing the discharge of those contaminants to the river.  As long as it was operating, we weren't finding anything in the river. Q:  As a result of that, does it say there was no exposure of aquatic species in the river to VOCs present in |

| | | *Ash Direct* |
|---|---|---|
| *Transcript Date* | *Page: Lines* | *Testimony* |
| | | groundwater?<br>A:  Yes. |

| Transcript Date 2/10/04 | Page: Lines | *Roux Direct* <br> Testimony |
|---|---|---|
| | 135-136:17-12 | Q:  Now, the upper pond is just, again, to the north of the pilot plan, across the parking lot.  Was it necessary to monitor the upper pond sediments for any contamination? <br> A:  Yes.  At the beginning of the investigation, the concern was that contaminated sediments from the pilot plan area could have washed across the surface and into the upper pond.  So that was investigated by looking at the quality of sediments beneath the two outfalls that connect the drainage system between the pilot plan and the upper pond. <br> Q:  What did they find; do you know? <br> A:  They found low levels of PCBs in the sediments. <br> Q:  And what did GEI recommend at that point? <br> A:  They recommended just, I guess, in a way, keeping an eye on it, monitoring it, because the levels that they found were below what at the time they believed would be action or cleanup levels.  So they didn't recommend doing anything active about cleaning that up. |
| | 137:7-9 | Q:  Now, no remediation of the upper pond sediments was done; correct? <br> A:  Correct. |

# EXHIBIT B

1                                    Volume 13, Pages 117 - 138

2              UNITED STATES DISTRICT COURT

3               DISTRICT OF MASSACHUSETTS

4    ----------------------------------------

5    LIBERTY MUTUAL INSURANCE COMPANY,

6                        Plaintiff

7    vs.                                    CA-96-10804-DPW

8

9    THE BLACK & DECKER CORPORATION, BLACK

10   & DECKER, INC., BLACK & DECKER (U.S.)

11   INC., EMHART CORPORATION, and EMHART

12   INDUSTRIES, INC.,

13                      Defendants

14   ----------------------------------------

15        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

16          UNITED STATES DISTRICT COURT JUDGE

17                     CONFERENCE

18            Wednesday, February 11, 2004

19              3:45 p.m. to 4:24 p.m.

20            Courtroom No. 1 - 3rd Floor

21      1 Courthouse Way, Boston, Massachusetts 02210

22      --------- Janis T. Young, RDR, CRR ---------

23             Farmer Arsenault Brock LLC

24      50 Congress Street, Boston, Massachusetts 02109

25          617.728.4404   Fax 617.728.4403

4 (Pages 10 to 13)
Liberty Mutual Insurance Company v. The Black & Decker Corporation - CONFERENCE
Volume 13 - 2/11/2004

10

1   This is on Page 17, Your Honor.
2       I'm sorry; I apologize. This is Page 3, Your
3   Honor. It should be the same document.
4       THE COURT: Right.
5       MR. LEPORE: It's the next-to-the-last
6   paragraph, Your Honor, on Page 17.
7       THE COURT: Okay.
8       MR. LEPORE: And if you see, what that means
9   is, "Therefore, additional response actions are
10  warranted to achieve a condition of no significant
11  risk." That has to do with the future site construction
12  workers' health.
13      There is nothing in here, not one word, that
14  says remediation is directed towards groundwater.
15      The reference that Mr. Pirozzolo cited, I
16  think it was Page 37 -- is that 37?
17      MS. ROWAN: 39.
18      MR. LEPORE: 39; I'm sorry:
19      "Groundwater quality may be improved by
20  removal of soil with elevated PCB and VOC
21  concentrations."
22      Well, yes; I'll agree with that. But that's
23  not the point. There's a whole bunch of things that
24  could have happened. This is a benefit. This lists the
25  benefits that could have resulted from what the GEI

11

1   people suggested be done.
2       But that wasn't the purpose of it, because
3   groundwater did not need to be remediated there. It
4   just didn't, and still doesn't, and it never did; and
5   here it is -- you know, I mean, Your Honor has heard,
6   this place was closed 40 years ago, and they only got
7   around to doing it last year. And during that entire
8   period of time, the only concern they had was future
9   construction workers, if they started digging up the
10  soil.
11      There's no reference at all to impact on
12  groundwater. The fact that there were VOCs there is
13  interesting, but that didn't even impact the
14  groundwater.
15      MR. PIROZZOLO: Your Honor, if I may offer a
16  couple of other references, Stage II, Exhibit 123. It
17  deals specifically with Mr. Lepore's point and the PCB
18  issue as well, migrating and exposure of fish and so on.
19      THE COURT: All right. Let me see the
20  exhibit.
21      MR. PIROZZOLO: Your Honor, this is -- I
22  should take my notes off it, I guess. This page of
23  Exhibit 124, here and here.
24      THE COURT: When you say "this page," it's
25  Page 6 and Page 7.

12

1       MR. PIROZZOLO: Thank you. Exhibit 123, Pages
2   4, 5 and 6; it should be 6 on PCBs.
3       THE COURT: Well, I'm going to let the
4   question go to the jury on this. So, how do we phrase
5   the question?
6       MR. PIROZZOLO: Thank you, Your Honor.
7       THE COURT: How do you propose phrasing the
8   question, Mr. Lepore?
9       MR. LEPORE: That's what I'm looking at right
10  now, Your Honor. It's going to be limited solely, Your
11  Honor, to the former waste disposal area --
12      THE COURT: I think it has to be.
13      MR. LEPORE: I don't disagree, Your Honor --
14  and Building 41, which is adjacent to that. It's part
15  and parcel of the same thing. I think even
16  Mr. Pirozzolo acknowledged that.
17      THE COURT: Right.
18      MR. LEPORE: Building 41 is a small percentage
19  in terms of dollars as well. It's a very
20  small percentage.
21      THE COURT: Can you agree upon the dollars if
22  the jury returns a verdict of yes in this case?
23      MR. LEPORE: Yes.
24      MR. PIROZZOLO: I think they're called out in
25  Exhibit 187.

13

1       THE COURT: I don't want them making it; it's
2   your arithmetic decision.
3       MR. LEPORE: We can agree, certainly, on the
4   costs with respect to the waste disposal area. We can
5   certainly agree on Building 41, and I think the evidence
6   will -- we can agree that one-half of Phase IV relates
7   to this.
8       MR. PIROZZOLO: I think we can probably agree,
9   and I can say at this point I can certainly agree, and
10  the court will decide if we don't agree.
11      THE COURT: What you have is Mr. Ash saying 50
12  percent.
13      MR. PIROZZOLO: Mr. Ash said 50 percent, and
14  there are some line items; but of course, I'll agree
15  with Mr. Lepore on the line items.
16      THE COURT: I would far prefer having you do
17  it, on that, so I'm not sending some dollar figure to
18  the jury.
19      MR. PIROZZOLO: I don't think we should do
20  that, Your Honor.
21      MR. LEPORE: Agreed, Your Honor.
22      I think the question, simply, Your Honor, is,
23  do you find that the contamination of the former waste
24  disposal area and Building 41 remained on the property?
25  I mean, that's the simplistic approach.

# EXHIBIT C

1                          Volume 14, Pages 1 - 123

2                  UNITED STATES DISTRICT COURT

3                  DISTRICT OF MASSACHUSETTS

4     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5     LIBERTY MUTUAL INSURANCE COMPANY,

6                          Plaintiff

7     vs.                                      CA-96-10804-DPW

8

9     THE BLACK & DECKER CORPORATION, BLACK

10    & DECKER, INC., BLACK & DECKER (U.S.)

11    INC., EMHART CORPORATION, and EMHART

12    INDUSTRIES, INC.,

13                         Defendants

14    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

16               UNITED STATES DISTRICT COURT JUDGE

17                    JURY TRIAL - DAY 14

18                    February 12, 2004

19                  9:13 a.m. to 1:19 p.m.

20               Courtroom No. 1 - 3rd Floor

21        1 Courthouse Way, Boston, Massachusetts 02210

22        - - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -

23               Farmer Arsenault Brock LLC

24        50 Congress Street, Boston, Massachusetts 02109

25               617.728.4404   Fax 617.728.4403

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 14 - 2/12/2004

---

**14**

1  should be "provide." We'll have a modification for you
2  that you can take into the jury room.
3        What are we talking about here?  Well, the
4  Liberty Mutual contention is that whatever they did at
5  the former waste disposal area, the taking of the soil
6  and so on, remediation, and the work they did with
7  Building 41, wasn't necessary to protect off-site or
8  adjacent areas.
9        You'll understand that in the insurance policy
10  that's been referenced here is included an exclusion for
11  own property.  You don't get to recover from damage to
12  your own property, under certain circumstances.  And
13  that's what's at the heart of this.
14        So what Question B-2 does is concerns itself
15  with the issue whether the remediation of the former
16  waste disposal plant and at Building 41 were necessary
17  only for purposes of cleaning up Bostik's property, and
18  not to address the problem of contaminant migration off
19  the Bostik site; and specifically here we're talking
20  about Question B-2.
21        We start with the proposition that costs
22  incurred for the sole purpose of remediating the Bostik
23  property are not costs as to which Liberty Mutual bears
24  responsibility.  But there are two important exceptions
25  that apply, and you're going to be evaluating those.

---

**15**

1        First, if adjacent areas such as the Ipswich
2  River, not owned by Bostik, are actually contaminated by
3  migration from the Bostik property, then Liberty Mutual
4  is responsible when the cleanup at issue is designed to
5  remediate, to prevent, or to abate further migration of
6  the contaminants off site.
7        Second, if adjacent areas are threatened, not
8  actually contaminated but threatened by contamination
9  from Bostik, then Liberty Mutual is responsible even if
10  the contaminating substances are now solely on the
11  Bostik property.
12        This is the case if the contamination being
13  addressed on the Bostik property, particularly at the
14  former waste disposal area and Building 41, involves a
15  demonstrated danger to adjacent areas, including the
16  Ipswich River.
17        Now, that is because the law recognizes that
18  it would serve no legitimate purpose to assert that soil
19  and groundwater pollution must be allowed to spread over
20  boundary lines before they can be said to have caused
21  the damage to other property which liability insurance
22  in this case is intended to indemnify.
23        So you've got the global questions.  Were
24  these accidents at the Whitman site and the Bostik site?
25  And you've got the very narrow question at the Bostik

---

**16**

1  site, having to do with whether or not that remediation
2  that was done at the former waste disposal area and
3  Building 41 is something for which Liberty Mutual is
4  responsible.
5        Now, with that, by way of general background,
6  we'll turn to counsel to begin closing arguments.
7        MR. LEPORE:  May we see you at sidebar, Your
8  Honor?
9        (Sidebar conference begins)
10        MR. LEPORE:  First of all, Your Honor, thank
11  you for picking up the correction on B-2. I missed it,
12  and I appreciate that.
13        With respect to your instruction of accident,
14  I want to just object for the same reasons we've
15  objected before.
16        THE COURT:  That's adequate to put me on
17  notice.
18        MR. LEPORE:  Thank you, Your Honor.
19        MR. PIROZZOLO:  And I would repeat the burden-
20  of-proof objection on the Bostik site.
21        THE COURT:  In this course of the case, and
22  the way the parties have chosen to try the case, is such
23  that it would be unfair in the extreme to shift
24  the burden of proof at this time; and so the compromises
25  that the parties have made here do not in my mind

---

**17**

1  necessitate the changing of the burden of proof;
2  although, as far as I'm concerned, with respect to the
3  Bostik site, duty to defend has been established.
4        MR. LEPORE:  Understood, Your Honor.  Thank
5  you.
6        MR. PIROZZOLO:  Your Honor, one other --
7        THE COURT:  Hold on.
8        MR. PIROZZOLO:  I just want to make clear also
9  our issue on the groundwater.  I ask that the
10  groundwater be defined --
11        THE COURT:  It's not in the case.  In any
12  event, I've made that determination, both in my summary
13  judgment motion; but the answer is, the proof in this
14  case doesn't make it a groundwater case.
15        MR. PIROZZOLO:  Thank you.
16        MR. LEPORE:  Your Honor, with respect to that
17  second question, my understanding is you're taking out
18  the word "further"?
19        THE COURT:  I'm taking out the word "prevent"
20  and making it "provide."
21        MR. LEPORE:  Is there any evidence of
22  migration?  I thought that we were taking out "prevent
23  migration" as opposed to --
24        THE COURT:  I think that's fair.
25        MR. LEPORE:  Thank you, Your Honor.

---

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LIBERTY MUTUAL INSURANCE CO., )
    Plaintiff,          )
                        )
    v.                  )
                        )
THE BLACK & DECKER CORP.,    )     CIVIL ACTION NO.
BLACK & DECKER, INC.,       )     96-10804-DPW
BLACK & DECKER, U.S. INC.,   )
EMHART CORP., and EMHART     )
INDUSTRIES, INC.,         )
    Defendants.        )

<u>VERDICT</u>

### A.  Whitman Site

    1.    Has Liberty Mutual established by a preponderance of the evidence that no accident within the meaning of the Liberty Mutual policies occurred at the Whitman Site during the period May 18, 1956 to January 1, 1969?

    Answer "YES" or "NO"        NO

## B.  Bostik Site

1.    Has Black & Decker established by a preponderance of the evidence that an accident within the meaning of the Liberty Mutual policies occurred at the Bostik Site during the period May 18, 1956 to January 1, 1969?

Answer "YES" or "NO"      _YES_

Answer Question B.2 only if you have answered "YES" to Question B.1; otherwise return your verdict.

2.    Has Liberty Mutual established by a preponderance of the evidence that the costs associated with remediation of the former waste disposal area and Building 41 were not incurred to remedy or prevent migration of contaminants off the Bostik Site?

Answer "YES" or "NO"      _YES_

2/13/04
DATE

FOREPERSON

# EXHIBIT E

 **GEI Consultants, Inc.**

# METHOD 3 RISK CHARACTERIZATION ADDENDUM
# BOSTIK, INC.
# DEP RTN 3-1494
# 211 BOSTON STREET
# MIDDLETON, MASSACHUSETTS

Submitted to:

**Bostik, Inc.**
**Middleton, Massachusetts**

CONFIDENTIAL INFORMATION
GEI SUPP 1 0947

1021 Main Street
Winchester, MA 01890-1970
(781) 721-4000

EXHIBIT
BD 124

April 27, 2000
Project 96125

area (Table 11) was selected as the EPC for each chemical of concern. Table 13 presents the estimated ambient air concentrations for volatiles migrating from the subsurface. These modeling results were used to calculate potential exposure and risk estimates for a Site landscaper, utility worker, and construction worker. The estimated indoor air concentrations from Table 12 were used for the Site worker. Ambient air concentrations for a trespasser were assumed to be the indoor air concentrations with an additional modifying factor of 10 to account for more rapid dispersion and dilution into the atmosphere. All volatile chemicals detected in groundwater were extrapolated to ambient air concentrations and used in this addendum.

## Surface Water

Few data points were available for surface water and in most cases no chemicals of concern were detected in surface water. The maximum detected concentration in Area 4 was selected to evaluate potential on-site exposure to surface water. Only xylene was detected at concentration of 2.6 µg/L. This value was used to assess potential exposure via direct contact for a Site trespasser and a Site construction worker. Use of maximum concentrations was considered to be a conservative estimate and protective of human health.

## Sediment

Few chemicals of concern were detected in sediment at the Site. Therefore, the maximum detected concentration of each chemical of concern in sediment was selected as the exposure point concentration for each receptor having direct contact with sediment either at the Site or within the Ipswich River. Total TPH was converted to the appropriate hydrocarbon ranges as described for soil. For example, for the Site trespasser and Site construction worker potentially exposed to sediment, the maximum detected TPH concentration as No. 6 fuel oil and diesel was 1,000 mg/kg which was converted to 300 mg/kg $C_9$-$C_{18}$ aliphatics and 700 mg/kg $C_{11}$-$C_{22}$ aromatics. In addition, a maximum concentration of 1.2 mg/kg (PCBs) were detected in one sample from the ponds. For exposures to area residents, the maximum detected concentrations in sediment in the Ipswich River included 130 mg/kg TPH as lube oil (which was converted to 58 mg/kg $C_9$-$C_{18}$ aliphatics and 78 mg/kg $C_{11}$-$C_{22}$ aromatics) and 5.1 mg/kg PCBs.

## Fish Tissue

The fish sample results used in this addendum were the same as those reported in the 1995 Method 3 risk characterization. The five fish samples from the Ipswich River were used to derive the average concentration. The average concentration of 0.043 mg/kg (PCB) was considered to be the exposure point concentration for the area resident ingesting fish after using the river for recreational purposes.

CONFIDENTIAL INFORMATION
GEI SUPP 1 0968

are observed at 0 to 15 ft bgs with concentrations ranging from 0.019 to 320 mg/kg with an average concentration of 33.91 mg/kg.

- The estimated cumulative risk for a Site trespasser (considered to be a youth aged 6 to 18) was $9 \times 10^{-7}$ for cancer, which is below the DEP's risk limit of $1 \times 10^{-5}$, and a total hazard of 0.08 which is also below DEP's acceptable HI of 1.0.

- The estimated cumulative risk for an area resident living along Pine Road including a child (age <6), youth (ages 6 to 18), and an adult (age >18) Site worker (age >18) was $3 \times 10^{-6}$ for cancer, which does not exceed DEP's risk limit of $1 \times 10^{-5}$, and a total hazard of 0.64 which is also below the acceptable HI of 1.0.

The results show that under current use, a potential risk of harm to human health exists to a Site worker from migration of volatiles from the subsurface into indoor air from groundwater and to a potential future construction worker from direct contact with PCBs in soil. The potential risks to other receptors from direct contact with surface water, sediment, or ingestion of fish were within acceptable limits.

### Comparison to Applicable or Suitably Analogous Health Standards

The MCP (310 CMR 40.0993[3]) requires that all applicable or suitably analogous health standards be identified and compared to exposure point concentrations in a Method 3 risk characterization. Applicable or suitably analogous health standards are based on the soil and groundwater classifications at the Site. The Method 1 soil and groundwater standards listed in 310 CMR 40.0970 are not considered applicable or suitably analogous, because those standards represent an alternative approach to a Method 3 risk characterization. The list of potentially applicable or suitably analogous standards include:

- Massachusetts Drinking Water Quality Standards promulgated in 310 CMR 22.00, which are considered applicable to all category GW-1 groundwater.
- Massachusetts Air Quality Standards promulgated in 310 CMR 6.0.
- Massachusetts Surface Water Quality Standards promulgated in 310 CMR 4.00.

The only applicable and suitably analogous health standard for this Site based on the soil and groundwater classifications is the *Massachusetts Surface Water Quality Standards* promulgated in 310 CMR 4.00. These standards are applicable to this Site because groundwater may migrate from the Site to the Ipswich River. As noted, the only compound detected in surface water was xylene (2.6 µg/L) which does not have any surface water quality standard. Therefore, no significant risk of harm to human health exists based on comparison with applicable or suitably analogous standards.

CONFIDENTIAL INFORMATION
GEI SUPP 1 0971