# EXHIBIT F

# Phase IV Remedy
# Implementation Plan
# Bostik Findley, Inc.
DEP RTN 3-1494
Middleton, MA

 GEI Consultants, Inc.

CONFIDENTIAL INFORMATION
GEI SUPP 2 2841

EXHIBIT
BD 130

## 4.2  Area 5:  Former Waste Disposal Area (FWDA)

### 4.2.1  Goals of the Remedial Action

The goal of the Remedial Action selected for Area 5 is to reduce PCB concentrations in soil to levels that will not pose unacceptable risks, particularly to potential future Site construction workers.  A risk-based remedial goal was developed for PCBs in soil in Area 5 using the cumulative exposure scenarios that were developed for the Site-wide Method 3 Risk Characterization.  The derivation of the remedial goal included an evaluation of human health criteria, environmental criteria, public welfare and safety criteria, and feasibility and practicability criteria.  A target cleanup level for PCBs of 26 milligrams per kilogram (mg/kg) was selected based on environmental criteria (potential leaching to groundwater).  GEI will use a target remedial goal of 25 mg/kg in order to meet federal requirements for low occupancy areas, in accordance with the TSCA regulations (40 CFR 761.61[a][4]), when determining the extent of soil requiring remediation.

The TSCA regulations require a characterization of the Site using a grid with specific sample frequencies; notification to the EPA Regional Administrator; cleanup of the Site to levels specified in the regulation based on occupancy levels at the Site; and disposal of the remediation waste in accordance with the regulations.  Therefore, GEI designed the RA for Area 5 to meet the requirements of TSCA as well as the MCP.  Following the implementation of a soil sampling and pre-characterization program in Area 5, GEI will prepare clean-up plan for Area 5 that will be submitted to EPA for approval.  A copy of the plan will also be submitted to DEP.  The plan will include many of the same elements of this Phase IV RIP that are related to Area 5, as well as the results of the pre-characterization program.

### 4.2.2  Conceptual Plan

The remedial action generally consists of excavation of PCB contaminated soils that exceed the target remedial goal of 25 mg/kg.  The work will consist of the following primary elements:

- Implementation of a soil sampling and pre-characterization program to define the limits of the excavation and to pre-characterize the soil for disposal.

- Construction of pollution control systems, such as hay bales, silt fences, and turbidity curtains, to protect adjacent surface water bodies from potential spills.

- Construction of an excavation support and dewatering system that will consist of a steel sheet-pile wall along the southern limit of the excavation and dewatering from sumps within the excavation.

CONFIDENTIAL INFORMATION
GEI SUPP 2 2861

The extent of the excavation into the bank of the Upper Pond will be determined during the pre-characterization program. Based on the horizontal extent of PCB contamination into the bank of Upper Pond, sheet-piling will be installed in the appropriate location to protect the stability of the bank, control the flow of water from the pond into the excavation, and minimize the potential for discharges of contaminated soil and groundwater into the pond. According to available information about the subsurface conditions in Area 5, GEI believes that a cantilever sheet pile system will be sufficient. The cantilever system is feasible if there is enough overburden above the till to support the sheet piles. If the results of the pre-characterization study show that the till is shallower than expected, the sheet piles will be braced or a precut will be made on the outside of the wall to provide additional support.

Because of the shallow groundwater table in Area 5 the excavation will require dewatering. After the sheet piles are installed, water in the excavation will be pumped into a fractionation tank. This tank will be located in front of Building 34 and Building 35. GEI will conduct a pilot water treatment study to determine whether the water is contaminated with PCBs and requires pre-treatment prior to pumping to the on-site water treatment plant. GEI estimates that the water will enter the treatment system at an approximate rate of 5 to 10 gallons per minute (gpm), which is within the treatment systems operating capacity.

Dewatering effluent will be treated to remove PCBs prior to discharging water to the on-site treatment system, if required. Decontamination of the effluent will be conducted in accordance with 40 CFR 761.79, which allows for filtering to remove or separate PCBs from liquids. Water will then be pumped to the on-site treatment system, which will remove VOCs prior to discharging to an on-site leachfield.

#### 4.2.4.2 Expected System Efficiencies

Under this alternative, all contaminated soil exceeding the risk-based standard will be removed from Area 5, resulting in a Permanent Solution. Excavation of soil exceeding the risk-based standard reduces the toxicity, mobility, and volume of the contaminants at the Site. Therefore, this alternative, which includes an AUL, will be effective at limiting exposure of the Site construction workers to PCB contaminated soil. Groundwater quality is expected to improve as a result of the removal of soil that exceeds the risk-based standard. This alternative will not reduce the level of OHM remaining at the Site to background conditions.

The existing groundwater treatment system, which will be used to treat VOCs in the excavation dewatering effluent, operated at an average flow rate of 14.87 gallons per minute from April 2000 through September 2000. During that time, the VOC removal efficiency of the system approached 100 percent, reducing total benzene, toluene, ethylbenzene, and xylene concentrations from approximately 108 parts per billion (ppb) to non-detectable

# EXHIBIT G

PHASE II COMPREHENSIVE SITE ASSESSMENT
ADDENDUM REPORT
BOSTIK, INC.
MIDDLETON, MASSACHUSETTS
DEP RTN 3-1494
TIER IA PERMIT #83066


November 1995

Submitted to

Bostik, Inc.
Boston Street
Middleton, Massachusetts


By

GEI Consultants, Inc.
1021 Main Street
Winchester, Massachusetts 01890-1970
(617) 721-4000


Project 94086


Richard J. Cushing, LSP
LSP of Record

Norma W. Keane, LSP
Senior Project Manager

EXHIBIT
BD 104

**5.4      Area 4: Surface Water and Sediments**

### 5.4.1 Sediment Screening Results

Tables 12, 13 and 14 summarize VOC sediment screening data in the Upper and Lower Ponds, the stream, the Cove and the Ipswich River. VOC concentrations of 6 ppm were detected in three areas within Upper Pond. A maximum of 5 ppm and 2 ppm total VOCs were detected in sediments from Lower Pond and the stream, respectively.

### 5.4.2 Sediment Analytical Results

Tables 26 presents the sediment analytical results from the Upper and Lower Ponds, the stream, the Cove and the Ipswich River.

PCB concentrations ranging from 47 to 1,200 ppb were detected in the two samples in Upper Pond, six samples in Lower Pond and four samples collected in the stream. The samples from the cove contained 71 to 1,500 ppb PCBs. Twelve samples from the river contained 32 to 5,100 ppb PCBs. SED17 contained 280 ppm of TPH. CSED05 contained 89 ppm TPH. Five river samples contained 14 to 130 ppm of TPH. There are no regulatory standards for PCBs in sediments. Figure 22 is a representation of the results of PCB analyses of sediment samples from the Cove and the River. As shown, only one sediment sample location in the Cove contained PCB concentrations greater than 1 ppm.

### 5.4.3 Surface Water Screening Results

Surface water samples contained total VOC concentrations of 4.0 ppb, 3.7 ppb, and 3.9 ppb from samples obtained from Upper Pond, Lower Pond, and the stream, respectively. Table 6 contains a summary of surface water sample screening results.

### 5.4.4 Surface Water Analytical Results

Table 27 summarizes surface water analytical results. No PCBs or TPH compounds were identified above detection limits in any of the samples.

**5.5      Area 5: Former Waste Disposal Area**

### 5.5.1 Soil Screening Results

Tables 16 and 18 list the location, depth, field screening, and laboratory PCB and VOC screening results for the samples collected from the test borings and test pits, respectively. Soil samples with total VOC screening concentrations exceeding 10,000

Screening results showed VOC contamination of sediments on the south shore of the River adjacent to the OTFA. GC/PID screening performed at GEI indicated a maximum total VOC concentration of 94 ppm for sediments in this area. Total VOC concentrations in the background sediment samples ranged from below detectable limits to approximately 21 ppm, and appeared to increase with depth below the sediment surface, suggesting historical releases of VOCs to the River from sources upstream of the Site. No VOC concentrations were identified above the detection limits in any other sediment samples.

No immediate hazard has been identified due to PCB or VOC contamination in the River. No surface water quality impact from the contaminated sediments was identified in surface water samples. Sediment deposition appears most prevalent along the south shore of the Ipswich River adjacent to the OTFA and slightly downstream by former Buildings 7 and 22. This observation is consistent with measured channel geometry, observed currents, measured velocities and observed presence of vegetation.

## 6.5    Area 5: Former Waste Disposal Area

The FWDA contains extensive PCB, TPH and VOC contamination in soil and ground water. Contamination is concentrated along the northern edge of Upper Pond and south of Building 35, as far east as TP406 and is bounded on the west by the eastern edge of Lower Pond.

As illustrated in Fig. 23, the highest PCB concentrations (greater than 100 ppm) in soils were detected along the north bank of Upper Pond where the greatest thickness of waste material was measured. Approximately equal amounts of waste debris and adhesive materials were observed in this area. PCB concentrations decreased with distance north of Upper Pond; however, PCB concentrations greater than 20 ppm were identified north of the paved access road. This concentration is an order of magnitude greater than the MCP Method 1 S-2/GW-2 soil cleanup standard of 2 ppm.

PCB contamination appears to be limited to the western portion of the FWDA. No evidence of PCB contamination was discovered in the soils east of Building 34 or within the Former Filter Bed Area located south of Building 37 (Fig. 23). Based on the Site history and the pattern of PCB contamination, it is likely that the source of PCBs in the FWDA is disposal of PCBs and PCB-containing material.

VOC soil contamination also appears to decrease with distance north of Upper Pond. Maximum total VOC concentrations from jar headspace screening were detected south of the paved access road (Fig. 24). However, VOC contamination does extend to the eastern edge of Building 37. TPH contamination in soils within the FWDA, appears to be limited to the soil and waste debris north of Upper Pond and west of Building 37.

No PCBs were detected in ground water samples from monitoring wells screened solely within the underlying till, which is expected based on the small vertical gradient, lower hydraulic conductivity of these soils, and the low transport potential of PCBs in water. However, PCBs

# EXHIBIT H

 GEI Consultants, Inc.

**STAGE II ECOLOGICAL RISK ASSESSMENT
BOSTIK, INC.
BOSTON STREET
MIDDLETON, MASSACHUSETTS**

Prepared for:

**GEI Consultants, Inc.**

**April 27, 2000**

CONFIDENTIAL INFORMATION
GEI SUPP 1 1026

Altshuler Environmental Consulting
10413 Headly Ct.
Fairfax, VA 22032

**EXHIBIT
BD 123**

Phone/Fax: 703.426.1884
kdba@patriot.net
GEI Project 96129

3)   Exposure to PCBs is likely to occur only to aquatic species in the surface water bodies on and adjacent to the Site, especially in the Cove and River due to the higher concentrations in these locations. Body burdens of PCBs in fish from the Ipswich River are comparable to other fish from non-contaminated areas of Massachusetts, and do not reach levels known to be associated with toxicity (death and reproductive effects). The data indicate that the PCBs in the sediments are not being bioconcentrated or bioaccumulated to a significant extent.

4)   Exposure to TPH is likely to only occur to burrowing mammals around Area 5 due to habitat limitations at other areas on-site. As discussed, remedial measures will be implemented in Area 5 that limit these exposures.

5)   A previous field investigation reported no evidence of stress on the wildlife and biota at or near the Site (SAI, 1996).

6)   Although a fish kill was reported recently (December 1995), it was the result of a specified release. No other kills have been reported and no observable toxic effects in fish have been observed. Field observations indicate a healthy, multitrophic level habitat at the Site with no current physical impacts.

7)   The sheen observed on the surface water of the Cove has been shown to be the result of iron bacteria growth and not related to petroleum hydrocarbons.

Exposure of Site wildlife to contaminants is expected to be low. The only contaminants that are known to bioaccumulate are the PCBs. The body burdens of Ipswich River fish, considered to be indicator species, are comparable to fish from non-contaminated areas of the state. Therefore, there are currently no observable impacts from exposure to Site contaminants on the environment and no significant risk of harm. The observations and statements made in this risk assessment are predicated on the current existence of a groundwater treatment system, the future implementation of remedial measures in Area 5, and the conditions at the Site as described in the Phase II report [GEI, 1995] and in the Stage I Environmental Screening [SAI, 1996]. Should these conditions be changed dramatically, these conclusions may no longer be valid and additional sampling and evaluation would be necessary to determine if exposures to wildlife could result in a significant risk of harm.

# V.   LIMITATIONS

This report was prepared in accordance with generally accepted environmental risk assessment practice, utilizing data and observations prepared by other independent parties. No other warranty, expressed or implied, is made.

CONFIDENTIAL INFORMATION
GEI SUPP 1 1036

# EXHIBIT I

Volume I:
Text, Tables, Figures
and Appendices A
through D

Self-Implementing
On-Site Cleanup and

 GEI Consultants, Inc.

GEOTECHNICAL

ENVIRONMENTAL

WATER RESOURCES

ENGINEERING

EXHIBIT

BD 135

CONFIDENTIAL INFORMATION
GEI SUPP 1 1040

Self-Implementing On-Site Cleanup and Disposal Plan
Bostik Findley, Inc.
March 2003

## 1.3 Regulatory History

The Site was first listed by the Massachusetts Department of Environmental Quality Engineering (DEQE), now DEP, as a location to be investigated on January 15, 1987, and was listed as a confirmed disposal site on January 15, 1988. Since that time, GEI has performed Phase I through IV response actions at the Site in accordance with the Massachusetts Contingency Plan (MCP) (310 CMR 40.0000). The following is a summary of response actions conducted by GEI at the Site, as they pertain to PCB contamination in the area that is the subject of this notification.

During the fall and winter of 1987 to 1988, GEI conducted a Phase I Environmental Site Assessment (Phase I) at the Site in response to a Notice of Responsibility (NOR) issued to Bostik Chemical Company (now Bostik Findley, Inc.), by the DEQE, in November 1986. The objective of the Phase I was to evaluate whether there had been a release or if there was a threat of release of oil or hazardous material (OHM) at the Site. GEI submitted the Phase I report to DEQE in March 1988.

During the Phase I investigation, GEI identified an area known as the Former Waste Disposal Area (FWDA) located north of the Upper Pond (Fig. 2). According to information available to GEI, the area now occupied by Upper Pond was formerly a wetland area, and in the late 1940s until the mid-1960s disposal in this area consisted of open burning of various waste materials generated at the facility. By 1969, Bostik had excavated the wetland to form the Upper Pond. During the Phase I investigation, GEI observed partially buried refuse north of Upper Pond.

GEI conducted a Phase II Comprehensive Site Assessment (Phase II CSA) in 1989 and a Phase II CSA Addendum from 1993 through 1995, both in accordance with the MCP. The purpose of these investigations was in part to characterize the nature and extent of PCB contamination discovered in the area north of Upper Pond. During the Phase II CSA investigations, GEI excavated test pits, advanced soil borings, and installed monitoring wells in the FWDA; and collected sediment and surface water samples from the Upper and Lower ponds and the adjacent Ipswich River. Soil samples were screened in the field for PCBs and/or submitted to a laboratory for chemical analysis of PCBs. Chemical analysis of soil samples indicated concentrations of PCBs in soil in the FWDA up to 320 ppm. A more detailed discussion of these investigations is provided in Section 3.

GEI also prepared a Method 3 Risk Assessment, Method 3 Risk Characterization Addendum, and a Stage II Ecological Risk Assessment, each of which considered the PCB contamination located in the FWDA. The Method 3 Risk Characterization Addendum was performed with the assumption that an Activity and Use Limitation (AUL) would be placed on the property to limit potential access to soil. One of the restrictions would limit the use of the Site to only industrial/commercial uses. The results of the Method 3 Risk Characterization Addendum

CONFIDENTIAL INFORMATION
GEI SUPP 1 1049

indicated that no significant risks to human health are present based on potential exposure to surface water, sediment, or fish fillets; however, a condition of no significant risk of harm to human health does not exist for current or reasonably foreseeable future land uses of the Site, in part due to PCB concentrations in soil in the FWDA from 0 to 15 feet below the ground surface.

The results of the Ecological Risk Assessment indicated that exposure to PCBs was likely to occur only to aquatic species in the surface water bodies on and adjacent to the Site, but the body burdens of PCBs in fish from the Ipswich River were comparable to other fish from non-contaminated areas of Massachusetts and did not reach levels known to be associated with toxicity. As a result, the conclusion of the ecological risk characterization was that there were no unacceptable risks to potential ecological receptors at the Site.

Pursuant to the MCP, GEI conducted a Phase III Identification, Evaluation, and Selection of Comprehensive Remedial Action Alternatives (Phase III), documented the results in a Remedial Action Plan dated December 29, 2000, and submitted the plan to the DEP. The selected remedial action alternative for the FWDA includes excavation, off-site ex-situ treatment and/or off-site disposal of soil exceeding a risk based standard, and backfill with clean, imported fill. GEI prepared and submitted to DEP a Phase IV Remedy Implementation Plan (Phase IV RIP) dated April 30, 2001, which documents the engineering design and specifications for implementation of the selected remedial action alternative.

Since the selected remedial action involves the disposal of PCB-contaminated wastes, the cleanup is required to meet the requirements of 40 CFR 761.61 in addition to the MCP. Therefore, in June 2001 GEI conducted a Site characterization program in accordance with Subpart N of 40 CFR 761 (herein after referred to as the TSCA Site characterization), for the purpose of meeting the requirements of self-implementing on-site cleanup and disposal of PCB remediation waste (40 CFR 761.61[a]). GEI prepared a plan entitled "Self-Implementing On-Site Cleanup and Disposal Plan, Bostik Findley, Inc., Middleton, MA," dated October 16, 2001 and submitted the plan to EPA for review and approval. EPA provided comments on the plan to GEI in a letter dated November 19, 2001 (Appendix B). GEI responded to EPA's comments in a letter dated July 18, 2002, and proposed additional investigations at the Site to address some of EPA's concerns. A copy of GEI's response is provided in Appendix C.

In August and November 2002, GEI conducted the additional investigations pursuant to our letter response to EPA's comments. This Plan is a revision to the October 2001 Plan and is intended to replace the October 2001 Plan. EPA's comments, the results of the August and November 2002 investigations, and a revised cleanup plan are included in this Plan. A discussion of the TSCA Site characterization program, and results of the characterization are provided in the following sections. The proposed cleanup is designed to meet the requirements of both 40 CFR 761.61 and the MCP. Therefore, a copy of this Plan has been

CONFIDENTIAL INFORMATION
GEI SUPP 1 1050

# EXHIBIT J

# Phase III
# Remedial Action Plan
# Bostik, Inc.
# DEP RTN 3-1494
Middleton, MA



# GEI Consultants, Inc.

GEOTECHNICAL

ENVIRONMENTAL

WATER RESOURCES

ENGINEERING

CONFIDENTIAL INFORMATION
GEI SUPP 2 1045

EXHIBIT

BD 129

Phase III Remedial Action Plan
Bostik, Inc.
December 29, 2000

**Area 2:** Old Tank Farm Area - Reduce VOC concentrations in soil and groundwater to levels that will not pose unacceptable risks to potential ecological receptors in the Ipswich River. In previous RAM submittals to DEP for Area 2, a target cleanup goal of one half of the GW3 standard or the AWQC, whichever was lower, was established for groundwater in Area 2.

**Area 5:** Former Waste Disposal Area - Reduce PCB concentrations in soil to levels that will not pose unacceptable risks to potential future Site construction workers.

**Area 6:** Building 9 Area - Reduce VOC concentrations in soil and groundwater to levels that will not pose unacceptable risks to Site workers in adjacent buildings. Discharge of contaminants in groundwater from Area 6 to the Ipswich River is not likely due to the distance of this area from the River. However, similar to Area 2, a target cleanup goal of one half of the GW3 standard or the AWQC, whichever is lower, will be established for groundwater in Area 6. This cleanup goal will eliminate the need for long-term surface water monitoring of the Ipswich River and groundwater monitoring downgradient from Area 6 after the system is shut down.

**Area 7:** Churn Pit Area -- Area 7 was included within the area of influence of the remedial system in Area 6 and will have the same remedial goals.

**Area 8:** Building 1 Area - Remove residual NAPL from the area between the former UST excavations and the foundations of Buildings 1 and 3.

**Area 11:** Old Dump Site Area - Contaminant concentrations in soil and groundwater in Area 11 did not exceed levels that would pose unacceptable risks to potential receptors at the Site. However, geophysical surveys of the area indicated the potential presence of buried drums. Therefore, an objective of this RAP is to investigate the presence of buried drums using test pits, and remove drums that may serve as continuing sources of soil and groundwater contamination.

## 4.2 Development of Risk-Based Remedial Goals

A risk-based remedial goal was developed for PCBs in soil in Area 5 using the cumulative exposure scenarios that were developed for the Site-wide Method 3 Risk Characterization. The derivation of the remedial goal included an evaluation of human health criteria, environmental criteria, public welfare and safety criteria, and feasibility and practicability criteria. A target cleanup level of 26 mg/kg was selected based on environmental criteria (potential leaching to groundwater). A summary of the calculations used to establish the risk-based remedial goal for PCBs is provided in Appendix F. GEI used a target remedial goal of 20 mg/kg when estimating the extent of soil requiring remediation and for the remedial cost estimates presented in Section 5.0. The use of 20 mg/kg as a remedial goal for

GEI Consultants, Inc.                    28

CONFIDENTIAL INFORMATION
GEI SUPP 2 1082

# EXHIBIT K

VOLUME 10                                      PAGES 1 - 138

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * *

Liberty Mutual Insurance Company          *

v.                                        *

The Black & Decker Corporation,           *        Civil Action

Black & Decker, Inc., Black & Decker      *    No. 96-10804-DPW

(U.S.) Inc., Emhart Corporation, and      *

Emhart Industries, Inc.                   *

* * * * * * * * * * * * * * * * * * * *

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT JUDGE

JURY TRIAL - DAY 10

Friday, February 6, 2004

Courtroom No. 1 - Third Floor

1 Courthouse Way, Boston, Massachusetts 02210

-------------- J. EDWARD VARALLO, RMR, CRR --------------

COURT REPORTER

FARMER ARSENAULT BROCK LLC, BOSTON, MASS.

617.728.4404

22 (Pages 82 to 85)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

82

1    A.    Yes.
2    Q.    And Mr. Mansourian testified on Wednesday that
3    that trench was one that he had actually gone into to
4    repair the pipes during the 1960s. Do you recall that
5    testimony?
6    A.    Yes.
7    Q.    And the trench was approximately four feet wide
8    by two and a half feet deep, is that right, and had about
9    twenty small, two-inch-diameter pipes within it. Is that
10   right?
11   A.    I think it was about seven or eight feet wide
12   and about two feet deep, yes.
13   Q.    And there were twenty small-diameter, like one
14   and a half or two-inch-diameter pipes running through it.
15   Is that right?
16   A.    Yes.
17   Q.    And as Mr. Mansourian described the trench, it
18   was made of cinder block walls with a soil base and no
19   lining. Is that right?
20   A.    Yes. I think in some parts there may have been
21   a brick pavement underneath it but it wasn't a sealed
22   bottom.
23   Q.    And there were a series of concrete slabs
24   covering the trench. Is that right?
25   A.    Yes.

83

1    Q.    So you could open up the covers, you could take
2    off the slabs and see what was happening inside the
3    trench. Is that right?
4    A.    That's my understanding.
5    Q.    And Mr. Mansourian stated that when he did the
6    repair work on the pipes in that trench, he noticed the
7    smell of solvent. Do you recall that testimony?
8    A.    I recall that.
9    Q.    And he also saw that the ground in the bottom of
10   the trench was saturated with chemicals. Is that right?
11   A.    That's what he said.
12   Q.    And he in fact said that it was sometimes so
13   saturated with chemicals that he had to stand on the pipes
14   rather than the floor of the trench in order to do his
15   repair work. Isn't that right?
16   A.    I heard him say that.
17   Q.    Now, when GEI investigated that solvent pipe
18   trench in 1995, you found that many of the pipes that were
19   left there were broken and rusted. Is that correct?
20   A.    Yes.
21   Q.    Now, the solvents that were sent through the
22   pipes in the trench from the old tank farm to Building 9
23   match up with the contaminants that were found in the soil
24   and groundwater around that solvent pipe trench. Is that
25   correct?

84

1    A.    Yes.
2    Q.    And Bostik never did any soil removal or
3    groundwater cleanup around that solvent pipe trench during
4    the time it was operating in the 1960s. Is that right?
5    A.    That's correct.
6    Q.    Or prior to that time when it was operating,
7    they didn't do any cleanup. Is that correct?
8    A.    Not that I'm aware of.
9    Q.    And in fact there was never any removal of the
10   solvent-saturated soil or a groundwater cleanup done until
11   GEI started the remediation in the mid 1990s. Is that
12   right?
13   A.    That's my understanding.
14       MS. ROWAN: Your Honor, if I may, we could have
15   the lights brought back up. Thank you. We won't be
16   referring to a plan for a while. Thank you very much.
17   BY MS. ROWAN:
18   Q.    Now, it is your opinion, Ms. Hanley, that
19   contamination had migrated into the Ipswich River and its
20   sediments from the Bostik site. Is that right?
21   A.    Yes.
22   Q.    But there has been no remediation of the surface
23   water located in the Ipswich River. Is that correct?
24   A.    Well, not exactly. The Phase 1 treatment plan
25   does in fact capture some surface water from the Ipswich

85

1    River.
2    Q.    But there's been no treatment done to the
3    Ipswich River water itself as it lies in the riverbed.
4    Correct?
5    A.    Well, it doesn't lie in the riverbed. Once it's
6    in the river it's flowing past the site, so there is no
7    reasonable way of capturing the surface water once it's
8    been contaminated.
9    Q.    And the Ipswich River sediments have not been
10   remediated either. Isn't that right?
11   A.    That's correct. Well, I take that -- Not
12   exactly. There were VOCs present in sediments adjacent to
13   the tank farm and as a result of the Phase 1 treatment
14   plan, the groundwater flow in the vicinity of that
15   extraction system has been reversed, which brings the
16   contamination back toward the site. So the sediments in
17   fact have been remediated adjacent to the extraction
18   system.
19   Q.    But there has been no excavation of those
20   sediments from the riverbed. Is that correct?
21   A.    That's correct.
22   Q.    Now, are you aware through your work on the
23   project with GEI of any complaints having ever been made
24   against Bostik by third parties about contamination in the
25   river?

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

86

1    A.  No.
2    Q.  And you're not aware of any complaints having
3  been made against Bostik by third parties for
4  contamination of properties that were located beyond the
5  borders of the Bostik site.  Is that correct?
6    A.  I don't remember if there were complaints.
7  There was a concern about water quality in the wells
8  across the river, the bedrock wells across the river, and
9  they were tested as part of the assessment.
10    Q.  And the conclusion of those tests was that there
11  was no remediation required for those wells.  Is that
12  correct?
13    A.  That's correct.
14    Q.  Now, the remedy that you just mentioned that has
15  been implemented to address solvent contamination in the
16  old tank farm and the solvent pipe trench is the soil
17  vapor extraction system.  Is that right?
18    A.  It is located in the old tank farm area and the
19  pipe trench area, yes.
20    Q.  And prior to the installation of the soil vapor
21  extraction system, there was what's known as a groundwater
22  pump-and-treat system there at the old tank farm.  Is that
23  right?
24    A.  That was a Phase 1 short-term measure, yes.
25    Q.  And for how long did that groundwater pump-and-

87

1  treat system continue to operate once it was installed?
2    A.  I don't know the exact date when it was shut
3  off, but it operated for at least five years.
4    Q.  And it was first installed in 1992.  Is that
5  correct?
6    A.  1991, '92, yes.
7    Q.  Now, prior to the installation of the pump-and-
8  treat system and the SVE system, the levels of
9  contamination in soil and groundwater at the old tank farm
10  exceeded permissible levels under the MCP, didn't they?
11    A.  Yes.
12    Q.  And those exceedances had to be addressed under
13  the MCP.  Isn't that right?  They had to be remediated?
14    A.  Yes.
15    Q.  And in fact the soil and groundwater remediation
16  that was done at the old tank farm would have had to have
17  been done in order to address the contamination existing
18  there in soil and groundwater regardless of whether the
19  river was nearby or not.  Correct?
20    A.  Well, the Phase 1 treatment plan was designed
21  specifically to protect the river, because it intercepted
22  the contamination as it migrated to the river.
23    Q.  But it was necessary, was it not, to address the
24  contamination that was actually located there whether the
25  river were present or not, just to deal with the levels of

88

1  contamination in soil at the old tank farm.  Is that
2  right?
3      MR. PIROZZOLO:  Pray your Honor's judgment.
4    A.  The --
5      THE COURT:  Just a moment.  I'm going to sustain
6  that objection.
7  BY MS. ROWAN:
8    Q.  Is it correct that under the MCP, Bostik had to
9  reduce the levels of soil contamination in the old tank
10  farm?
11    A.  Yes.
12    Q.  And it would have to engage in some remedial
13  activity in order to accomplish that.  Is that correct?
14    A.  Yes.
15    Q.  Is it also correct that Bostik had to reduce the
16  level of groundwater contamination located within the old
17  tank farm itself?
18    A.  Yes, in order to prevent the migration of the
19  groundwater to the river, yes.
20    Q.  But they also, because of the levels of
21  contamination there and the extent to which they exceeded
22  permissible levels, had to deal with the groundwater
23  itself at the old tank farm, didn't they?
24    A.  Yes, the groundwater in the old tank farm area
25  needed to be cleaned up to surface water standards.

89

1    Q.  I would like to turn your attention now to the
2  pilot plant at the Bostik site.  What was the contaminant
3  of concern at the pilot plant?
4    A.  It was primarily PCBs.
5    Q.  And you testified earlier today that PCBs adsorb
6  or cling to soil particles.  Is that right?
7    A.  That's correct.
8    Q.  And then in 1989 GEI did a specific
9  investigation of the PCBs found at the pilot plant.  Is
10  that correct?
11    A.  That's correct.
12    Q.  Now, why was that specific investigation
13  undertaken?
14    A.  There was evidence of contaminated soil in the
15  vicinity of the tank farm and there was evidence of
16  contamination -- I'm sorry, not the tank farm, the pilot
17  plant, and there was evidence of contamination inside the
18  pilot plant.
19    Q.  And that level of contamination and the fact
20  that it was PCB contamination raised a concern on the part
21  of GEI under the MCP that some kind of remedial measure
22  had to be undertaken immediately.  Is that right?
23    A.  Yes.
24    Q.  And in fact that's what went on after that first
25  study was done, there was in fact remediation work

24 (Pages 90 to 93)

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

90

1   undertaken there at the pilot plant?
2       A.   There was remediation, yes.
3       Q.   And that remediation involved addressing the
4   shallow soil PCB contamination. Correct?
5       A.   Yes.
6       Q.   And also addressing oil-stained soils. Right?
7       A.   Yes.
8       Q.   And then also addressing building surfaces. Is
9   that right?
10      A.   Yes, it did.
11      Q.   Now, the levels of PCBs that were found in the
12  shallow soil at the pilot plant exceeded permissible
13  levels and had to be cleaned up. Correct?
14      A.   Yes, it did.
15      Q.   And that cleanup was done by excavating that
16  PCB-contaminated soil and taking it off-site for disposal.
17  Is that right?
18      A.   Yes.
19      Q.   How far down did that excavation go? How deep
20  were the PCBs found in the soil?
21      A.   I don't remember exactly how deep the excavation
22  was, but I think it was four or five feet.
23      Q.   So it was something more than just surficial
24  soil, you actually went down to a depth of at least four
25  to five feet in order to address the PCBs at the pilot

91

1   plant?
2       A.   Yes.
3       Q.   Were there PCBs also located outside the
4   building there at the pilot plant, in drums? Was there
5   PCB oil in drums?
6       A.   I believe there was some storage adjacent to the
7   building, yes.
8       Q.   And was stained soil located around the building
9   there as well?
10      A.   Yes.
11      Q.   Now, what connection was there between
12  demolition of the building at the pilot plant and any kind
13  of requirement that the PCBs be cleaned up at the pilot
14  plant?
15      A.   The building demolition and the interior work
16  was specifically done to protect the employees and
17  visitors to Bostik from direct contact with those building
18  surfaces.
19      Q.   And in fact the cleanup of PCB-contaminated soil
20  which was done there at the pilot plant was also done in
21  order to address concerns about contact with contaminated
22  soils. Is that right?
23      A.   In part, yes.
24      Q.   And there was no groundwater cleanup done at the
25  pilot plant itself. Correct?

92

1       A.   That's right.
2       Q.   What was the total quantity of PCBs that were
3   located at the pilot plant and in its vicinity?
4       A.   Total as in mass?
5       Q.   Right, pounds or gallons if it was liquid.
6       A.   I don't know.
7       Q.   Now, you stated that stormwater runoff from the
8   area of the pilot plant drains to the upper pond. Is that
9   right?
10      A.   That's correct.
11      Q.   And you've also stated that you believe that
12  stormwater runoff during construction of the upper and
13  lower ponds and during storm events thereafter caused PCBs
14  to be transported from the pilot plant area into the upper
15  pond. Is that correct?
16      A.   Yes.
17      Q.   And you stated that you think it's likely that
18  PCBs had moved from the upper and lower ponds out through
19  the unnamed stream to the Ipswich River. Is that correct?
20      A.   Based on the testing data, yes.
21      Q.   Now, if PCBs had moved by means of stormwater
22  runoff into the upper pond, they should be found in the
23  upper pond where the stormwater enters into it through the
24  drainage outfall. Is that right?
25      A.   That's one location, yes.

93

1       Q.   And in fact did GEI investigate in 1989 the
2   levels of PCBs that were found at the outfall in the upper
3   pond?
4       A.   Yes.
5       Q.   And isn't it correct that the levels that were
6   found at the two outfalls in the upper pond didn't exceed
7   permissible levels for PCBs?
8       A.   They indicated transport of PCBs to the ponds.
9       Q.   But the levels that were found there didn't
10  exceed permissible levels. Correct?
11      A.   They did not require remediation, no.
12      Q.   Did not require any remediation, okay. So in
13  fact the November 1989 PCB investigation report that GEI
14  prepared recommended that no action be taken with respect
15  to the sediments at the upper pond other than monitoring
16  to ensure that PCB levels didn't exceed 10 parts per
17  million. Is that right?
18      A.   Yes.
19      Q.   At any time have PCB levels been found to exceed
20  permissible levels in the sediments at the upper pond?
21      A.   Well, there are no standards, nor were there any
22  standards for PCBs in sediments at that time. And the --
23  I'm sorry. Could you repeat the question?
24      Q.   My question was: Has there ever been a finding
25  of levels of PCBs in sediments at the upper pond that have

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 10 - 2/6/2004

94

1 required remediation?
2    A.    Based on the evaluations that were performed by
3 GEI, it was determined that remediation of the sediments
4 was not required.
5    Q.    Now I would like to turn your attention, please,
6 to the former waste disposal area or the dump as
7 Mr. Mansourian referred to it on Wednesday.  You testified
8 that there were PCBs present in the soil at the dump, is
9 that correct, the former waste disposal area?
10    A.    Yes.
11    Q.    What quantity or volume of PCBs was located at
12 the former waste disposal area?
13    A.    We don't know.
14    Q.    And that waste disposal area was essentially a
15 hole.  Is that right?  It was a pit?
16    A.    My understanding is it was a depression in the
17 ground where the solid waste material would be brought and
18 placed and then ignited with solvent and burned.  But the
19 testing data at the site indicates -- Or, not testing
20 data, test pits at the site indicated the presence of
21 solid waste.
22    Q.    Now, cleanup at the former waste disposal area
23 has involved only excavation of PCB-contaminated soil.  Is
24 that right?
25    A.    That is my understanding.

95

1    Q.    And the reason why that PCB-contaminated soil
2 was excavated was in order to eliminate the risk of
3 persons coming into contact with that soil.  Isn't that
4 correct?
5    A.    Yes, and also to protect the groundwater and
6 surface water adjacent to the disposal area.
7    Q.    Well, the work that was done was to excavate
8 soil because there was concern that there would be contact
9 made by construction workers.  Isn't that right?
10    A.    That's one of the scenarios that was evaluated,
11 yes.
12    Q.    Well, I would like to show you, please, the
13 Phase 3 remedial action plan.  This is Liberty Mutual
14 Exhibit 6-56.  And we need to go, please, to page 28 in
15 that.
16        MR. LEPORE:  There should be a comparable BB
17 number.
18        MR. PIROZZOLO:  Yes, and I found it.  It's just
19 there was no easy cross-reference.  I believe I have the
20 right page.  Thanks.
21 BY MS. ROWAN:
22    Q.    Ms. Hanley, if you look here at the excerpt from
23 the Phase 3 remedial action plan that was done in December
24 of 2000, I call your attention, please, to Section 4.1
25 which is concluding there and the discussion of the

96

1 recommended work to be done at the former waste disposal
2 area.  Do you see that reference there?
3    A.    I do.
4    Q.    And could you read that for us, please?
5    A.    "Former waste disposal area.  Reduce PCB
6 concentrations in soil to levels that will not pose
7 unacceptable risks to potential future site construction
8 workers."
9    Q.    Now, there is no recommendation there that any
10 work be done with respect to PCBs in groundwater, is
11 there?
12    A.    I don't know what the title of this section is
13 so I don't know in what context this is being presented.
14    Q.    Well, we can back up to the first page of . .
15 Section 4.1, if you would, please, Mr. Thomas.  Page 26.
16 And you'll see that the caption for this section in the
17 Phase 3 remedial action plan is Development of Risk-Based
18 Remedial Goals.  Do you see that?
19    A.    Yes.
20    Q.    I'm sorry.  We want 4.1.  We have to move back
21 to page 26.  I'm sorry.  Okay, there it is.  Thank you.
22        Section 4.1, Remedial Objectives.  Do you see
23 that reference there?  So what's being discussed here in
24 Section 4.1 are the recommended remedial actions to be
25 undertaken after completion of the risk assessment.  Is

97

1 that right?
2    A.    Yes.  I'm sorry.  What was the title of Section
3 4.2?  I'm sorry.
4    Q.    But we actually were referring to Section 4.1
5 and its continuation onto the next page.  That's what I
6 had asked you to read.
7    A.    I'm sorry.  Could you go back to the next page
8 for me?
9    Q.    Certainly.  Could you put that page up, please?
10 And my question to you was, you don't see any
11 recommendation there that any work be done with respect to
12 PCB contamination in groundwater at the former waste
13 disposal area, do you?
14    A.    It does not indicate that in this statement.
15    Q.    And there's no reference there to a
16 recommendation that any work be done with respect to PCB
17 contamination in sediments in connection with the former
18 waste disposal area.  Is that correct?
19    A.    Not in this paragraph, no.
20    Q.    Now, we talked about PCBs having been found at
21 the pilot plant and also having been found at the former
22 waste disposal area.  How would you describe the
23 difference in -- Well, let me strike that and ask you:  It
24 is true, is it not, that one of those two areas was chosen
25 as the one that the remediation activities were going to

# EXHIBIT L

Volume 11, Pages 1-134

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------------

LIBERTY MUTUAL INSURANCE COMPANY,

                    Plaintiff

vs.                                    CA-96-10804-DPW


THE BLACK & DECKER CORPORATION, BLACK

& DECKER, INC., BLACK & DECKER (U.S.)

INC., EMHART CORPORATION, and EMHART

INDUSTRIES, INC.,

                    Defendants

----------------------------------------

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT JUDGE

JURY TRIAL - DAY 11

February 9, 2004

9:09 a.m. to 1:07 p.m.

Courtroom No. 1 - 3rd Floor

1 Courthouse Way, Boston, Massachusetts 02210

--------- Alan H. Brock, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

---

102

1    A.    No.
2    Q.    So that meant that the PCB levels didn't reach
3  levels known to be associated with toxicity; correct?
4  No?
5    A.    No.
6    Q.    Oh. Why is that?
7    A.    A risk characterization for the Ipswich
8  River -- risk characterization for the Ipswich River
9  would consider the local conditions and the pathways for
10  risk associated with that site. PCBs at similar
11  concentrations could pose toxic hazards under different
12  exposure conditions, for instance. So that risk
13  characterization considered the effects on the local
14  environment at that site, at the Bostik site.
15    Q.    So at this particular site they didn't reach
16  the levels that needed to be dealt with; right?
17    A.    Yes.
18    Q.    And in fact, one of the rational reasons for
19  your excavation recommendation was based on your
20  conclusion that the only unacceptable risk from PCBs
21  were presented by current or reasonably foreseeable
22  future land uses at the site; correct?
23    A.    The only unacceptable risk?
24    Q.    Yes, for PCBs.
25    A.    Yes.

---

103

1    Q.    And wasn't that unacceptable risk only with
2  respect to future construction workers?
3    A.    Yes.
4    Q.    And you've determined, you and your colleagues
5  determined, that the only remedial action necessary to
6  address the only unacceptable risk was to excavate the
7  PCB-contaminated soil; correct?
8    A.    Could you repeat the question?
9    Q.    And so you and your colleagues determined that
10  the only remedial action necessary to address the only
11  unacceptable risk presented was to excavate the PCB-
12  contaminated soil; correct?
13    A.    The only remedial action necessary?
14    Q.    Let's just clarify this, Mr. Ash. You've
15  already said that the only unacceptable risk was to
16  future construction workers; right?
17    A.    Yes.
18    Q.    And you've also said that the only thing you
19  recommended was excavation; correct?
20    A.    That is what we recommended, yes.
21    Q.    So putting those two together, isn't that what
22  was done? In order to address the only unacceptable
23  risk, you recommended that it be excavated?
24    A.    Yes. However, we considered the other
25  benefits of that remedy in addition to addressing the

---

104

1  construction-worker risk exposure to PCB-contaminated
2  soil. Other pathways were considered in selecting the
3  remedy.
4    Q.    I understand that, but that's -- only
5  unacceptable risk was to the workers; correct?
6    A.    Yes.
7    Q.    And that's what you wrote; correct?
8    A.    Yes.
9    Q.    Now, so the soil was excavated; right?
10    A.    Yes.
11    Q.    And it was done last year; right?
12    A.    Yes.
13    Q.    And that was almost 40 years after it was
14  closed; right?
15    A.    Yes.
16    Q.    And about nine years after the pilot plant was
17  shut down and demolished?
18    A.    Yes.
19    Q.    Now, the soil that was excavated was solely in
20  that dump area; right?
21    A.    There was some contaminated soil and drums
22  removed from this portion of the site at the same time
23  we were working on this portion -- Area 11, I believe
24  it's called.
25    Q.    In comparison, that was small dollars, I

---

105

1  guess; is that right?
2    A.    It was less contaminated material than the
3  former waste disposal area.
4    Q.    Were there PCBs in that area?
5    A.    Yes.
6    Q.    In No. 11?
7    A.    Yes.
8    Q.    Where did that come from?
9    A.    The material was deposited on the ground at
10  some time in the past.
11    Q.    How do you know that?
12    A.    We found it in the ground when we were there.
13  We did a magnetometer survey, found anomalies that
14  appeared to be potential buried drums, and debris. We
15  did test bits in that location, and found that material
16  and debris in that area.
17    Q.    The PCBs there didn't come from the pilot
18  plant?
19    A.    I do not know.
20    Q.    You don't know where it came from, is where
21  I'm headed. Right?
22    A.    The PCBs appeared to be attributable to the
23  waste debris that deposited in that location. We
24  found the contaminants in soil and in groundwater in the
25  same location where we found the debris and drums.

---

Liberty Mutual Insurance Company v. The Black & Decker Corporation
Volume 11 - 2/9/2004

118

1    contaminant concentrations."
2        Q.    And go on, please.
3        A.    "Since all excavated soils would be treated
4    on-site, the quantity of PCB-contaminated soils
5    transported off site would be greatly reduced or
6    eliminated, resulting in reduced local truck traffic.
7    No long-term maintenance or environmental monitoring
8    would be required under this alternative."
9        Q.    So would it be correct, then, that one purpose
10   of the soil remediation was to prevent migration of
11   contamination into groundwater?
12       A.    Yes.
13       Q.    And you already testified, once it migrates to
14   groundwater, it migrates to the river; is that right?
15       A.    Yes.
16       Q.    So one purpose of the excavation was to
17   prevent migration to the river.
18       A.    Yes.
19       Q.    Through groundwater.
20       A.    Yes.
21       Q.    And was another purpose of the excavating of
22   soil to prevent migration of the contaminants through
23   surface water into the upper pond and from there to the
24   lower pond and to the river?
25       A.    Yes.

119

1        Q.    Is there a concern with burrowing animals?
2        A.    Yes.
3        Q.    Just briefly, what's a burrowing animal?
4            MR. LEPORE:    Objection. This is beyond what
5    we did, and he's already done it.
6            THE COURT:    I'll sustain it. Sustained.
7            MR. PIROZZOLO:    May I ask that we have Exhibit
8    123.
9        Q.    Could I ask you to turn to Page 4. Before you
10   turn to Page 4, what is this?
11       A.    This is the Stage 2 ecological risk assessment
12   that was included with our Phase II addendum report in
13   April of 2000.
14       Q.    Could I ask you to turn to Page 4. You were
15   asked some questions about the groundwater treatment
16   system. Do you recall that?
17       A.    Yes.
18       Q.    And the groundwater treatment system -- and
19   subsequent to the installation and operation of the
20   groundwater treatment system, the soil vapor system was
21   started up and operated.
22       A.    Yes.
23       Q.    Could I ask you to look on Page 4, the second
24   paragraph in the section Pathways of Exposure.
25       A.    That begins with the sentence, "VOCs present

120

1    in groundwater are likely to migrate toward the Ipswich
2    River following hydraulic gradient."
3        Q.    That's what you've been explaining here, about
4    migration to the Ipswich River.
5        A.    Yes.
6        Q.    Does it then refer to the groundwater
7    treatment system?
8        A.    Yes.
9        Q.    What does it say about that, starting with
10   "however"?  The middle of that paragraph.
11       A.    Well, the second sentence says, "VOCs are
12   currently not detectable in the river due to the
13   groundwater treatment system."
14       Q.    What does that mean?
15       A.    We were collecting samples from surface water
16   in the river, and due to operation of the groundwater
17   extraction system, it was preventing the discharge of
18   those contaminants to the river. As long as it was
19   operating, we weren't finding anything in the river.
20       Q.    As a result of that, does it say there was no
21   exposure of aquatic species in the river to VOCs present
22   in groundwater?
23       A.    Yes.
24       Q.    And then the next sentence says what?
25       A.    It says, "However, the groundwater treatment

121

1    system is a temporary measure. Upon termination of this
2    treatment system, further analysis of the surface water
3    will be necessary to determine the potential for
4    exposure of the aquatic species."
5        Q.    Go on, please.
6        A.    "There are detectable concentrations of VOCs
7    in sediments, but these concentrations are unlikely to
8    result in adverse effects in the aquatic species."
9        Q.    Can I ask you to go to Page 4 -- I'm sorry,
10   Page 5, and the section on PCBs.
11           MR. PIROZZOLO:    I'm sorry, Your Honor, I
12   didn't appreciate Your Honor's ruling on burrowing
13   animal.
14           THE COURT:    We've had a chance to burrow into
15   that. It was avoided, and now we'll keep marching on.
16           MR. PIROZZOLO:    I will pass that, Your Honor.
17       Q.    Do you have the two plans, Exhibit 150 and
18   Exhibit 151, handy?
19       A.    Yes.
20           MR. PIROZZOLO:    Can you project them one at a
21   time. First would you project the title block of 150.
22       Q.    Before I ask you about the plans specifically,
23   Mr. Ash:  As part of your training as an engineer, have
24   you learned to read plans and understand them?
25       A.    Yes.